IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL KULAKOWSKI,             )
                                )
    Plaintiff,                  )
                                )
vs.                             ) CASE NO.
                                ) 3:16-CV-02510
                                )
WESTROCK SERVICES, INC.,        )
                                )
    Defendant.                  )

DEPOSITION OF

JEB BELL

Taken on Behalf of the Plaintiff

December 18, 2017

Commencing at 1:00 p.m.

Reported by: Elisabeth A. Miller Lorenz, RMR, CRR
Tennessee LCR No. 66
Expires: 6/30/2018

```
 1                    JEB BELL
 2  was called as a witness, and after having been first
 3  duly sworn, testified as follows:
 4                  E X A M I N A T I O N
 5  BY MS. COLLINS:
 6  Q        Could you state your full name for the
 7  record, please?
 8  A        James Ellingwood Bell, Jr.
 9  Q        And do you go by Jeb?
10  A        Uh-huh.
11  Q        Okay.  What is your address?
12  A        25 Adair Road, Jackson, Tennessee, 38305.
13  Q        And what is your phone number?
14  A        (731)694-7591.
15  Q        Where do you currently work, Mr. Bell?
16  A        WestRock.
17  Q        How long have you been with WestRock?
18  A        I've been with WestRock and its legacy
19  companies since '97.
20  Q        What is your current job title?
21  A        I'm an area vice president.
22  Q        Are you an area vice president over a
23  particular area?
24  A        Area vice president of the midsouth.
25  Q        What do you do as area vice president over
```

1 the midsouth?

2 A      It's comprised of facilities in Mississippi,
3 Alabama, Tennessee.  There are 9 manufacturing
4 sites, 2 specialty sites; 11 facilities.  And I am
5 responsible for the P&L.  I have oversight of all
6 manufacturing, sales, engineering, design.
7       There's only two functions that don't report
8 to me directly but indirectly on a dotted line.
9 That would be the HR and the finance.

10 Q      But you said HR reports indirectly to you?
11 A      Yes.
12 Q      Through who?
13 A      I'm not following.
14 Q      You said they report indirectly.
15       How do they indirectly report to you?  Who
16 is it through?
17 A      There is an HR lead that is assigned to the
18 midsouth.  So there's an area HR manager who
19 functionally reports up through the HR function and
20 has a dotted line to the operational lead that they
21 are working with.
22 Q      How long have you been in this role as area
23 vice president of midsouth?
24 A      2014.  October or so of 2014.
25 Q      What was your job title before you were area

1 vice president of midsouth?
2 A    It's what they call business unit general
3 manager.
4 Q    As the area VP of the midsouth, are you over
5 the WestRock Gallatin plant?
6 A    Gallatin would be one of the facilities that
7 I have responsibility for.
8 Q    And what is the chain of command before it
9 gets to you from Gallatin?
10 A    There is a general manager of the facility,
11 there is a business unit general manager, and then
12 there's an AVP.
13 Q    Now, I'm specifically referring to the time
14 when Tommy Whited was there.
15     Was he the general manager?
16 A    Yes.
17 Q    Who is the business unit general manager
18 while he was there, specifically in 2016 and '15?
19 A    A gentleman by the name of Tom Pedine.
20 Q    As the area vice president of midsouth, do
21 you have authority to hire and fire employees?
22 A    Yes.
23 Q    What sort of situations would you typically
24 exercise that authority for?  Who -- who would you
25 typically exercise that authority for?

1 A      Hiring or firing?

2 Q      Yes.

3 A      Well, hiring would be a direct report to me;
4 would also be what I consider key functional
5 businesses -- leaders, whether that's a GM or a
6 plant manager.

7       On the sales side of it, sales managers, I
8 exercise veto power. I don't typically tell a
9 business leader that you're going to hire this
10 person. Then I own it; they don't. But if I have a
11 problem with them, I would exercise my veto.

