IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MICHAEL KULAKOWSKI,                    )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    ) CASE NO.
                                       ) 3:16-CV-02510
                                       )
WESTROCK SERVICES, INC.,               )
                                       )
        Defendant.                     )
_____


DEPOSITION OF

TERRI HENLEY

Taken on Behalf of the Plaintiff

November 15, 2017

Commencing at 11:20 a.m.

_____

Reported by:  Jerri L. Porter, RPR, CRR
Tennessee LCR No. 335
Expires:  6/30/2018

1  Q       What is your job title?

2  A       Business unit HR manager.

3  Q       Have you been in that role since April of

4  2012?

5  A       No, ma'am.

6  Q       Okay.  How long have you been business unit

7  HR manager?

8  A       November of 2014.

9  Q       What was your job before that?

10  A       Senior HR rep.

11  Q       What is the difference between a business

12  unit HR manager and a senior HR rep?

13  A       When I was promoted to the BU HR manager, I

14  took on additional facilities, and also took on

15  salary employees.

16  Q       As the senior HR rep, were you just at the

17  Lewisburg plant?

18  A       No, ma'am.

19  Q       Which plant were you at?

20  A       I was at Lewisburg and I had Chattanooga.

21  Q       But you were still based out of the

22  Lewisburg plant?

23  A       Yes, ma'am.

24  Q       How many facilities are you over as the

25  business unit HR manager?

```
1    A       Four.

2    Q       Which four?

3    A       Chattanooga, Gallatin, Lewisburg,

4    Murfreesboro.

5    Q       Do you have anyone that reports to you?

6    A       No, ma'am.

7    Q       Who is your manager?

8    A       Regina Wimbley.

9    Q       How long has Regina been your manager?

10   A       I don't know the exact date.

11   Q       Who was your manager before Regina?

12   A       Melinda McGraw.

13   Q       Ms. McGraw was your manager in 2016, right?

14   A       Yes.

15   Q       Was she your manager in 2015?

16   A       Yes.

17   Q       What about 2014?

18   A       Yes.

19   Q       Okay.  So, Ms. Wimbley probably became your

20   manager sometime 2017?

21   A       Yes.

22   Q       When Ms. McGraw was your manager, where was

23   she based?

24   A       Humboldt, Tennessee.

25   Q       What was her job title?
```

1   A       Atlanta.

2   Q       Okay.  Is that where WestRock's main offices

3   are, corporate offices?

4   A       No.  Norcross.

5   Q       Okay.  Norcross, Georgia?

6   A       Yes.

7   Q       So, when you became the business unit HR

8   manager, that included the Gallatin plant, and that

9   was in 2012, I think you said, right?

10  A       No.

11  Q       Oh.  When was that?

12  A       November 2014.

13  Q       So, November 2014 was the first time you

14  were over the -- or you were the HR person for the

15  Gallatin plant, right?

16  A       Yes.

17  Q       Who preceded you in that position?

18  A       I don't know.

19  Q       So, when you became the business unit HR

20  manager for the Gallatin plant in November of 2014,

21  after that point, how many times would you go out to

22  the plant?  Or how frequently?

23  A       I estimate an average of once a month.

24  Q       Was that the same in 2015?

25  A       Yes.

1   sexual harassment, right?

2               MS. DOHNER SMITH:  Objection.

3               THE WITNESS:  It depends.

4   BY MS. COLLINS:

5   Q       On what?

6   A       The nature of the horseplay.

7   Q       Tell me what you would define horseplay to

8   be.

9   A       Goofing around.

10  Q       I'm talking about grabbing other employees

11  in their private parts or hitting them in their

12  private parts, that type of horseplay could be

13  considered sexual harassment, correct?

14              MS. DOHNER SMITH:  Objection.

15              THE WITNESS:  It could be.

16  BY MS. COLLINS:

17  Q       And horseplay is a violation of WestRock's

18  code of conduct, right?

19  A       Yes.

20  Q       And can an employee be disciplined for

21  engaging in horseplay in the workplace?

