IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MICHAEL KULAKOWSKI,                    )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )CASE NO.
                                       )3:16-CV-02510
                                       )
WESTROCK SERVICES, INC.,               )
                                       )
        Defendant.                     )
_____

VIDEOTAPED DEPOSITION OF

WILLIAM LEE "TOMMY" WHITED

Taken on Behalf of the Plaintiff

December 21, 2017

Commencing at 9:14 a.m.

_____

Reported by:  Jerri L. Porter, RPR, CRR
Tennessee LCR No. 335
Expires:  6/30/2018

Case 3:16-cv-02510  Document 32-20  Filed 01/26/18  Page 1 of 34 PageID #: 361

1          E X A M I N A T I O N

2     BY MS. COLLINS:

3     Q         Good morning.  Could you state your complete

4     name for the record, please?

5     A         William Lee Whited.

6     Q         And Mr. Whited --

7     A         I'm sorry.  They call me Tommy.

8     Q         Okay.  Mr. Whited, what is your address?

9     A         I live at 271 Greenfield Lane, in

10    Castalian Springs, Tennessee.

11    Q         What is that zip code?

12    A         37031.

13    Q         And what is your phone number?

14    A         My cell phone number is (615)948-1956, and I

15    do not have a landline at home.

16    Q         Okay.  What is your date of birth?

17    A         April 3rd, 1953.

18    Q         Are you currently employed?

19    A         I am not.

20    Q         Where was -- where were you last employed?

21    A         With WestRock.

22    Q         When did that employment end?

23    A         That was August 30th of 2016.

24    Q         Okay.  At the time that you were terminated,

25    what was your job title?

1   A       I was the general manager for the Gallatin
2   plant operations.
3   Q       The Gallatin plant operations, that refers
4   to two facilities, the sheet plant and the
5   fulfillment center, correct?
6   A       That's correct.
7   Q       Okay.  How long were you in that position?
8   A       I took that position in, I believe it was
9   1986.
10  Q       Of those two facilities, where was your
11  office located?
12  A       Actually, my office was at the sheet plant.
13  Q       Okay.  How much time in the last two years
14  of your employment did you spend at the fulfillment
15  center?
16  A       The majority of my time in that -- in the
17  last year was probably at the fulfillment center.
18  Q       Why was that?
19  A       We had taken on some -- an account for GE,
20  General Electric, piece of business there that
21  required the installation of a one of a kind piece
22  of equipment that -- and I was asked by my boss to
23  get it up and running and make the thing successful.
24  Q       Okay.  And so that was in 2016 that you
25  spent most of your time at the fulfillment center?

1  A       Yes, that's correct.  Prior to that, it was
2  kind of split between the two.
3  Q       What was the percentage prior to that?
4  A       You know, it's really difficult to say.  I
5  was back and forth between the two.  I probably
6  spent 70 percent of my time at the sheet plant.
7  Q       When did y'all get that piece of equipment
8  so that you started spending more time at the
9  fulfillment center?
10 A       The piece of equipment was delivered during
11 the holidays, and we started installation on
12 January 4th of 2016.
13 Q       Who was your immediate supervisor?
14 A       Tom Pedine.
15 Q       In the hierarchy at WestRock, were you the
16 highest ranking management official at the Gallatin
17 facility?
18 A       On a daily basis, yes.
19 Q       How often was Tom Pedine at the Gallatin
20 plant in 2015/2016?
21 A       I'm going to have to guess.  I don't
22 remember exactly, but Tom probably visited the plant
23 three or four times.
24 Q       Who was the HR person assigned to the
25 Gallatin plants in 2015/2016?

1    Q        And when you say corporate, where are you

2    referring to?

3    A        Our home office was in Norcross, Georgia.

4    Q        A moment ago you mentioned surveys.  When

5    the employees did these annual surveys, did you

6    receive a summary of the results of those surveys?

7    A        Yes.

8    Q        What sort of information did the summary

9    provide?

10   A        It was primarily a rating on a variety of

11   topics that told us how we were doing.