12       In the case of terminations, they're
13 typically for nonperformance.

14 Q      Were you involved in the decision to
15 terminate Tommy Whited?

16 A      I was.

17 Q      Were you the final decision-maker?

18 A      No. I was one of several senior people who
19 made that decision.

20 Q      Who were the several senior people who made
21 that decision?

22 A      Gentlemen -- well, it would have gone all
23 the way to the chairman, Steve Voorhees; the
24 president of the corrugated packaging segment, which
25 would have been Jeff Chalovich; but the primary

1 would be Rick Parris, who I report to, who's the
2 senior vice president of the central region;
3 Jill Horner, who is the vice president of HR reports
4 to Jeff Chalovich; Joy Jones, who is the regional
5 HR, who reports to my boss -- or actually reports to
6 Jill but is assigned to be the HR lead for
7 Rick Parris.
8 Q     How did that process play out? Was there
9 some sort of form y'all had to check that you agreed
10 he should be terminated, Mr. Whited?
11 A     The decision to terminate Tommy came from
12 the results of an investigation that occurred from
13 an anonymous 800 call to the hotline. Investigation
14 ensued, and the findings from that investigation led
15 to his termination.
16 Q     Did all of the people that you just
17 mentioned, Rick Parris and Jill Horner and Joy Jones
18 and yourself, all have to agree; or did anyone
19 disagree that he should be terminated?
20 A     No one disagreed. It was consensus.
21      Do other voices outweigh others?
22      The most senior person in that decision
23 group would be Rick Parris, but there wasn't any
24 dissension at all.
25 Q     Did y'all have a phone conference to discuss

1  Q      Who typically gets those?
2  A      Go into an 800 number, and they're directed
3  either to the employment legal counsel, who
4  distributes to the HR leader of the business.  It's
5  typically contained within the HR and legal group.
6  Q      Are you familiar with Tommy -- had you --
7  well, are you familiar with WestRock's employment
8  policies?
9  A      Yes.
10 Q      And was one of the reasons he was terminated
11 due to a violation of its sexual harassment policy?
12 A      I would say it was conduct unbecoming of
13 leadership that was a violation of the core values
14 of the company.  There may have been kind of what we
15 perceived as workplace violence.
16 Q      What about his conduct was unbecoming?
17 A      Well, based on the investigation, there were
18 incidents where Tommy behaved in a manner that we,
19 you know, don't think holds respect or integrity.
20         There was the incident with Michael.  That
21 was probably the overwhelming issue.  There were
22 actions that he did with Michael.
23 Q      Was that considered by the company to be
24 sexual harassment since it was just directed towards
25 a male employee?

Q     And based on WestRock's policies, can horseplay constitute sexual harassment to your knowledge?

A     I suppose it could. It depends on the context that transpired.

Q     What would you consider horseplay to be?

A     Horseplay is behavior that is inappropriate for the workplace, so examples would be hitting, using language, banter that gets out of hand, arguments, but basically as it applies to create an unsafe work environment.

Q     When was the last time you went to the Gallatin plant before -- when it was still during Tommy Whited's tenure?

A     I try to go to facilities once every six to eight weeks. So I can't time-wise nail that down for you of when the investigation started.

Q     When you go to plants every six to eight weeks, is it announced ahead of time; or do you go there for a specific purpose?

A     Well, it's not always announced. But most of the time out of respect, I let folks know. I could be traveling in the area and show up. But the agenda is typically about operational performance.

Q     When you would go out to the Gallatin

1  Q       So to your knowledge, was there any sort of
2  investigation or additional oversight as a result of
3  the 2013 complaint against Tommy Whited?
4  A       I don't know.  I mean, I don't know the
5  complaint.
6          800 calls don't necessarily come through me.
7  They go to HR, and they investigate.  Whether I need
8  to be brought into the loop is a call that's made by
9  legal and HR.  Most calls come in anonymously, so...
10 Q       What typically would rise to the level where
11 you would get involved?
12 A       The -- as it applies to this, the call came
13 in anonymously -- anonymously for the complaint
14 about employees leaving Gallatin.  That really
15 didn't rise to the level of my involvement.
16         What transpired is when they went in to
17 investigate and discussed with employees, other
18 things began to come out.  That's when I was brought
19 further into the situation.
20 Q       Have you seen the 2013 complaint that was
21 made against Mr. Tommy Whited?
22 A       Not that I recall, no.
23 Q       First, let's go to -- if you could turn in
24 this book to Exhibit No. 15.
25 A       As it's in the tabs here?