22  A       Yes.

23  Q       And pursuant to this policy that we've been

24  talking about, employees who believe they've been

25  harassed, they can talk directly to the harasser and

1  Michael Kulakowski getting hit in the workplace?

2  A       No supervisor prior to, yes.

3  Q       Now I'm going to skip back to Page 11 again.

4  Well, no.  I'm going to jump forward to Page 7, the

5  compliance hotline.

6          Tell me what this is for, Page 7.

7  A       The compliance hotline?

8  Q       Uh-huh.

9  A       It's another avenue for employees to report

10  inappropriate behavior or concerning behavior,

11  anything that they think may be inappropriate

12  violation of company policy.

13  Q       Okay.  And is this posted in the workplace,

14  this compliance hotline paper?

15  A       Yes.

16  Q       Where is it posted?

17  A       On the bulletin boards.

18  Q       Okay.  And what is posted, does it look just

19  like this page, Page 7?

20  A       What's posted today?

21  Q       No.  What was posted in, I don't know,

22  2015/2016.

23  A       Yes.

24  Q       It looks like this document right here

25  that's Page 7?

Case 3:16-cv-02510   Document 32-16   Filed 01/26/18   Page 6 of 22 PageID #: 233

Page 40

```
 1   A        Yes.

 2   Q        Is it different now?

 3   A        It has WestRock at the top, yes.

 4   Q        Okay.  Now, you would agree with me that

 5   nowhere on this piece of paper does it say

 6   complaints regarding sexual harassment should -- can

 7   be reported to this phone number?

 8   A        It does not specifically say sexual

 9   harassment.

10   Q        Okay.  Has -- to your knowledge, has

11   WestRock ever disciplined an employee for not

12   reporting harassment or assault?

13   A        I don't recall.

14   Q        Other than handing out employee handbooks,

15   do y'all make one accessible to employees in the

16   workplace?

17   A        Yes.

18   Q        Where do y'all keep them?

19   A        Breakroom.  And the intranet has WestRock

20   policies on there that they have access to.

21   Q        Was that the same in 2015 and 2016?

22   A        Yes.  We have HR kiosks.

23   Q        Is it the same at the fulfillment center?

24   A        Yes.

25   Q        Have you ever been involved in a termination
```

1    A      Melinda McGraw.

2    Q      But you're not aware of any complaints from

3    women about Tommy Whited kicking or hitting them in

4    the groin?

5    A      I am not.

6    Q      Okay.  So is it fair to say that you only

7    have knowledge about men working at WestRock being

8    kicked or hit in the groin by Tommy Whited?

9    A      Yes.

10    Q      And you agree that was a violation of

11    WestRock's policies for him to do that?

12    A      Yes.

13    Q      Tell me about when you first found out --

14    how it came about that y'all investigated Tommy

15    Whited in August of 2016.

16    A      I was asked to check into a Speak Up! e-mail

17    that was received at corporate.

18    Q      So, that was not a Global Compliance hotline

19    complaint?  It was something different?

20    A      Yes.

21    Q      Okay.  When did y'all start this Speak Up!

22    e-mails?

23    A      The company?

24    Q      That you know of.

25    A      I don't recall.

1   Q       What is the Speak Up! e-mails?  What do you

2   mean by that?

3   A       It's another avenue for employees to report

4   any concerns, ideas, suggestions, things of that

5   nature, via e-mail, anonymously, or you can put your

6   name to it, if you like.

7   Q       Who made the -- who sent the Speak Up!

8   e-mail?

9   A       Who sent it?

10  Q       Who was it from?  Was it anonymous or did it

11  have a name identified with it?

12  A       I believe it was anonymous.

13  Q       Okay.  Well, then what happened once you got

14  that?

15  A       I came to the -- well, I made a couple of

16  phone calls to employees referenced in the e-mail.

17  Q       Who did you call?

18  A       I attempted to call Ken Buckmaster, and I

19  called Johanna Crowder.

20  Q       Anyone else?

21  A       Eventually, yes.

22  Q       Okay.  So, when you called these people,

23  what did you find out?

24  A       Buckmaster never responded, so I never spoke

25  with him.  And my conversation with Johanna was

1   based on her exit interview.  She was leaving.

2   Q      Okay.  What did you find out there?

3   A      She was leaving for another opportunity, and

4   she wasn't happy with the current work environment.