12   Q        Did you get any specific feedback other than

13   a rating?  Like examples of comments employees had

14   made without --

15   A        Yes.  There was a comment section in the --

16   at the -- I think it was at the end of the survey,

17   there were comments in there.

18   Q        Would it identify who had made the comment?

19   A        Would it -- as far as having their names?

20   Q        Yes.

21   A        No, no.

22   Q        As the -- as the general manager of the

23   Gallatin facilities, were you typically made aware

24   of complaints, of employee complaints?

25   A        I -- I can't tell you that I was aware of

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 5 of 34 PageID #: 365

1  head?

2  A       No.

3  Q       Did you ever kick him in the workplace?

4  A       No.

5  Q       Did you ever hit him with a broom?

6  A       No.

7  Q       Did you do that to any other employees,

8  either -- did you ever hit any other employees in

9  the groin area?

10  A       No.  Well, what -- what we did -- and I'll

11  give you a bit of an explanation.  But if there

12  was -- we would make moves that solicited a response

13  that was similar to goosing somebody in the ribs

14  maybe.  But you never -- you never actually made

15  contact.

16  Q       What do you mean, that solicited -- you

17  would make a move that solicited a response?

18  A       Oh, my goodness.  You know, maybe you'd

19  (indicating), you'd do that (indicating), like

20  you're -- you know, like you're saying -- I don't

21  know how to explain that.

22  Q       So you would take your hand and act like you

23  were backhanding someone?

24  A       Yes.

25  Q       But you wouldn't actually make contact --

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 6 of 34 PageID #: 366

1  A       At -- no.  At them, yes, like I described,
2  yes, we'd do that.  But no, I -- I did not hit them.
3  The incident that I told you about with Jerry
4  Harville was an accident that happened, as I said,
5  as he stepped forward.  I don't remember ever making
6  any contact with anybody else.
7  Q       Did you ever knock Michael Kulakowski's hat
8  off his head or slap his hat off his head?
9  A       Nope, not that I remember, no.
10 Q       Have you ever kneed Michael Kulakowski in
11 the groin?
12 A       I have gone through the motion, just as with
13 the backhand flick (indicating), gone through the
14 motions, but never hit him.
15 Q       You've gone through the motions of kneeing
16 him in the groin?
17 A       Yes.
18 Q       Why?
19 A       We were -- in the working environment that
20 we had, a lot of us had worked together for a number
21 of years, and we were friends.  And it was just a
22 matter of simple camaraderie that we cut up with --
23 you know, with each other within our group of
24 friends.  Michael Kulakowski was a part of that
25 group of friends.

1    Q       Do you remember Michael Kulakowski telling
2    you to stop that?
3    A       No.
4    Q       Would you consider that horseplay in the
5    workplace?
6    A       No.
7    Q       What would you consider it?
8    A       My definition of horseplay is creating a
9    situation or actions that cause somebody to be hurt
10   or the potential for an unsafe condition.
11   Q       And you're saying you did not engage in that
12   in the workplace?
13   A       No, I did not.
14   Q       Did you do that with women that worked out
15   there, pretend like you were going to knee them or
16   slap them in the groin?
17   A       Oh, no.  No.
18   Q       Would you say there's a culture of horseplay
19   out at the Gallatin plants when you were general
20   manager?
21                   MS. DOHNER SMITH:  Objection.
22                   THE WITNESS:  No.
23   BY MS. COLLINS:
24   Q       Did you ever kick Mike Eden in the
25   workplace?

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 8 of 34 PageID #: 368

1  Kulakowski so hard that he fell to the ground and
2  couldn't breathe?
3  A      Oh, my goodness, no.
4  Q      And Michael Kulakowski did not hit you back,
5  right?
6  A      Yes, he did.  This was -- what I'm
7  describing is what we did with each other.
8  Q      Okay.  Did he hit you back physically, make
9  contact with you?  Michael Kulakowski, did he ever
10 hit you back, make physical contact with you?
11 A      Not in the groin area, if that's what you're
12 asking.
13 Q      Anywhere on your body?
14 A      Oh, slap me on the shoulder or, you know,
15 that type thing, yes.
16 Q      Did you write him up for that?
17 A      No.
18 Q      Did you document it in any way?
19 A      No.
20 Q      Did you ever cuss out Michael Kulakowski in
21 the workplace?
22 A      No.
23 Q      Did you ever call him a stupid Polak?
24 A      I don't remember ever calling him that, no.
25 I remember him calling himself that, but I don't

1  Q       Did you ever ask employees to come in and

2  get some work done off the clock?