1  HR was doing a -- you know, notifying that they were
2  doing an investigation.
3  Q       So you think HR did not notify him that he
4  was under investigation?
5  A       I can't -- I don't know.
6  Q       Did you notify him that he was under
7  investigation?
8  A       No, because at the point -- at the point in
9  time when the compliance call came in, it was about
10 employees leaving because of dissatisfaction to
11 work.
12         You know, I took it initially the complaint
13 or compliance call was a work-life balance issue.
14 People were working excessive overtime and were
15 quitting the job.
16         It's only after they began investigating,
17 you kind of open one door and the next door and
18 other things kept coming up, you began to understand
19 the severity of what was going on.
20 Q       And were you kept apprized along the way as
21 more and more egregious things came up?
22 A       There were -- the investigation, and then
23 there were conference calls that took place that I
24 was invited to or participated in.  But the -- the
25 actual investigation was led by the HR and legal

1  group.
2         So at what point they had the conference
3  calls or made the decisions to have the conference
4  calls, you know, I don't know.
5  Q      When you participated in those conference
6  calls, did you get, like, a meeting request for
7  that?  How did -- how were you notified that a
8  conference call was going to take place?  Was it put
9  on your calendar?
10 A      I believe it was put on my calendar.
11 Q      Would those dates that you participated in
12 conference calls still be reflected on your 2016
13 calendar?
14 A      I don't know.  I just -- I don't know.
15 Q      What HR person did you talk to directly
16 about the investigation?
17 A      My HR lead would have been Melinda McGraw.
18 Q      And is she still with the company?
19 A      No.
20 Q      Why did she leave?
21             MS. DOHNER SMITH:  Objection.
22 BY MS. COLLINS:
23 Q      Do you know why she left?
24 A      Yes, I do know why she left, but I don't
25 think it's germane to this.

1  shipping department.
2      The HR lead came to me and said that was
3  going on, and I stopped it.
4  Q      And was that because that could be
5  considered retaliation if he would have done that?
6  A      As ongoing investigation, yes, it would be
7  retaliation.  And there were no -- there were no
8  write-ups in Michael's employment, no things that
9  would corroborate a move or a demotion, because it
10 was going to, I think, impact pay as well.
11 Q      Why was Tommy Whited terminated?
12 A      Tommy was terminated because of not
13 conducting himself in a professional manner, that
14 the behaviors that the investigation found were
15 egregious enough for us to terminate a 40-year
16 tenured employee.
17     Hitting people in the groin goes beyond, you
18 know, appropriate behavior in the workplace.  It's
19 not just -- it's not just horseplay that you would
20 see in an organization that is that tight knit that
21 has worked together for that length of time as a
22 team.
23 Q      Were you there the day he was terminated?
24 A      I terminated Tommy.
25 Q      What did you tell him?

1 Were you involved in that decision?
2 A     I would have been involved in putting some
3 type of security service in. Again, we do that
4 where there is a termination and the potential that,
5 you know, an employee could, you know, come back
6 with a gun and shoot everybody, go postal.
7 Q     Right.
8       What led you to believe there was a level of
9 acrimony?
10 A     Well, we terminated a guy who's worked 40
11 years with the company and by all appearances was
12 highly successful. In his mind, he was successful.
13 Plant of the year, a good employee.
14 Q     Who would you say made the final decision to
15 terminate Tommy Whited?
16 A     I would say it was a consensus. But if
17 there's going to be one overriding voice in that
18 situation, it's going to be Rick Parris. He's the
19 senior vice president of it. But it's going to
20 be -- you know, legal is going to play a big part in
21 it.
22       At that point, though, it was really -- it's
23 just -- everyone knew he had to go. You can't
24 conduct yourself that way.
25 Q     Was he offered a severance to your

1 knowledge?

2 A      No.  He was terminated for cause.

3           MS. COLLINS:  All right.  We can take a
4 quick break off the record.  I'm going to review my
5 notes.

6           (Recess observed.)

7           MS. COLLINS:  Let's go back on the
8 record.

9 BY MS. COLLINS:

10 Q      Mr. Bell, if you could turn to Exhibit 16 in
11 the binder, and if you could turn to the second page
12 of that document.  It starts with 219.

13           (Presented Exhibit No. 16.)

14 BY MS. COLLINS:

15 Q      Just let me know when you've had a moment to
16 review that.

17 A      Am I reading the whole document or this
18 first page?

19 Q      If you want to -- well, first, have you seen
20 this document before?

21 A      This format doesn't look familiar.

22 Q      Okay.

23 A      But the information I've -- I've seen
24 before.

25 Q      But have you seen this particular form as it

# REPORTER'S CERTIFICATE

I, Elisabeth A. Miller Lorenz, RMR, CRR, Notary Public and Court Reporter, do hereby certify that I recorded to the best of my skill and ability by machine shorthand all the proceedings in the foregoing transcript, and that said transcript is a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

SIGNED this 21st day of December, 2017.

*Elisabeth A Miller Lorenz*

Elisabeth A. Miller Lorenz, RMR, CRR

My Notary commission expires: 3/10/2019

Tennessee LCR No. 66
Expires: 6/30/2018