5   Q      Okay.  What was she not happy about?

6   A      I don't recall specifically.

7   Q      What do you recall generally?

8   A      Hours.  That's all I recall.

9   Q      Okay.  So, what about those two phone calls

10  led you to investigate further?

11  A      I went to the facility to speak to Johanna

12  in person.

13  Q      Okay.  What about you speaking with her in

14  person led you to investigate further?

15  A      She indicated there was someone else that

16  wanted to speak to me.

17  Q      Who?

18  A      That was Helen Kendall.

19  Q      Okay.  And did you speak with Helen?

20  A      I did.

21  Q      Okay.  What did Helen have to say?

22  A      She brought forth some items about an

23  employee being paid when he wasn't at work, alleged

24  that Tommy was having an affair with a subordinate.

25  That's all I recall.

1   Q      Okay. How long was your meeting with

2 Johanna when you first met with her?

3   A      I don't remember.

4   Q      Just about, approximate? Less than an hour?

5 More than an hour?

6   A      I would say at least 30 minutes.

7   Q      Okay. Did you take notes?

8   A      Yes.

9   Q      What kind of notes?

10   A      What do you mean?

11   Q      Did you handwrite them, did you record the

12 meeting, did you --

13   A      No. I typed those notes.

14   Q      Did you type them at the time?

15   A      Yes.

16   Q      And with Helen, when you met with her --

17 first, where did you meet Johanna?

18   A      In the conference room at the sheet plant.

19   Q      Okay. And when you met with Helen, where

20 did you meet her?

21   A      Same location.

22   Q      Did you take handwritten notes or type

23 notes?

24   A      Typed.

25   Q      Did you type them at the time?

1  A       Yes.

2  Q       Okay.  So based on these two conversations,

3  what did you do next?

4  A       I spoke with Gary Pagels, because I was told

5  that he wanted to speak to me.

6  Q       Gary who?

7  A       Pagels.

8  Q       Okay.  Is he out at the sheet plant or

9  fulfillment center?

10 A       Sheet.

11 Q       All right.  What did he have to say?

12 A       He was frustrated with the performance of

13 the facility and the direction and communication

14 that the plant was currently at.

15 Q       Okay.  Anything else?

16 A       Not that I recall.

17 Q       Okay.  And then what did you do?

18 A       I don't remember exactly who I spoke with

19 next.

20 Q       How long was your meeting with Helen, about?

21 A       Oh, I would say at least 30 minutes.

22 Q       What about with Gary?

23 A       I would say about the same, at least

24 30 minutes.

25 Q       And you didn't record any of these meetings,

1  right?

2  A      Record?

3  Q      Record them.

4  A      No.

5  Q      Like I'm talking audio recording.

6  A      No.

7  Q      All right.  So you spoke with Gary, you

8  spoke with Helen, and you spoke with Johanna, and

9  you can't remember if you spoke with anyone else?

10  A      I know I spoke with other people.  I just

11  don't remember the exact order.

12  Q      Okay.  Did you speak with other people that

13  day or --

14  A      It may have been the next day.  It could

15  have been that afternoon.  I don't recall.

16  Q      And do you recall the others that you spoke

17  to?

18  A      I do.  Just not necessarily the order.

19  Q      Okay.  Who were they?

20  A      I had a conversation with Lana Potts, Jerry

21  Harville.  And I believe that was it.  I was there a

22  day or two back to back --

23  Q      Okay.

24  A      -- at the sheet plant in the conference

25  room.

1  Q      Were these the first round of sort of
2  initial interviews that you conducted to figure out
3  what was going on based on the -- that e-mail?
4  A      Yes.
5  Q      All right.  What did Ms. Potts have to say?
6  A      What I recollect is she stated that she had
7  witnessed Tommy kiss a subordinate.  She discussed
8  communication issues.  And she gave me the name of
9  Jerry Harville and Michael Kulakowski, and I don't
10 remember who else.
11 Q      Okay.  And did you type up your notes from
12 her conversation?
13 A      Yes.
14 Q      What did you do with the notes?
15 A      As in?
16 Q      Did you e-mail them or were they a Word
17 document or --
18 A      In an e-mail to have the date and time
19 stamp.
20 Q      Okay.  Did you just e-mail them to yourself?
21 A      Yes.
22 Q      Okay.  And about how long did the meeting
23 with Lana last?
24 A      At least 30 minutes.
25 Q      Okay.  Anything else you can recall about