3  A       Did I ask them what?

4  Q       Ask them to come in and get work done off

5  the clock?

6  A       No.

7  Q       Did you discourage employees from taking

8  vacation days?

9  A       I'm sorry.  I'm --

10  Q       Yeah.  Did you discourage employees from

11  taking vacation days?

12  A       No.  Absolutely not.

13  Q       Do you recall telling any employee out there

14  that you could leave now if you don't like how I run

15  things, you have to do things my way?

16  A       No, I've never told anybody that.

17  Q       Did you ever call Michael Kulakowski a

18  stupid son of a bitch?

19  A       No.

20  Q       If multiple employees stated that you

21  physically slapped them in the groin area, do you

22  have a basis to dispute that?

23              MS. DOHNER SMITH:  Objection.

24              THE WITNESS:  Yeah.  It's like I said

25  earlier, there were a group of us who had worked

1  together for years, and we were -- we were all

2  friends.  We had -- in the course of our working

3  relationship, we made gestures toward each other

4  like we were going to hit each other.

5       It was -- this was just our -- I don't

6  know what you call it.  It was just our camaraderie.

7  There was -- I don't know what to tell you other

8  than there was -- if anybody hit anybody, it would

9  have been totally by accident, because I don't

10  believe there was any intentional harm meant toward

11  anybody.

12  BY MS. COLLINS:

13  Q     Do you think that behavior was in

14  conformance with WestRock's policies?

15  A     I think it was.

16  Q     Do you recall ever telling an employee that

17  the horseplay stops now because another employee was

18  terminated for horseplay at another plant?

19  A     I do, uh-huh.

20  Q     Tell me about that.

21  A     I know there was a -- I read about a

22  situation with our Murfreesboro facility where an

23  employee was terminated after -- well, I shouldn't

24  say after.  But he was terminated, and I think there

25  was a law -- well, I know there was a lawsuit that

1   physical contact with one person on one occasion; is

2   that correct?

3   A       That's the only one I remember.

4   Q       And you don't recall any employee ever

5   telling you to stop doing that?

6   A       No, no.

7   Q       Do you think allowing horseplay like that in

8   the work environment is consistent with WestRock's

9   policies?

10  A       I still don't consider what we were doing to

11  be horseplay, as I understand horseplay.

12  Q       Were you aware that WestRock had a policy

13  prohibiting assault in the workplace?

14  A       Yes.

15  Q       And you didn't consider that behavior

16  assault?

17  A       No.

18  Q       Do you recall an incident in the shipping

19  office where Michael Kulakowski was bent over

20  looking at the computer and you came in and reached

21  your hand between his legs and grabbed his balls?

22  A       I do not, no.

23  Q       Is it that you just don't remember it or it

24  did not happen?

25  A       It didn't happen.

1  boss, correct?

2           MS. COLLINS:  Objection to form.

3           THE WITNESS:  Really didn't have her as

4  a boss, I don't think.  She worked directly with

5  Terri.

6  BY MS. DOHNER SMITH:

7  Q       She would pass information on to Terri?

8  A       Okay.

9  Q       Correct?

10 A       Yes, that's true.

11 Q       Okay.  There wasn't actually a local HR

12 representative, and so Helen was the one who would

13 pass questions on, pass information on, get forms

14 from HR to give to employees, correct?

15 A       Right.

16          MS. COLLINS:  Objection to form.

17 BY MS. DOHNER SMITH:

18 Q       So she wasn't really technically an HR

19 person, she was the person there kind of being the

20 go-between, between the plant and HR?

21 A       Yes.  Helen had a number of

22 responsibilities.  That was -- that communication

23 piece was part of it.