1    Q      Do you recall if he said that it happened to
2    other people?
3    A      Yes.
4    Q      What did he say about that?
5    A      He gave me -- he told me to speak with
6    Michael Kulakowski, and I don't remember if anyone
7    else.
8    Q      Okay.  Other than telling you to speak with
9    Michael Kulakowski because the same thing had
10   happened to him --
11                  MS. DOHNER SMITH:  Objection.
12   BY MS. COLLINS:
13   Q      -- anything specific that you can recall
14   about why he thought you needed to talk to Michael
15   Kulakowski?
16   A      I can't remember his exact words.
17   Q      Okay.  All right.  And after you met with
18   these people, Ms. Potts, Mr. Harville, Gary, Helen,
19   and Johanna, what did you do after that?
20   A      I don't remember the exact timeline.  I
21   would have called in a report to my boss, and I know
22   that I came back to the facility, because the best I
23   recall, this was maybe at the end of the week, and I
24   came back maybe that following Monday and/or
25   Tuesday.  I don't know the exact dates.  So I spoke

1   to other people.

2   Q      Okay.

3   A      I specifically remember calling Kuli,

4   because he was on vacation.

5   Q      And when you say Kuli, just for the

6   record --

7   A      Michael Kulakowski.

8   Q      Right.  It's just for the record.  Everybody

9   else calls him Kuli, too.

10         Before we get into this, let's take a quick

11  break.

12              (Recess observed.)

13  BY MS. COLLINS:

14  Q      Now, Ms. Henley, were you aware that another

15  complaint had been made about Tommy Whited sexually

16  harassing an employee in 2013?

17  A      No.

18  Q      Okay.  I'll ask you about this specifically.

19              MS. COLLINS:  Let's mark this next

20  document as Exhibit Number 15.

21              (Marked Exhibit No. 15.)

22  BY MS. COLLINS:

23  Q      Just let me know when you've had a chance to

24  review this.

25  A      (Reviewing document.)  Okay.

1  him on the phone conversation.

2  Q       What do you mean?

3  A       I thought that he meant that Tommy had

4  grabbed his zipper.  I misunderstood him.  He later

5  explained -- and I don't recall if it's in this --

6  that Tommy grabbed his own zipper while going into

7  the bathroom.

8  Q       And said something -- it says, "shake in his

9  pants."  "Asking him to come into the bathroom to do

10 this; shake in his pants."

11 A       Grab the zipper, shook it, like his pants.

12 Q       So it was like he was requesting

13 Mr. Kulakowski come in the bathroom with him?

14 A       I don't know exactly what he was doing.

15 Q       Is that what you took that to mean?

16 A       Repeat it, the question.

17 Q       Is that what you took that to mean, that he

18 was shaking his -- that Mr. Whited was shaking his

19 groin area and telling him to come into the

20 bathroom?

21              MS. DOHNER SMITH:  Objection.

22              THE WITNESS:  I don't know what Tommy

23 meant, so I don't know.

24 BY MS. COLLINS:

25 Q       But if Mr. Whited was shaking his -- shaking

1            MS. COLLINS:  Okay.  That's all I have.

2            MS. DOHNER SMITH:  Unfortunately, I

3    have a few.

4                    E X A M I N A T I O N

5    BY MS. DOHNER SMITH:

6    Q       Ms. Henley, just a moment ago you were asked

7    about whether or not Tommy Whited was placed on

8    suspension during the investigation or whether

9    Mr. Kulakowski had to continue to work on him.

10           Mr. Kulakowski was actually on vacation at

11   the time that the investigation took place, correct?

12           MS. COLLINS:  Objection to form.

13           THE WITNESS:  He was on vacation at

14   some point during the investigation, yes.