24 Q       Okay.  Now, the surveys that took place at

25 the Gallatin facility, those were actually biannual,

Case 3:16-cv-02510  Document 32-20  Filed 01/26/18  Page 13 of 34 PageID #: 373

1  correct?  They weren't every year?

2  A       Employee surveys?

3  Q       Uh-huh.

4  A       I think they missed the prior year.  I

5  really can't recall.

6  Q       Okay.  So if other people in the corporate

7  structure testified that they're done biannually,

8  you would have no reason to --

9                (Overlapping speech.)

10 A       I have no reason to say that's wrong.

11               MS. COLLINS:  Objection to form.

12 BY MS. DOHNER SMITH:

13 Q       In 2015, the company changed from RockTenn

14 to WestRock, correct?

15 A       True.

16 Q       And when that took place, corporate sent out

17 HR to do code of conduct training at the facility,

18 correct?

19 A       For --

20 Q       For employees.

21 A       You know, I don't remember that.

22 Q       Okay.  Could have happened, you just don't

23 remember it?

24 A       Could be, could be.

25 Q       All right.  Earlier you were talking about

1  this group, I think you called it, a group of

2  friends.

3  A      Uh-huh.

4  Q      Was Mr. Kulakowski your friend?

5  A      Oh, yes.

6  Q      Okay.  And you talked about the conduct you

7  said was camaraderie, where you would pretend or

8  make a movement like you were going to hit somebody

9  but not actually make contact?

10 A      Right.

11 Q      Would Mr. Kulakowski engage in that as well?

12 A      Yes.

13 Q      Would he -- who would he engage in that type

14 of behavior with?

15 A      Oh, shucks.  Pretty much anybody in the

16 group.  Terry Stafford, J.R., myself, Donnie Taylor.

17 And I'm sorry, I just can't remember all of them off

18 the top of my head, but it was -- it was a number of

19 folks, yeah.

20 Q      And was that something that was contained

21 just within your group of friends?

22 A      It was -- we didn't -- you didn't do that

23 kind of thing with a newcomer.  You know, that --

24 that could -- maybe they would not understand what

25 was going on.  But there were some of us who had

1 worked together for a number of years, and that's --
2 it was -- well, that's all it was, camaraderie in a
3 group of friends.
4 Q     So you didn't mean it to be harmful in any
5 way?
6 A     Oh, absolutely not.
7 Q     And you didn't mean to hurt anybody
8 physically --
9 A     No.
10 Q     -- in any way?
11           MS. COLLINS:  Objection to form.
12 BY MS. DOHNER SMITH:
13 Q     Was that meant to be sexual in nature at
14 all?
15 A     No.
16           MS. COLLINS:  Objection to form.
17 BY MS. DOHNER SMITH:
18 Q     As of August 30th, 2016, you didn't have
19 any intent to resign at that time, did you, as of --
20 A     No.
21 Q     -- August 30th?
22       The only reason you would have considered a
23 voluntary resignation is because you were told you
24 were being terminated?
25 A     Yes.

Case 3:16-cv-02510  Document 32-20  Filed 01/26/18  Page 16 of 34 PageID #: 376

1    workforce?

2    A        You know, he would -- Mr. Kulakowski would

3    use -- you know, he'd drop the F word, you know.  I

4    really can't pin them down.  I just -- the same type

5    of thing a bunch of redneck guys do.

6    Q        Okay.  You were asked some questions about

7    whether you would pretend like you were going to hit

8    Mr. Kulakowski with your truck or if you actually

9    hit him.  I think that was a do you recall question.

10            Did you ever act like you were going to hit

11   him with your truck or hit him with your truck?

12   A        No, I've never hit him with the truck, I'm

13   sure.  And no, I never -- I never made any attempt

14   to run over Mr. Kulakowski, no.  I think that's what

15   you asked.

16   Q        Yes.  You were asked about an incident in

17   the shipping office and whether you recalled

18   throwing Mr. Kulakowski across a desk.  Is that

19   something you just don't recall or that didn't

20   happen?