15   BY MS. DOHNER SMITH:

16   Q       If you look on Exhibit 28, Tom Pedine had

17   asked you about Donnie Taylor confirming

18   Mr. Kulakowski's allegations on August 29th.  And

19   Mr. Whited was terminated the very next day,

20   correct, on August 30th?

21   A       According to Number 24, separation notice.

22           MS. COLLINS:  I'm just going to object

23   to form, just due to the inconsistency in the date

24   beside the initial --

25           MS. DOHNER SMITH:  Well, it says at the

1  his next step is out the door, that is something

2  that would have happened before he made that report

3  to you, correct?  If he was reporting it, it had to

4  have happened before?

5  A      Yes.

6  Q      Jerry Harville is not a member of

7  management, correct?  He's an hourly employee?

8  A      Correct.

9  Q      And he has no managerial authority?

10  A      Correct.

11  Q      Earlier you were asked if Tommy Whited shook

12  his groin and asked for sexual favors, would that be

13  a violation of the harassment policy, and you said

14  yes.

15          Did Mr. Kulakowski ever report to you that

16  Tommy Whited shook his groin and asked for sexual

17  favors from him?

18  A      No.

19  Q      Despite the fact that Mr. Whited denied

20  allegations that he kicked and hit employees in the

21  groin, he was terminated, correct?

22              MS. COLLINS:  Objection to form.

23              THE WITNESS:  Yes.

24  BY MS. DOHNER SMITH:

25  Q      If you take a look at Exhibit 22, what is

1  Mr. Whited was let go?

2  A       Yes.

3  Q       If you could grab for us, I think it was

4  Number 4.

5              (Presented Exhibit No. 4.)

6  BY MS. DOHNER SMITH:

7  Q       If you turn to Page 7, you were asked about

8  the complaints hotline not saying anything specific

9  about harassment.  But it does say, "Complaints

10 about suspected violations by any RockTenn

11 employee...of any law or of any RockTenn code of

12 business conduct and ethics."

13 A       Yes.

14 Q       So it basically covers anything.

15 A       Yes.

16 Q       Okay.  And if you turn to Pages 11 and 12 of

17 the harassment policy, throughout here it actually

18 says, call the compliance hotline, correct?

19 A       Yes.

20 Q       It actually says it a number of times?

21 A       Yes.

22 Q       Okay.  Now, in the policy, it says if a

23 manager is involved, harassment should be reported

24 to local HR.

25              Prior to August of 2016, did Michael

1  Kulakowski ever report anything to you indicating he

2  had been sexually harassed?

3  A      He did not.

4  Q      When Mr. Kulakowski met with you and talked

5  with you in August of 2016, did he ever tell you he

6  had been sexually harassed?

7               MS. COLLINS:  Objection to form.

8  BY MS. DOHNER SMITH:

9  Q      Did he use those words?

10 A      I don't recall.

11 Q      If that had been something he had said,

12 would you have put it in your notes?

13 A      Yes.

14              MS. COLLINS:  Objection to form.

15 BY MS. DOHNER SMITH:

16 Q      Earlier you answered a question that Michael

17 Kulakowski told you he had -- or that Michael

18 Kulakowski had reported to you that on numerous

19 occasions, he had been hit or kicked and it had been

20 witnessed by managers.

21              Was he saying he had reported that on

22 numerous occasions or that it had happened on

23 numerous occasions?

24 A      It had happened on numerous occasions.

25 Q      Is the safety coordinator position a

Page 130

REPORTER'S CERTIFICATE

1

2

3        I, Jerri L. Porter, RPR, CRR, Notary

4  Public and Court Reporter, do hereby certify that I

5  recorded to the best of my skill and ability by

6  machine shorthand all the proceedings in the

7  foregoing transcript, and that said transcript is a

8  true, accurate, and complete transcript to the best

9  of my ability.

10        I further certify that I am not an

11  attorney or counsel of any of the parties, nor a

12  relative or employee of any attorney or counsel

13  connected with the action, nor financially

14  interested in the action.

15        SIGNED this 27th day of November, 2017.

16

17

18

19

20  _____

21        Jerri L. Porter, RPR, CRR

22  My Notary commission expires:  2/19/2018

23  Tennessee LCR No. 335
    Expires:  6/30/2018

24

25