21   A        No, I didn't -- I didn't do that.

22   Q        Okay.  Part of your job responsibilities as

23   the general manager would be to ensure that

24   WestRock's policies were complied with, correct?

25   A        Right.

1    Q        That includes the code of conduct?

2    A        Yes.

3    Q        That includes the anti-violence policy?

4    A        Yes.

5    Q        And that would include the anti-harassment

6    policy?

7    A        Yes.

8    Q        Hitting Mr. Kulakowski in his groin would

9    not be part of your job duties, would it?

10   A        No.

11   Q        That's not something you were employed by

12   the company to do, correct?

13   A        Correct.

14   Q        And I'm not saying you did it, but that

15   would not be anything that was serving to WestRock

16   in any way, correct?

17   A        Correct.

18   Q        And that's not something that WestRock would

19   expect from you as a general manager, correct?

20                  MS. COLLINS:  Objection to form.

21                  THE WITNESS:  As far as hitting?

22   BY MS. DOHNER SMITH:

23   Q        Actually hitting him in the groin.

24   A        Right.

25   Q        Okay.  And you were never authorized by

Case 3:16-cv-02510  Document 32-20  Filed 01/26/18  Page 18 of 34 PageID #: 378

1   anybody to slap Mr. Kulakowski in the groin,

2   correct?

3   A      Correct.

4   Q      Got to run through these with each of these.

5   I'm sorry; just bear with me.

6         Same thing with kicking Mr. Kulakowski in

7   the groin. That's not something that was part of

8   your job duties, correct?

9   A      Correct.

10   Q      It wasn't something you were employed to do,

11   correct?

12   A      Correct.

13   Q      That's not something that, if it happened,

14   was serving in any positive way to WestRock,

15   correct?

16            MS. COLLINS: Objection to form.

17   BY MS. DOHNER SMITH:

18   Q      It wasn't in service?

19   A      Right.

20   Q      That's not something that WestRock would

21   expect a general manager to do?

22            MS. COLLINS: Objection to form.

23            THE WITNESS: To?

24   BY MS. DOHNER SMITH:

25   Q      To kick Mr. Kulakowski in the groin?

Case 3:16-cv-02510  Document 32-20  Filed 01/26/18  Page 19 of 34 PageID #: 379

1   A       To actually hit?

2   Q       To kick him in the groin, to make contact

3   and kick him in the groin?

4   A       Right.

5   Q       And that's not something that WestRock

6   authorized you to do, kick him in the groin?

7   A       Right.

8   Q       We're going to run through the same thing

9   with grabbing of the groin.  That's not something

10  that's part of your job duties, correct?

11  A       Right.

12  Q       It's not something you were employed to do?

13  A       Correct.

14  Q       Doing that would not be in service to

15  WestRock in any way?

16              MS. COLLINS:  Objection to form.

17              THE WITNESS:  Correct.

18  BY MS. DOHNER SMITH:

19  Q       It's not something that WestRock would have

20  expected you to do?

21              MS. COLLINS:  Objection to form.

22              THE WITNESS:  Correct.

23  BY MS. DOHNER SMITH:

24  Q       And that's not something that WestRock would

25  have authorized you to do?

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 20 of 34 PageID #: 380

1   A        Correct.

2                MS. COLLINS:   Objection to form.

3   BY MS. DOHNER SMITH:

4   Q        Let's run through the same thing with

5   hitting Mr. Kulakowski with a broom.   That's not

6   something that would be part of your job duties?

7   A        Correct.

8   Q        Not something you were employed to do?

9   A        Correct.

10  Q        Not something that would be in service of

11  WestRock?

12               MS. COLLINS:   Objection to form.

13               THE WITNESS:   Correct.

14  BY MS. DOHNER SMITH:

15  Q        Not something WestRock would have expected

16  you to do?

17               MS. COLLINS:   Objection to form.

18               THE WITNESS:   I'm sorry.   I'm losing

19  you now.

20  BY MS. DOHNER SMITH:

21  Q        Sorry.   I think I'm getting a little softer.

22  Sorry about that.

23           Hitting Mr. Kulakowski with a broom, that's

24  not something WestRock would have expected you to

25  do?

1          MS. COLLINS:  Objection to form.

2          THE WITNESS:  No.

3   BY MS. DOHNER SMITH:

4   Q       And that's not something WestRock authorized

5   you to do?

6   A       No.

7   Q       Same thing with -- there's been an

8   allegation that you unzipped your pants, exposed

9   your penis and told Mr. Kulakowski to suck your

10  dick.

11         That's not something that would be part of

12  your job duties, correct?

13  A       No.

14  Q       That's not something you were employed to

15  do?

16  A       No.

17  Q       That's not something that would be in

18  service to WestRock in any way?

19          MS. COLLINS:  Objection to form.

20          THE WITNESS:  No.

21  BY MS. DOHNER SMITH:

22  Q       That is not something that WestRock

23  expected?

24          MS. COLLINS:  Objection to form.

25          THE WITNESS:  No.

1  BY MS. DOHNER SMITH:

2  Q        And that is not something that authorized --

3  or WestRock would have authorized you to do?

4  A        No.

5  Q        And by no with those, you mean correct, that

6  was a correct statement?

7  A        Correct.  I'm sorry.

8  Q        All right.  Let's talk about the allegation

9  that you hit him with your truck or pretended to hit

10 him with your truck.  That's not something that

11 would be part of your job duties?

12 A        No.

13 Q        And that is not something you were employed

14 to do?

15 A        Correct.

16 Q        Your earlier no, that means correct?

17 A        Right.

18 Q        Thank you.  That wouldn't be serving

19 WestRock in any way, correct?

20 A        Correct.

21            MS. COLLINS:  Objection to form.

22 BY MS. DOHNER SMITH:

23 Q        And that was not something WestRock would

24 expect you to do, correct?

25 A        Correct.

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 23 of 34 PageID #: 383

1           MS. COLLINS:  Objection to form.

2    BY MS. DOHNER SMITH:

3    Q       And that's not something that you were

4    authorized by WestRock to do, correct?

5    A       Correct.

6    Q       What about calling an employee a pussy, is

7    that something that would be part of your job

8    duties?

9    A       No.

10   Q       You weren't employed to call people that

11   term, were you?

12   A       No.

13   Q       And if you had called somebody a pussy, that

14   wouldn't be serving WestRock in any way, correct?

15   A       No.

16          MS. COLLINS:  Objection to form.

17   BY MS. DOHNER SMITH:

18   Q       WestRock wouldn't expect you as a general

19   manager to be calling employees pussies, correct?

20   A       No.

21          MS. COLLINS:  Objection to form.

22          THE WITNESS:  Correct.

23   BY MS. DOHNER SMITH:

24   Q       And that's not something that WestRock would

25   authorize and say, hey, call --

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 24 of 34 PageID #: 384

```
 1            MS. COLLINS:  Objection to the form.
 2   BY MS. DOHNER SMITH:
 3   Q        -- your employees pussies, correct?
 4   A        Correct.
 5   Q        Same thing with calling Mr. Kulakowski a
 6   quote/unquote fucking Polak.  That wouldn't be part
 7   of your job duties, correct?
 8   A        Correct.
 9   Q        You weren't employed to do that, correct?
10   A        Correct.
11   Q        And that wouldn't be serving WestRock in any
12   way, correct?
13            MS. COLLINS:  Objection to the form.
14            THE WITNESS:  Correct.
15   BY MS. DOHNER SMITH:
16   Q        And that is not something WestRock would
17   have expected you to do, correct?
18            MS. COLLINS:  Objection.
19            THE WITNESS:  Correct.
20   BY MS. DOHNER SMITH:
21   Q        And that's not something that you were
22   authorized to do, correct?
23   A        Correct.
24   Q        There's also been an allegation by
25   Mr. Kulakowski that you made a comment to him that
```

1    he needed to stay late so you could go home and fuck

2    his wife.  Is that anything that you ever said to

3    him?

4    A       No.

5    Q       Would that be part of your job duties?

6    A       No.

7    Q       Would that be something you were employed to

8    do?

9    A       No.

10   Q       Would that be something that was serving

11   WestRock in any way?

12   A       No.

13   Q       Is that something WestRock would have

14   expected you to say to an employee?

15   A       No.

16              MS. COLLINS:  Objection to form.

17   BY MS. DOHNER SMITH:

18   Q       Is that something that WestRock authorized

19   you to say to an employee?

20   A       No.

21   Q       Now, actually, making contact, hitting,

22   kicking, grabbing Mr. Kulakowski in the groin, that

23   would be a violation of WestRock's policies,

24   correct?

25   A       Correct.

1  Q        Hitting Mr. Kulakowski with a broom would be

2  a violation of company policy, correct?

3  A        Correct.

4  Q        Hitting him with your car would be -- or

5  your truck --

6  A        Correct.

7  Q        My husband doesn't want his truck called a

8  car, so...

9  A        Right.

10  Q        So hitting him with your truck would not

11  be -- or would be a violation of company policy?

12  A        Correct.

13  Q        Calling Mr. Kulakowski a pussy, a stupid

14  fucking Polak, or saying I'm going to fuck your

15  wife, those would be a violation of company policy,

16  correct?

17  A        Yeah.  And if I'm squirming, it's because

18  I'm just not used to hearing this language in mixed

19  company.

20  Q        I'm sorry.  I grew up with four brothers, so

21  I've heard it all by now.

22  A        Okay.  Well, yeah.  No, they don't expect me

23  to do that.

24  Q        And those would all be a violation of

25  company policy?

1    A        Yes.

2    Q        Okay.  Employees receive a copy of the -- of

3    the employee handbook, correct?

4    A        Yes.

5    Q        And that has a copy of the compliance

6    hotline in it; is that correct?

7    A        Yes.

8    Q        Now, the compliance hotline, that's also

9    posted at the --

10   A        Yes.

11   Q        -- facility, correct?

12   A        It is.

13   Q        And that's been posted for years, correct?

14   A        Yes.

15   Q        That's not something that just went up in

16   2016.

17   A        No.

18   Q        That's been there for a long time?

19   A        Yes.

20   Q        How far back can you recall the compliance

21   hotline being posted?

22   A        Ever since we had one.

23   Q        Do you know when that was?

24   A        I do -- it's been a long, long time.

25   Q        Okay.

```
 1   A        Years and years.

 2   Q        And that's posted on the employee bulletin

 3   board in the breakroom?

 4                MS. COLLINS:  Objection to form.

 5                THE WITNESS:  Well, the bulletin boards

 6   are not in the breakroom.

 7   BY MS. DOHNER SMITH:

 8   Q        Oh, okay.  Where are they?

 9   A        They're in the walkway --

10   Q        Okay.

11   A        -- to the breakroom.

12   Q        Okay.  And that's where that's posted?

13   A        Yes.

14   Q        All right.

15   A        Or that's where they were.  I don't know if

16   they've been moved or not.

17   Q        Okay.

18   A        When I was there, they were in the -- they

19   were in the -- posted in the walkway.

20   Q        Okay.  Thank you.

21            Throwing somebody across a desk, that's not

22   something that would be part of your job duties,

23   correct?

24   A        Correct.

25   Q        And that's not something you were employed
```

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 29 of 34 PageID #: 389

1  to do?

2  A      Correct.

3  Q      And that's not something that would be

4  serving to WestRock in any way?

5  A      Correct.

6             MS. COLLINS:  Objection to form.

7  BY MS. DOHNER SMITH:

8  Q      That's not something WestRock expected you

9  to do?

10            MS. COLLINS:  Objection to form.

11            THE WITNESS:  Correct.

12 BY MS. DOHNER SMITH:

13 Q      And that's not something WestRock authorized

14 you to do?

15 A      Correct.

16 Q      I think you testified that this group of

17 friends that would pretend to hit each other, it

18 wasn't expected that anybody was actually going to

19 hit each other, was it?

20            MS. COLLINS:  Objection to form.

21            THE WITNESS:  No, no.

22 BY MS. DOHNER SMITH:

23 Q      And if they were actually hitting each other

24 in the groin, that would not be appropriate

25 workplace behavior?

Case 3:16-cv-02510  Document 32-20  Filed 01/26/18  Page 30 of 34 PageID #: 390

1  A       No, it would not.

2  Q       And that would be a violation of policy?

3  A       Yes, it would.

4  Q       So you draw a distinction between the kind

5  of act of pretending you're going to hit somebody

6  and then actually hitting somebody?

7  A       Yes.

8  Q       Okay.  Earlier you asked if you recalled

9  whether you told employees that hotline complaints

10 came to you.  Is that something you just don't

11 recall telling them or is that something you didn't

12 tell them?

13 A       I'm sorry.  Say that -- I'm not sure I

14 understood what you just asked me.

15 Q       Sorry.  And I talk fast.  I'm from the

16 north.

17 A       No, that's okay.  I'm just not sure I

18 understood what you said.

19 Q       Earlier you were asked a question about

20 whether you recall if you told employees that

21 hotline complaints came to you.

22 A       Okay.

23 Q       And you said no.  So do you just not recall

24 that or is that something you didn't tell employees?

25 A       I -- I did not tell employees that hotline

Case 3:16-cv-02510   Document 32-20   Filed 01/26/18   Page 31 of 34 PageID #: 391

1    complaints came to me.

2    Q        Okay.  Because they don't come to you,

3    right?

4    A        They don't -- no, I don't get them.  Now, as

5    I did say earlier, I may be asked about them by

6    somebody like Terri Henley.

7    Q        I think earlier you testified that with your

8    group of friends you would pretend, you know, to hit

9    them, but you wouldn't do that with female

10   employees?

11   A        Right.

12   Q        Why wouldn't you do that with female

13   employees?

14   A        I'm not sure that -- they're just not that

15   close a friendly relationship with female employees

16   to do that.

17   Q        Okay.  And you didn't engage in that type of

18   conduct, pretending to hit people, males that

19   weren't your friends?  That's a horrible question.

20   A        No, we didn't.

21   Q        Did you understand what I asked?  For

22   example, men that weren't your friends, you didn't

23   pretend to slap them in the groin either?

24   A        The men that you didn't know, yeah,

25   newcomers, those, no, didn't.

1  Q    So it was just your male friends?

2  A    Yeah.  It was the -- yeah, the group of

3  guys.  And that's what it amounted to, just a group

4  of guys that worked together, and they were very

5  comfortable working with each other.

6  Q    You've never threatened to terminate an

7  employee if they reported you to the compliance

8  hotline?

9  A    No.

10  Q    Did you ever tell Mr. Kulakowski to work off

11  the clock?

12  A    No.

13  Q    Did you ever tell him that he couldn't punch

14  in if he came back to work after he left during his

15  normal shift?

16  A    If he was called back?  No.

17  Q    You expected he would punch in if he was

18  called back to work?

19  A    Yes.

20       MS. DOHNER SMITH:  That's it.

21       MS. COLLINS:  I have a couple of

22  follow-up.

23            E X A M I N A T I O N

24  BY MS. COLLINS:

25  Q    You were asked on cross-examination about

Case 3:16-cv-02510  Document 32-20  Filed 01/26/18  Page 33 of 34 PageID #: 393

1                    REPORTER'S CERTIFICATE

2

3          I, Jerri L. Porter, RPR, CRR, Notary

4    Public and Court Reporter, do hereby certify that I

5    recorded to the best of my skill and ability by

6    machine shorthand all the proceedings in the

7    foregoing transcript, and that said transcript is a

8    true, accurate, and complete transcript to the best

9    of my ability.

10          I further certify that I am not an

11   attorney or counsel of any of the parties, nor a

12   relative or employee of any attorney or counsel

13   connected with the action, nor financially

14   interested in the action.

15          SIGNED this 2nd day of January, 2018.

16

17

18

19                

20   _____

21          Jerri L. Porter, RPR, CRR

22   My Notary commission expires:  2/19/2018

23   Tennessee LCR No. 335
     Expires:  6/30/2018

24

25

Brentwood Court Reporting Services
(615)791-6983 * * * (888)991-DEPO