**In the Matter Of:**

KULAKOWSKI vs WESTROCK SERVICES

---

**TERRI HENLEY**

*November 15, 2017*

---



**BRENTWOOD COURT
REPORTING SERVICES**
www.brentwoodcourtreporting.com
(615) 791-6983

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL KULAKOWSKI,                      )
                                         )
        Plaintiff,                       )
                                         )
vs.                                      )CASE NO.
                                         )3:16-CV-02510
                                         )
WESTROCK SERVICES, INC.,                 )
                                         )
        Defendant.                       )
_____

DEPOSITION OF

TERRI HENLEY

Taken on Behalf of the Plaintiff

November 15, 2017

Commencing at 11:20 a.m.

_____

Reported by:  Jerri L. Porter, RPR, CRR
Tennessee LCR No. 335
Expires:  6/30/2018

## Page 2

```
1  APPEARANCES:
2  For the Plaintiff:
3       HEATHER MOORE COLLINS
         Collins & Hunter
4       7000 Executive Center Drive
         Building 2, Suite 320
5       Brentwood, Tennessee  37027
         (615) 724-1996
6       heather@collinshunter.com
7
   For the Defendant:
8
         MARY DOHNER SMITH
9        Constangy, Brooks, Smith & Prophete
         1010 SunTrust Plaza
10       401 Commerce Street
         Nashville, Tennessee  37219
11       (615) 320-5200
         mdohner@constangy.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1              I N D E X
2          INDEX OF EXAMINATIONS
3                                          Page
4  Examination By Ms. Collins .....................7
5  Examination By Ms. Dohner Smith .............120
6
7
8          MARKED EXHIBITS
9
   Exhibit      Description              Page
10
   No. 15  10/31/13 Global Compliance Alertline ....53
11         System Report No. RTC-13-10-0031
          Bates WestRock 000193-0196
12
   No. 16  8/17/16 Henley e-mail to McGraw .........56
13         Subject: 2133 - Investigation Report
          - August 2016
14         Bates WestRock 000218-0223
15 No. 17  8/18/16 Henley e-mail to McGraw .........68
          Subject: Investigation
16         Bates WestRock 000224
17 No. 18  Henley notes "Follow up on four .........70
          alleged witnesses-Names provided
18         by Michael Kulakowski"
          Bates WestRock 000225
19
   No. 19  WestRock Investigation Summary ..........75
20         Bates WestRock 000226-0229
   No. 19  ........................................123
21
   No. 20  8/26/16 Henley/McGraw e-mail chain ......78
22         Subject: Questions
          Bates WestRock 000230
23
   No. 21  8/26/16 Meeting notes  ..................79
24         "August 26, 2016-MK-2:10pm"
          Bates WestRock 000231-0233
25
```

## Page 4

```
1          MARKED EXHIBITS
              (Continued)
2
3  Exhibit      Description              Page
   No. 22  2133 - Investigation - 8/26/16 ..........85
4         Interview with Tommy Whited
          Bates WestRock 000234-0238
5  No. 22  ........................................123
6  No. 23  8/27/16 McGraw/Pedine/Bell ..............90
          Subject: Cooley e-mail chain
7         Bates WestRock 000239
8  No. 24  8/30/16 Whited Separation Notice ........91
          Bates WestRock 000246
9  No. 24  ........................................121
10 No. 25  8/8/16-8/23/16 E-mail chain .............93
          Subject: Speak Up! #1327 -
11         General Manager
          Bates WestRock 000199-0205
12
   No. 26  8/8/16-8/9/16 E-mail chain ..............97
13         Subject: Speak Up! #1327 -
          General Manager
14         Bates WestRock 000206-0207
15 No. 27  8/12/16, 8/15/16, 8/17/16, 8/18/16 ......98
          Henley notes e-mails Subject: Exit
16         Interview with Johanna Bates
          WestRock 000208-0214
17
   No. 28  8/29/16 McGraw/Pedine/Henley ...........113
18         e-mail chain
          Bates WestRock 000242
19
20
21
22
23
24
25
```

## Page 5

```
1     PREVIOUSLY MARKED EXHIBITS
        PRESENTED TO WITNESS
2
3  Exhibit      Description              Page
4  No. 4   2011 RockTenn Employee Handbook .........21
5  No. 4   ........................................126
6  No. 8   8/16/16 1:45 p.m. ......................116
          2133 Investigation transcript
7         Bates WestRock 000215-0217
8  No. 9   Handwritten notes ......................114
9  No. 14  8/29/16 Henley e-mail to McGraw ........118
10         Subject: 2133-Interview
          Questions-8.26.16; 8/29/16 Henley
          e-mail to McGraw Subject: Interview
11         with Tracie-August 29, 2016 Bates
          WestRock 000240-0241
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1          The deposition of TERRI HENLEY was
2  taken on behalf of the Plaintiff on November 15,
3  2017, in the offices of Bone, McAllester & Norton,
4  131 Saundersville Road, Suite 130, Hendersonville,
5  Tennessee, for all purposes under the Federal Rules
6  of Civil Procedure.
7          The formalities as to notice, caption,
8  certificate, et cetera, are waived.  All objections,
9  except as to the form of the questions, are reserved
10 to the hearing.
11         It is agreed that Jerri L. Porter,
12 being a Notary Public and Court Reporter for the
13 State of Tennessee, may swear the witness, and that
14 the reading and signing of the completed deposition
15 by the witness are reserved.
16
17
18
19
20
21              * * *
22
23
24
25

Page 7

1              TERRI HENLEY
2  was called as a witness, and after having been first
3  duly sworn, testified as follows:
4          E X A M I N A T I O N
5  BY MS. COLLINS:
6  Q     Could you state your complete name for the
7  record?
8  A     It's Terri Henley, T-e-r-r-i, H-e-n-l-e-y.
9  Q     Ms. Henley, what is your address?
10 A     320 Arnold Road, Shelbyville, Tennessee.
11 Q     What is that zip?
12 A     37160.
13 Q     And what is your phone number?
14 A     (931)492-3172.
15 Q     Is that a mobile or home?
16 A     That is my mobile.
17 Q     Okay.  Where do you currently work?
18 A     WestRock.
19 Q     Which -- well, are you based out of a
20 particular facility?
21 A     I have a home plant that is Lewisburg,
22 Tennessee.
23 Q     How long have you been based out of the
24 Lewisburg plant?
25 A     April of 2012.

Page 8

1  Q     What is your job title?
2  A     Business unit HR manager.
3  Q     Have you been in that role since April of
4  2012?
5  A     No, ma'am.
6  Q     Okay.  How long have you been business unit
7  HR manager?
8  A     November of 2014.
9  Q     What was your job before that?
10 A     Senior HR rep.
11 Q     What is the difference between a business
12 unit HR manager and a senior HR rep?
13 A     When I was promoted to the BU HR manager, I
14 took on additional facilities, and also took on
15 salary employees.
16 Q     As the senior HR rep, were you just at the
17 Lewisburg plant?
18 A     No, ma'am.
19 Q     Which plant were you at?
20 A     I was at Lewisburg and I had Chattanooga.
21 Q     But you were still based out of the
22 Lewisburg plant?
23 A     Yes, ma'am.
24 Q     How many facilities are you over as the
25 business unit HR manager?

Page 9

1  A     Four.
2  Q     Which four?
3  A     Chattanooga, Gallatin, Lewisburg,
4  Murfreesboro.
5  Q     Do you have anyone that reports to you?
6  A     No, ma'am.
7  Q     Who is your manager?
8  A     Regina Wimbley.
9  Q     How long has Regina been your manager?
10 A     I don't know the exact date.
11 Q     Who was your manager before Regina?
12 A     Melinda McGraw.
13 Q     Ms. McGraw was your manager in 2016, right?
14 A     Yes.
15 Q     Was she your manager in 2015?
16 A     Yes.
17 Q     What about 2014?
18 A     Yes.
19 Q     Okay.  So, Ms. Wimbley probably became your
20 manager sometime 2017?
21 A     Yes.
22 Q     When Ms. McGraw was your manager, where was
23 she based?
24 A     Humboldt, Tennessee.
25 Q     What was her job title?

1  A      Area HR manager.

2  Q      Okay.  So I'm gathering that the WestRock

3  facilities are divided up into -- as far as HR

4  functions, are divided up into business units, and

5  then area, which is a larger area, and then beyond

6  that, is it regional?

7  A      Yes.

8  Q      Who was the -- who was Ms. McGraw's boss or

9  over her?

10  A      Joy Jones.

11  Q      Is Ms. McGraw still with WestRock?

12  A      No.

13  Q      When did she leave?  Sometime in 2017, I

14  guess.

15  A      No.  December of 2016.

16  Q      Do you know why she left WestRock?

17  A      No.

18  Q      Do you know if she was terminated or if she

19  quit?

20  A      No.

21  Q      You don't know?

22  A      I don't know.

23  Q      Where is Ms. Jones?

24  A      I don't understand the question.

25  Q      Where is she based out of?

1  A      Atlanta.

2  Q      Okay.  Is that where WestRock's main offices

3  are, corporate offices?

4  A      No.  Norcross.

5  Q      Okay.  Norcross, Georgia?

6  A      Yes.

7  Q      So, when you became the business unit HR

8  manager, that included the Gallatin plant, and that

9  was in 2012, I think you said, right?

10  A      No.

11  Q      Oh.  When was that?

12  A      November 2014.

13  Q      So, November 2014 was the first time you

14  were over the -- or you were the HR person for the

15  Gallatin plant, right?

16  A      Yes.

17  Q      Who preceded you in that position?

18  A      I don't know.

19  Q      So, when you became the business unit HR

20  manager for the Gallatin plant in November of 2014,

21  after that point, how many times would you go out to

22  the plant?  Or how frequently?

23  A      I estimate an average of once a month.

24  Q      Was that the same in 2015?

25  A      Yes.

1  Q      When I say the Gallatin plant, did you go to

2  the sheet plant or did you go to the fulfillment

3  center?

4  A      I would go to both locations.

5  Q      Why would you go out there?

6  A      I would go out to be the HR presence in the

7  facility.

8  Q      Did you have set office hours?

9  A      No.

10  Q      Did you let employees know when you were

11  coming?

12  A      Yes.

13  Q      Who would you let know?  Or how would you

14  let them know?

15  A      I would tell the general manager.

16  Q      Would that be Tommy Whited?

17  A      Yes.

18  Q      Did you have a dedicated HR office out at

19  the Gallatin plant?

20  A      No.

21  Q      Where would you sort of set up shop when you

22  were out there?

23  A      In the conference room.

24  Q      Was the conference room next door to Tommy

25  Whited's office?

1  A      No.

2  Q      How close was it to Tommy Whited's office?

3  A      Which location?

4  Q      Both.

5  A      At the sheet plant, maybe 25, 30 feet.  I'm

6  not sure of the exact distance.

7  Q      Like on the same hall or something?

8  A      Yes.

9  Q      Okay.  And what about at the fulfillment

10  center?

11  A      His office was across the plant.  I can't

12  give you the distance.

13  Q      Okay.

14  A      I don't know how far it would be.

15  Q      What about Susan Hart's office?  How close

16  was it to Susan Hart's office, the conference room

17  at the fulfillment center?

18  A      Next door.

19  Q      Do you know how many plants WestRock has in

20  Tennessee?

21  A      No.

22  Q      Do you have a guess?

23  A      No.  Because I'm only responsible for the

24  corrugated division.  I don't know how many WestRock

25  has in the state of Tennessee.

Page 14

1  Q       Is the Gallatin plant in the corrugated
2  division?
3  A       Yes.
4  Q       Okay.  Do you know Tom Pedine?
5  A       Yes.
6  Q       What's his job?
7  A       Business unit general manager.
8  Q       Was that the same in 2016 and '17?
9  A       Yes.
10 Q       Where is he based out of?
11 A       Murfreesboro.
12 Q       Is the business unit manager over HR?
13 A       No.
14 Q       What is it -- do you know what that job is
15 for?
16 A       He is responsible for the four facilities in
17 the Tennessee BU.
18 Q       And the four facilities in the Tennessee
19 business unit are the ones that you are the HR
20 person for?
21 A       Yes.
22 Q       Now, you mentioned that when you would go to
23 the Gallatin plant, you would go there to be an HR
24 presence.  Like what sort of functions did you
25 perform?

Page 15

1  A       I would walk the plant floor, participate in
2  any meetings, assist employees with any issues they
3  may have, meet with the management team.
4  Q       What do you mean, you would assist with the
5  employees with issues?  Like what?
6  A       If they had any issues, comments, or
7  concerns.
8  Q       Was that the same in 2015?
9  A       Yes.
10 Q       Was that the same in 2016?
11 A       Yes.
12 Q       When you would go to the Gallatin plant, how
13 much time would you spend there per day?
14 A       Approximately eight hours.
15 Q       So if you went to the Gallatin plant, you
16 would stay there all day?
17 A       Yes.
18 Q       But you didn't have any sort of set days or
19 times of the month that you would come out, right?
20 A       No.  I did not have set days.
21 Q       And when you say you would go to the
22 Gallatin plant for eight hours, was that eight hours
23 at the fulfillment center and eight hours at the
24 sheet plant, or you would split your time between
25 the two?

Page 16

1  A       It varied.
2  Q       What would it depend on?
3  A       I may drive up one morning, spend six hours
4  at fulfillment, stay overnight, the next morning go
5  to the sheet plant or vice versa.
6  Q       And who determined that schedule or when you
7  needed to go out there?
8  A       I did.
9  Q       Did you keep a calendar or schedule of when
10 you went out to the various plants?
11 A       For what time frame?
12 Q       Well, let's start with 2016.  And I'm
13 excluding -- let me just say, I'm excluding the
14 investigation period related to Mr. Whited, because
15 I know there was an uptick.
16 A       I don't recall.
17 Q       Okay.  You don't recall if you kept any sort
18 of calendar or schedule?
19 A       I don't recall.
20 Q       Okay.  Well, if you're going to be at a
21 different plant other than the Lewisburg plant,
22 would you let somebody know where you were going to
23 be?
24 A       Yes.
25 Q       Who would you typically let know?

Page 17

1  A       I would let my boss know.
2  Q       Did you have any sort of assistant or
3  administrative assistant that helped you?
4  A       No.
5  Q       And how would you let your boss know?
6  A       Via e-mail or phone call.
7  Q       And that was Ms. McGraw, right?
8  A       Yes.
9  Q       Until she left in December of 2016?
10 A       Yes.
11 Q       Do you maintain your e-mails?
12 A       I don't understand.
13 Q       Do you have any sort of specific process
14 where you keep certain e-mails or delete certain
15 e-mails or how do you maintain your e-mails?
16 A       I have them filed in my Outlook.
17 Q       So it doesn't sound like you delete e-mails,
18 right?
19 A       I didn't say I didn't delete e-mails.
20 Q       Well, do you delete e-mails?
21 A       Yes.
22 Q       What is your typical practice of the ones
23 that you delete?
24 A       I don't know -- I don't understand the
25 question.

1 Q     Well, do you just delete spam type e-mails,
2 marketing e-mails, or do you delete other business
3 related e-mails that you think you don't need
4 anymore?
5 A     Yes, I delete spam.  Yes, I delete junk.
6 Yes, I have -- delete business related.
7 Q     Do you know if the company has a document
8 destruction or preservation policy?
9 A     Yes.
10 Q     Okay.  Is that in the company handbook?
11 A     I don't know.
12 Q     What is your understanding of that policy?
13 A     It outlines what files have to be kept and
14 for how long and the destruction process.
15 Q     Does it have any specific provisions about
16 e-mails?
17 A     I don't know.
18 Q     I can't remember if I asked you, do you
19 supervise anyone?
20 A     I do not.
21 Q     Okay.  Did you play a part in the decision
22 to demote Larry Eden?
23 A     No.
24 Q     Do you know anything about that?
25 A     Yes.

1 Q     What do you know?
2 A     That he was demoted.
3 Q     What else do you know?  Why was he demoted?
4 A     Performance.
5 Q     Who made that decision?
6 A     The general manager.
7 Q     And who was the general manager at that
8 time?
9 A     Al Hasbrouck and Tim Goeke.
10 Q     How do you spell Tim's last name?
11 A     G-o-e-k-e.
12 Q     What are their job titles?
13 A     Al Hasbrouck is general manager.  Tim Goeke
14 is the area HR manager.
15 Q     How long has Tim been area HR manager?
16 A     I don't know.
17 Q     What about his performance was deficient?
18 A     I don't know that.
19 Q     Was he demoted -- did his demotion have
20 anything to do with Tommy Whited or Michael
21 Kulakowski?
22 A     No.
23 Q     And Al Hasbrouck, he replaced Tommy Whited
24 as general manager, right?
25 A     Yes.

1 Q     I understand Susan Hart was moved from the
2 fulfillment center to the sheet plant.  Is that
3 correct?
4 A     Yes.
5 Q     Why?
6 A     I don't know.
7 Q     Were you involved in that decision?
8 A     No.
9 Q     Who was?
10 A     I don't know.
11 Q     How did you find out about it?
12 A     She was at the sheet plant one day when I
13 came to visit.
14 Q     Okay.  But you weren't involved in that at
15 all?
16 A     No.
17 Q     I guess as the business unit manager, which
18 is an HR job, right?
19 A     Would you re-ask the question?
20 Q     Well, I think you said your job title is
21 business unit -- what?  HR?
22 A     HR manager.
23 Q     So, as business unit HR manager, you're
24 familiar with WestRock's policies?
25 A     Yes.

1 Q     If you could turn to Exhibit Number 4 here
2 in this binder.
3      (Presented Exhibit No. 4.)
4 BY MS. COLLINS:
5 Q     If you could turn to Page 11 for me, please.
6 Have you seen this policy before?
7 A     Yes.
8 Q     Okay.  And is this WestRock's sexual
9 harassment policy?
10 A     Yes.
11 Q     And this policy covers any sort of unwelcome
12 sexual advances, requests for favors, or other
13 verbal or physical conduct of a sexual nature,
14 right?
15 A     Would you repeat the question?
16      MS. COLLINS:  Would you repeat it.
17      (The requested question was read back
18 by the court reporter as follows:
19      "Question:  And this policy covers any
20 sort of unwelcome sexual advances, requests for
21 favors, or other verbal or physical conduct of a
22 sexual nature, right?")
23      THE WITNESS:  Yes.
24 BY MS. COLLINS:
25 Q     Okay.  Now, is an employee hitting another

Page 22

1 employee in the groin conduct of a sexual nature?
2          MS. DOHNER SMITH:  Objection.
3          THE WITNESS:  Would you repeat the
4 question.
5          (The requested question was read back
6 by the court reporter as follows:
7          "Question:  Now, is an employee hitting
8 another employee in the groin conduct of a sexual
9 nature?")
10          THE WITNESS:  I don't know.
11 BY MS. COLLINS:
12 Q     Why do you not know?
13 A     I need clarification on the question.
14 Q     Well, if you were hit in the groin, would
15 you consider that conduct of a sexual nature in the
16 workplace?
17 A     Repeat the question, please.
18          (The requested question was read back
19 by the court reporter as follows:
20          "Question:  Well, if you were hit in
21 the groin, would you consider that conduct of a
22 sexual nature in the workplace?")
23          THE WITNESS:  May I please take a
24 restroom break?
25

Page 23

1 BY MS. COLLINS:
2 Q     Not while a question is pending.
3 A     Will you please re-read the question for me.
4          (The requested question was read back
5 by the court reporter as follows:
6          "Question:  Well, if you were hit in
7 the groin, would you consider that conduct of a
8 sexual nature in the workplace?")
9          THE WITNESS:  Yes.
10          MS. COLLINS:  Do you still need a
11 break?
12          THE WITNESS:  Yes, please.
13          (Recess observed.)
14 BY MS. COLLINS:
15 Q     All right.  We are back on the record.
16          We were talking before the break about the
17 policies, the WestRock policies that you testified
18 that you were familiar with.
19          Ms. Henley, we were also talking about
20 hitting in the groin.  I think you said you would
21 find hitting in the groin to be sexual in nature,
22 correct?
23 A     Yes.
24 Q     And that's unacceptable conduct in the
25 workplace at WestRock, correct?

Page 24

1 A     Yes.
2 Q     And if submission to conduct like that,
3 either hitting in the groin -- well, let's just
4 stick with hitting in the groin -- was made a
5 condition of their employment, that would be a
6 violation of WestRock's policies, right?
7          MS. DOHNER SMITH:  Objection.
8          THE WITNESS:  Would you repeat the
9 question?
10 BY MS. COLLINS:
11 Q     Sure.  Submission to conduct like that,
12 hitting in the groin, if that was made -- if either
13 explicitly or implicitly a term or condition of
14 employment, that would be a violation of WestRock's
15 policies, right?
16 A     If proven.
17 Q     Well, let's go back to the policy.  The
18 first bullet point up there at the top of the page,
19 says, "submission to such conduct is made either
20 explicitly or implicitly a term or condition of
21 employment."
22          That would be a violation of the policy if
23 it was unwelcome hitting in the groin?
24 A     Unwelcome hitting in the groin.  Would you
25 repeat the question?

Page 25

1 Q     Sure.  Would unwelcome hitting in the groin,
2 if that was made -- if submission to that kind of
3 conduct was made either explicitly or implicitly a
4 term or condition of a WestRock employee's
5 employment, that would be a violation of this
6 policy, right?
7 A     Yes.
8 Q     Okay.  And this policy also talks about
9 unreasonable interference with the work environment.
10 Would getting kicked in the groin so that you lose
11 your breath and can't stand up, would that interfere
12 with an employee's work environment at WestRock?
13          MS. DOHNER SMITH:  Objection.
14          THE WITNESS:  Repeat the question,
15 please.
16          (The requested question was read back
17 by the court reporter as follows:
18          "Question:  And this policy also talks
19 about unreasonable interference with the work
20 environment.  Would getting kicked in the groin so
21 that you lose your breath and can't stand up, would
22 that interfere with an employee's work environment
23 at WestRock?")
24          MS. DOHNER SMITH:  Objection.
25          THE WITNESS:  I don't know.

Page 26

1  BY MS. COLLINS:
2  Q      Well, if they're getting kick or hit in the
3  groin and they can't stand up because they've lost
4  their breath, they wouldn't be doing their regular
5  job duties, right?
6          MS. DOHNER SMITH:  Objection.
7          THE WITNESS:  I don't know.
8  BY MS. COLLINS:
9  Q      Well, if an employee gets hit or kicked in
10 the groin so that it hurts them so bad they fall to
11 the ground and they can't breathe, they're not doing
12 their regular job duties, correct?
13         MS. DOHNER SMITH:  Objection.
14         THE WITNESS:  I don't know.
15 BY MS. COLLINS:
16 Q      I mean, would you be able to?
17 A      I don't know.
18 Q      If you're on the ground struggling to
19 breathe because somebody has hit you in a place that
20 hurt, you wouldn't be able to do your regular job
21 duties, right?
22         MS. DOHNER SMITH:  Objection.
23         THE WITNESS:  I don't know.
24 BY MS. COLLINS:
25 Q      Why don't you know?  What's the problem with

Page 27

1  the question?
2  A      Because I've not been hit in the groin to
3  know how that would affect me.
4  Q      Okay.  Have you talked to employees who have
5  been?
6  A      Yes.
7  Q      Okay.  Did they talk about how it made it
8  hard for them to do their jobs?
9  A      I don't remember.
10 Q      Who have you talked to that's been hit in
11 the groin?
12 A      Michael Kulakowski.
13 Q      Who else?
14 A      Jerry Harville.
15 Q      Who else?
16 A      I don't remember.
17 Q      Donnie Taylor, was he one of them?
18 A      I don't remember.
19 Q      Okay.  Was it the ones that have been hit in
20 the groin by Tommy Whited?
21 A      The ones?
22 Q      The employees who had been hit in the groin
23 by Tommy Whited.
24 A      Yes.
25 Q      Did they tell you that it made it hard for

Page 28

1  them to do their job duties?
2  A      I don't remember.
3  Q      Did you ask them?
4  A      I don't remember.
5  Q      What would help you to remember?
6  A      The investigation notes.
7  Q      Okay.  Your investigation notes from when
8  you talked with these people?
9  A      Yes.
10 Q      Okay.  All right.  We'll get to those in
11 just a second.
12 A      All right.
13 Q      But you think those notes would help refresh
14 your recollection as to whether or not it interfered
15 with their ability to perform their job duties?
16         MS. DOHNER SMITH:  Objection.
17         THE WITNESS:  Well, I don't know.
18 BY MS. COLLINS:
19 Q      So, do you think it would help you refresh
20 your recollection if you looked at your notes?
21 A      Refresh recollection, yes.
22 Q      Okay.  Now, is it appropriate workplace
23 conduct at WestRock if a manager is showing his
24 private parts to one of his subordinate employees?
25 A      Repeat the question.

Page 29

1  Q      Is it appropriate workplace conduct for a
2  manager to show his private parts to a subordinate
3  employee in the workplace at WestRock?
4  A      No.
5  Q      Would that be considered sexual harassment?
6          MS. DOHNER SMITH:  Objection.
7          THE WITNESS:  Not necessarily.
8  BY MS. COLLINS:
9  Q      Why wouldn't it be?
10 A      Would you repeat the question, please.
11 Q      Sure.  Why wouldn't a manager showing his
12 private parts to a subordinate employee be
13 considered sexual harassment?  You said you didn't
14 know if it would be considered sexual harassment,
15 and I'm wanting to know why it wouldn't be, if
16 that's the case.
17 A      Reading the policy, exposing one time
18 doesn't fall under sexual harassment.
19 Q      Where in the policy does it say a one-time
20 exposure of someone's penis to another employee is
21 not sexual harassment?
22 A      It states, "Unwelcome sexual advances,
23 requests for sexual favors, and other verbal or
24 physical conduct of a sexual nature constitute
25 sexual harassment when:  Submission to such conduct

Page 30

1  is made either explicitly or implicitly a term or
2  condition of individual employment...used as the
3  basis for employment decisions...effect of
4  unreasonable interference of an individual's work
5  performance..."
6  Q       "...or creating an intimidating, hostile, or
7  offensive working environment."  Right?
8  A       Right.
9  Q       That's what it says.  So it doesn't say
10 anything about a one-time exposure not being sexual
11 harassment, correct?
12 A       It doesn't say that it is either.
13 Q       Okay.  So are you saying that a one-time
14 exposure of a manager's penis to a subordinate
15 employee is not sexual harassment in your mind
16 because it doesn't explicitly say so in this policy?
17 A       No.  Because it's not pervasive and is a
18 one-time event.
19 Q       So, you're saying that it's not -- because
20 it just happened once, that it's not a big deal?
21 A       No.
22 Q       What are you saying?
23 A       Would you repeat the question, please.
24
25

Page 31

1                (The requested question was read back
2  by the court reporter as follows:
3                "Question:  What are you saying?")
4                THE WITNESS:  Would you repeat the
5  previous question?
6  BY MS. COLLINS:
7  Q       Let me put it this way:  Can a one-time
8  event be considered sexual harassment?
9  A       I don't know.
10 Q       Well, if somebody exposed themselves to you
11 in the workplace, a male manager of yours showed you
12 his penis, and said, why don't you come to the
13 bathroom and suck my penis, would you consider that
14 severe?
15 A       Yes.
16 Q       Would you consider that sexual harassment?
17 A       Yes.
18 Q       Okay.  If an employee came to you and said
19 this happened to me, would you consider that sexual
20 harassment?
21 A       What is "this"?
22 Q       What I just described.
23 A       Yes.
24 Q       What about assault by another employee?
25                MS. DOHNER SMITH:  Objection.

Page 32

1  BY MS. COLLINS:
2  Q       Could that be considered sexual harassment
3  under this policy?  Hitting in the groin,
4  specifically.
5  A       Repeat the question, please.
6                (The requested question was read back
7  by the court reporter as follows:
8                "Question:  Could that be considered
9  sexual harassment under this policy?  Hitting in the
10 groin, specifically.")
11               THE WITNESS:  It could be.
12 BY MS. COLLINS:
13 Q       Okay.  If the employee found it offensive,
14 could it be considered sexual harassment to be hit
15 in the groin?
16 A       Yes.
17 Q       Okay.  Would an employee being afraid to use
18 the bathroom because they were afraid the manager
19 would expose themselves, their private parts in the
20 bathroom, would that constitute interference with
21 their ability to perform their job?
22               MS. DOHNER SMITH:  Objection.
23               THE WITNESS:  I don't know.
24 BY MS. COLLINS:
25 Q       Okay.  Now, horseplay can be considered

Page 33

1  sexual harassment, right?
2                MS. DOHNER SMITH:  Objection.
3                THE WITNESS:  It depends.
4  BY MS. COLLINS:
5  Q       On what?
6  A       The nature of the horseplay.
7  Q       Tell me what you would define horseplay to
8  be.
9  A       Goofing around.
10 Q       I'm talking about grabbing other employees
11 in their private parts or hitting them in their
12 private parts, that type of horseplay could be
13 considered sexual harassment, correct?
14               MS. DOHNER SMITH:  Objection.
15               THE WITNESS:  It could be.
16 BY MS. COLLINS:
17 Q       And horseplay is a violation of WestRock's
18 code of conduct, right?
19 A       Yes.
20 Q       And can an employee be disciplined for
21 engaging in horseplay in the workplace?
22 A       Yes.
23 Q       And pursuant to this policy that we've been
24 talking about, employees who believe they've been
25 harassed, they can talk directly to the harasser and

Page 34

1 tell them to stop, right?
2 A      Yes.
3 Q      And one of the ways that they can report
4 their problems is to notify a supervisor or a
5 manager, correct?
6 A      Yes.
7 Q      Who falls in that chain of command or that
8 definition of supervisor or manager?
9 A      Be more specific.
10 Q      Well, I'm asking you, it says, the policy --
11 on Page 11 of Exhibit Number 4 says, "If an employee
12 makes a complaint regarding harassment to a
13 supervisor or manager, then the supervisor or
14 manager is required to notify his or her divisional
15 HR director..."
16         Who would be considered a supervisor or
17 manager under that part of the policy?
18 A      Production supervisors or managers.
19 Q      What other types of managers or supervisors?
20 General manager?
21 A      A general manager, yes.
22 Q      Plant manager?
23 A      Yes.
24 Q      Any other type of supervisor or manager?
25 A      Production supervisor, customer service

Page 35

1 manager, a safety manager.
2 Q      Anyone else?
3 A      Possibly.  Any manager or supervisor.
4 Q      Okay.  Who was the production manager --
5 production supervisor at the Gallatin fulfillment
6 center?
7 A      Michael White.
8 Q      And he's still the production supervisor,
9 right?
10 A      Yes.
11 Q      And the general manager, that was Tommy
12 Whited, right?
13 A      Yes.
14 Q      Who was the plant manager?  Was that Larry
15 Eden?
16 A      Yes.
17 Q      And the customer service manager?
18 A      Keith Hall.
19 Q      And the safety manager?
20 A      We did not have a safety manager.  Safety
21 coordinator.
22 Q      Who is the safety coordinator?
23 A      Lana Potts.
24 Q      Okay.  So, if any one of those people
25 received a complaint or had an employee tell them

Page 36

1 that they had been harassed or kicked or anything
2 like that in the workplace, those people should have
3 reported that to divisional HR.
4 A      Yes.
5         MS. DOHNER SMITH:  Objection.
6 BY MS. COLLINS:
7 Q      Okay.  And the divisional HR manager, was
8 that -- who?
9 A      Joy Jones.
10 Q      And it says, "...along with his or her local
11 human resources representative..."
12         And the local HR representative, would that
13 be considered you?
14 A      What time frame?
15 Q      2016.
16 A      Yes.
17 Q      And 2015?
18 A      Yes.
19 Q      Okay.  And before the report in August of
20 2015, had any of these people -- or 2016, had any of
21 these people reported anything to you about Tommy
22 Whited?
23 A      Which report?
24 Q      Before August of 2016, at any time before
25 August of 2016, had any of these people made a

Page 37

1 report to you about Tommy Whited's behavior of
2 hitting other employees in the groin or harassing
3 other employees?
4 A      No.
5 Q      If they had witnessed such conduct, should
6 they have reported that to you?
7 A      Yes.
8 Q      And when you started dealing with Michael
9 Kulakowski's situation, he told you that he had told
10 Mr. Whited on several occasions to stop hitting him,
11 right?
12 A      I don't recall.
13 Q      But Michael Kulakowski reported to you that
14 he had been hit in the groin on numerous occasions
15 by Mr. Whited, right?
16         MS. DOHNER SMITH:  Objection.
17         THE WITNESS:  Yes.
18 BY MS. COLLINS:
19 Q      And he also reported that he had -- that
20 those -- that some of those incidents had been
21 witnessed by other members of management or
22 supervisors.
23 A      Yes.
24 Q      Were any of the managers or supervisors that
25 he reported witnessing him being hit, written up or

Page 38

1 disciplined for not reporting it when they saw it?
2 A      Repeat the question.
3 Q      Were any of the managers or supervisors that
4 Michael Kulakowski reported having witnessed him
5 being hit by Tommy Whited disciplined in any way for
6 not reporting that conduct to HR?
7 A      No.
8 Q      If you could turn to Page 12 of Exhibit 4,
9 please.
10       Down at the bottom of the page is the
11 company's anti-violence policy.  Are you familiar
12 with that policy?
13 A     Familiar, yes.
14 Q     And pursuant to this policy, "If an employee
15 is threatened, witnesses, or overhears a threat of
16 bodily harm, he or she must report it directly to a
17 supervisor or manager."  Right?
18 A     Yes.
19 Q     And if a manager is involved in the threat,
20 then it should be reported to local human resources.
21 A     Yes.
22 Q     And that would be you, correct?
23 A     Yes.
24 Q     And I think we've already gone over that no
25 supervisor or manager reported anything to you about

Page 39

1 Michael Kulakowski getting hit in the workplace?
2 A     No supervisor prior to, yes.
3 Q     Now I'm going to skip back to Page 11 again.
4 Well, no.  I'm going to jump forward to Page 7, the
5 compliance hotline.
6       Tell me what this is for, Page 7.
7 A     The compliance hotline?
8 Q     Uh-huh.
9 A     It's another avenue for employees to report
10 inappropriate behavior or concerning behavior,
11 anything that they think may be inappropriate
12 violation of company policy.
13 Q     Okay.  And is this posted in the workplace,
14 this compliance hotline paper?
15 A     Yes.
16 Q     Where is it posted?
17 A     On the bulletin boards.
18 Q     Okay.  And what is posted, does it look just
19 like this page, Page 7?
20 A     What's posted today?
21 Q     No.  What was posted in, I don't know,
22 2015/2016.
23 A     Yes.
24 Q     It looks like this document right here
25 that's Page 7?

Page 40

1 A      Yes.
2 Q      Is it different now?
3 A      It has WestRock at the top, yes.
4 Q      Okay.  Now, you would agree with me that
5 nowhere on this piece of paper does it say
6 complaints regarding sexual harassment should -- can
7 be reported to this phone number?
8 A      It does not specifically say sexual
9 harassment.
10 Q     Okay.  Has -- to your knowledge, has
11 WestRock ever disciplined an employee for not
12 reporting harassment or assault?
13 A     I don't recall.
14 Q     Other than handing out employee handbooks,
15 do y'all make one accessible to employees in the
16 workplace?
17 A     Yes.
18 Q     Where do y'all keep them?
19 A     Breakroom.  And the intranet has WestRock
20 policies on there that they have access to.
21 Q     Was that the same in 2015 and 2016?
22 A     Yes.  We have HR kiosks.
23 Q     Is it the same at the fulfillment center?
24 A     Yes.
25 Q     Have you ever been involved in a termination

Page 41

1 of an employee for incorrect information on their
2 job application?
3 A      No.
4 Q      Have you ever been involved in the
5 termination of an employee for incomplete
6 information on a job application?
7 A      No.
8 Q      Does WestRock run background checks on
9 employees when they hire them?
10 A     Yes.
11 Q     Was that the same when it was RockTenn?
12 A     I can only speak for my facilities.  Yes.
13 Q     And has it been that way since 2012, since
14 you've worked there?
15 A     Yes.
16 Q     How far back do y'all go for background
17 checks?
18 A     Seven years.
19 Q     And as far as you know, has it always been
20 you just go back seven years?
21 A     As far as I know, yes.
22 Q     And you did not -- WestRock did not receive
23 any complaints from women that they were hit or
24 kicked in the groin by Tommy Whited, did they?
25 A     Well, I don't know.

Page 42

1 Q    Are you aware of any?
2 A    Would you rephrase the question.
3 Q    Are you aware of any report -- of WestRock
4 receiving any reports by women that they were hit or
5 kicked in the groin by Tommy Whited?
6 A    I am not aware of any.
7 Q    Okay.  And if it happened since 2012, you
8 would have been made aware of it, given your role in
9 HR, right?
10 A    No.
11 Q    Why not?
12 A    Because I only supported one facility in
13 2012.
14 Q    Okay.
15 A    So I would only have knowledge of that
16 facility.
17 Q    Okay.  But when you were over -- became over
18 the Gallatin facility, you would have known about
19 it, right?
20 A    Not necessarily.
21 Q    Why not?
22 A    It could have come to someone else.
23 Q    Like who?
24 A    My boss.
25 Q    Okay.  And that was?

Page 43

1 A    Melinda McGraw.
2 Q    But you're not aware of any complaints from
3 women about Tommy Whited kicking or hitting them in
4 the groin?
5 A    I am not.
6 Q    Okay.  So is it fair to say that you only
7 have knowledge about men working at WestRock being
8 kicked or hit in the groin by Tommy Whited?
9 A    Yes.
10 Q    And you agree that was a violation of
11 WestRock's policies for him to do that?
12 A    Yes.
13 Q    Tell me about when you first found out --
14 how it came about that y'all investigated Tommy
15 Whited in August of 2016.
16 A    I was asked to check into a Speak Up! e-mail
17 that was received at corporate.
18 Q    So, that was not a Global Compliance hotline
19 complaint?  It was something different?
20 A    Yes.
21 Q    Okay.  When did y'all start this Speak Up!
22 e-mails?
23 A    The company?
24 Q    That you know of.
25 A    I don't recall.

Page 44

1 Q    What is the Speak Up! e-mails?  What do you
2 mean by that?
3 A    It's another avenue for employees to report
4 any concerns, ideas, suggestions, things of that
5 nature, via e-mail, anonymously, or you can put your
6 name to it, if you like.
7 Q    Who made the -- who sent the Speak Up!
8 e-mail?
9 A    Who sent it?
10 Q    Who was it from?  Was it anonymous or did it
11 have a name identified with it?
12 A    I believe it was anonymous.
13 Q    Okay.  Well, then what happened once you got
14 that?
15 A    I came to the -- well, I made a couple of
16 phone calls to employees referenced in the e-mail.
17 Q    Who did you call?
18 A    I attempted to call Ken Buckmaster, and I
19 called Johanna Crowder.
20 Q    Anyone else?
21 A    Eventually, yes.
22 Q    Okay.  So, when you called these people,
23 what did you find out?
24 A    Buckmaster never responded, so I never spoke
25 with him.  And my conversation with Johanna was

Page 45

1 based on her exit interview.  She was leaving.
2 Q    Okay.  What did you find out there?
3 A    She was leaving for another opportunity, and
4 she wasn't happy with the current work environment.
5 Q    Okay.  What was she not happy about?
6 A    I don't recall specifically.
7 Q    What do you recall generally?
8 A    Hours.  That's all I recall.
9 Q    Okay.  So, what about those two phone calls
10 led you to investigate further?
11 A    I went to the facility to speak to Johanna
12 in person.
13 Q    Okay.  What about you speaking with her in
14 person led you to investigate further?
15 A    She indicated there was someone else that
16 wanted to speak to me.
17 Q    Who?
18 A    That was Helen Kendall.
19 Q    Okay.  And did you speak with Helen?
20 A    I did.
21 Q    Okay.  What did Helen have to say?
22 A    She brought forth some items about an
23 employee being paid when he wasn't at work, alleged
24 that Tommy was having an affair with a subordinate.
25 That's all I recall.

1 Q        Okay.  How long was your meeting with
2 Johanna when you first met with her?
3 A        I don't remember.
4 Q        Just about, approximate?  Less than an hour?
5 More than an hour?
6 A        I would say at least 30 minutes.
7 Q        Okay.  Did you take notes?
8 A        Yes.
9 Q        What kind of notes?
10 A       What do you mean?
11 Q       Did you handwrite them, did you record the
12 meeting, did you --
13 A       No.  I typed those notes.
14 Q       Did you type them at the time?
15 A       Yes.
16 Q       And with Helen, when you met with her --
17 first, where did you meet Johanna?
18 A       In the conference room at the sheet plant.
19 Q       Okay.  And when you met with Helen, where
20 did you meet her?
21 A       Same location.
22 Q       Did you take handwritten notes or type
23 notes?
24 A       Typed.
25 Q       Did you type them at the time?

1 A        Yes.
2 Q        Okay.  So based on these two conversations,
3 what did you do next?
4 A        I spoke with Gary Pagels, because I was told
5 that he wanted to speak to me.
6 Q        Gary who?
7 A        Pagels.
8 Q        Okay.  Is he out at the sheet plant or
9 fulfillment center?
10 A       Sheet.
11 Q       All right.  What did he have to say?
12 A       He was frustrated with the performance of
13 the facility and the direction and communication
14 that the plant was currently at.
15 Q       Okay.  Anything else?
16 A       Not that I recall.
17 Q       Okay.  And then what did you do?
18 A       I don't remember exactly who I spoke with
19 next.
20 Q       How long was your meeting with Helen, about?
21 A       Oh, I would say at least 30 minutes.
22 Q       What about with Gary?
23 A       I would say about the same, at least
24 30 minutes.
25 Q       And you didn't record any of these meetings,

1 right?
2 A        Record?
3 Q        Record them.
4 A        No.
5 Q        Like I'm talking audio recording.
6 A        No.
7 Q        All right.  So you spoke with Gary, you
8 spoke with Helen, and you spoke with Johanna, and
9 you can't remember if you spoke with anyone else?
10 A       I know I spoke with other people.  I just
11 don't remember the exact order.
12 Q       Okay.  Did you speak with other people that
13 day or --
14 A       It may have been the next day.  It could
15 have been that afternoon.  I don't recall.
16 Q       And do you recall the others that you spoke
17 to?
18 A       I do.  Just not necessarily the order.
19 Q       Okay.  Who were they?
20 A       I had a conversation with Lana Potts, Jerry
21 Harville.  And I believe that was it.  I was there a
22 day or two back to back --
23 Q       Okay.
24 A       -- at the sheet plant in the conference
25 room.

1 Q        Were these the first round of sort of
2 initial interviews that you conducted to figure out
3 what was going on based on the -- that e-mail?
4 A        Yes.
5 Q        All right.  What did Ms. Potts have to say?
6 A        What I recollect is she stated that she had
7 witnessed Tommy kiss a subordinate.  She discussed
8 communication issues.  And she gave me the name of
9 Jerry Harville and Michael Kulakowski, and I don't
10 remember who else.
11 Q       Okay.  And did you type up your notes from
12 her conversation?
13 A       Yes.
14 Q       What did you do with the notes?
15 A       As in?
16 Q       Did you e-mail them or were they a Word
17 document or --
18 A       In an e-mail to have the date and time
19 stamp.
20 Q       Okay.  Did you just e-mail them to yourself?
21 A       Yes.
22 Q       Okay.  And about how long did the meeting
23 with Lana last?
24 A       At least 30 minutes.
25 Q       Okay.  Anything else you can recall about

Page 50

1  that meeting?
2  A       No.
3  Q       Do you recall any specifics about
4  communication issues, what she was talking about,
5  communication issues?
6  A       I don't remember.
7  Q       When she gave you the name of Jerry and
8  Michael Kulakowski, do you recall any specifics as
9  to why she told you you should talk to them?
10 A       I don't remember specifically what she said.
11 Q       Or generally why she thought you should talk
12 to them?
13 A       I don't remember her specific words, but it
14 was to the effect of the reason I needed to speak to
15 them was because of behavior issues with Tommy
16 Whited toward them.
17 Q       And Lana Potts, had she turned in her notice
18 at that time, or was she --
19 A       No.
20 Q       She was still working there?
21 A       Yes.
22 Q       Did she indicate whether or not she was
23 concerned about her job if she talked to you?
24 A       No.
25 Q       Okay.  What about Jerry Harville?  Tell me

Page 51

1  about your conversation with him.
2  A       Jerry discussed his work comp injury.  He
3  told me that he had been hit by Tommy Whited in the
4  groin area, and that he hit Tommy back.  And I don't
5  remember all of the specifics of his exact
6  statement.
7  Q       Did he -- did he say that he had only been
8  hit once by Tommy Whited or did he say it had
9  happened multiple times?
10 A       I don't recall.
11 Q       When he said he hit Tommy Whited back, was
12 that because he had been hit first?
13 A       Yes.
14 Q       Did he say anything to the effect like he
15 was defending himself?
16 A       He told me it was a reflex.  I remember
17 that.
18 Q       Okay.  Other than being -- him telling you
19 he'd been hit in the groin area, had he been hit or
20 kicked -- he had indicated he had been hit or kicked
21 by Tommy Whited?
22 A       I don't remember.
23 Q       Had he told you it had happened more than
24 once?
25 A       I don't remember.

Page 52

1  Q       Do you recall if he said that it happened to
2  other people?
3  A       Yes.
4  Q       What did he say about that?
5  A       He gave me -- he told me to speak with
6  Michael Kulakowski, and I don't remember if anyone
7  else.
8  Q       Okay.  Other than telling you to speak with
9  Michael Kulakowski because the same thing had
10 happened to him --
11         MS. DOHNER SMITH:  Objection.
12 BY MS. COLLINS:
13 Q       -- anything specific that you can recall
14 about why he thought you needed to talk to Michael
15 Kulakowski?
16 A       I can't remember his exact words.
17 Q       Okay.  All right.  And after you met with
18 these people, Ms. Potts, Mr. Harville, Gary, Helen,
19 and Johanna, what did you do after that?
20 A       I don't remember the exact timeline.  I
21 would have called in a report to my boss, and I know
22 that I came back to the facility, because the best I
23 recall, this was maybe at the end of the week, and I
24 came back maybe that following Monday and/or
25 Tuesday.  I don't know the exact dates.  So I spoke

Page 53

1  to other people.
2  Q       Okay.
3  A       I specifically remember calling Kuli,
4  because he was on vacation.
5  Q       And when you say Kuli, just for the
6  record --
7  A       Michael Kulakowski.
8  Q       Right.  It's just for the record.  Everybody
9  else calls him Kuli, too.
10         Before we get into this, let's take a quick
11 break.
12         (Recess observed.)
13 BY MS. COLLINS:
14 Q       Now, Ms. Henley, were you aware that another
15 complaint had been made about Tommy Whited sexually
16 harassing an employee in 2013?
17 A       No.
18 Q       Okay.  I'll ask you about this specifically.
19         MS. COLLINS:  Let's mark this next
20 document as Exhibit Number 15.
21         (Marked Exhibit No. 15.)
22 BY MS. COLLINS:
23 Q       Just let me know when you've had a chance to
24 review this.
25 A       (Reviewing document.)  Okay.

Page 54

1  Q      Have you ever seen this document before?
2  A      No.
3  Q      Okay.  When you're investigating a complaint
4  about an employee, do you go in their employee file
5  and see if they've had complaints made against them
6  in the past?
7  A      Would you re-ask the question?
8  Q      Sure.  When you're investigating an employee
9  for a violation of company policies, whether it's
10 your ethics policies or sexual harassment policy, do
11 you go back and review that employee's personnel
12 file to see if they've had other complaints made
13 against them in the past?
14 A      Not necessarily.
15 Q      Why not?
16 A      It would depend on the complaint and the
17 allegation.
18 Q      Well, if the complaint and the allegation
19 was about a violation of your ethics or code of
20 conduct or sexual harassment policy, would you go
21 back and look at that employee's personnel file to
22 determine if other complaints like that had been
23 made in the past?
24 A      Me specifically?  Yes.
25 Q      Okay.  When complaints were made against

Page 55

1  Tommy Whited and you found out that he'd been
2  kicking employees, did you go back and review his
3  personnel file?
4  A      I did not.
5  Q      All right.  Do you know if your boss,
6  Melinda, did?
7  A      I don't know if she did.  I can't answer
8  that.
9  Q      Would you have access to his personnel file
10 if you needed it?
11 A      Yes.
12 Q      Where are those files kept?
13 A      At the sheet plant.
14 Q      Okay.  And if -- where in the sheet plant?
15 A      In a filing cabinet.
16 Q      Okay.  If an employee had had a prior Global
17 Compliance complaint made against them, where would
18 this be kept?
19 A      It most likely would have been kept with
20 legal.
21 Q      Okay.  If an employee had had a prior
22 complaint of sexual harassment, would that prior
23 complaint of sexual harassment be kept in their
24 personnel file or just with legal?
25 A      With legal and the previous owner.  Whoever

Page 56

1  investigated this would that have record.
2  Q      But you don't know anything about this
3  complaint in 2013 --
4  A      I do not.
5  Q      -- against Mr. Whited?
6         So is it fair to say that you didn't take
7  this into consideration when you conducted your
8  investigation in 2016?
9  A      I did not.
10 Q      Do you think it would have been helpful to
11 know that he had had prior complaints of sexual
12 harassment made against him?
13 A      No.
14         MS. DOHNER SMITH:  I'm going to say
15 it's been marked as 15.  Is that for identification
16 since she couldn't authenticate it?  I'll make that
17 objection and we can move on.
18         MS. COLLINS:  I'll mark the next
19 document as Exhibit 16.
20         (Marked Exhibit No. 16.)
21 BY MS. COLLINS:
22 Q      Okay.  This document that's been marked as
23 Exhibit 16, have you seen this before?
24 A      Yes.
25 Q      Okay.  In the investigation summary that's

Page 57

1  attached to this, is this -- it says that it's
2  updated 8/16/2016.  Is this the document that was
3  attached to your e-mail from August 17th?
4  A      I mean, I don't remember if this is the
5  exact document that was attached without looking at
6  the e-mail itself.
7  Q      Do you think it probably would have been?
8  A      I can only assume.
9  Q      Okay.  And the statement from Lana Potts
10 that's on the last page of this document at WestRock
11 223, is that the statement she gave you?
12 A      Yes.
13 Q      Did you ask her to write out this statement?
14 A      I don't recall.
15 Q      Okay.  But this wasn't all you talked about
16 with her?
17 A      It is not.  It's not.
18 Q      Okay.  And going back to your -- the
19 investigation summary, did you type up this
20 investigation summary?
21 A      Yes.
22 Q      And it looks like at the top the initial
23 allegation was inappropriate relationship with
24 direct report, right?
25 A      That was -- yes, that was an allegation.

Page 58

1 Q      And that related to Susan Hart?

2 A      Yes.

3 Q      And then there was also a violation of the

4 company code of conduct with respect to conflict of

5 interest, company accounting and reporting, privacy,

6 respect, guidance in reporting.  Right?

7 A      Yes.

8 Q      And what was that about?

9 A      The allegations that Tommy was paying

10 someone when they were not physically working, and

11 that he was using his son's company's employees as

12 temp labor in the facility and paying them to do

13 work for the plant, construction work for the plant.

14 Q      Okay.  And you also have -- is that your

15 handwriting on this document?

16 A      That is not my handwriting.

17 Q      Okay.  So where it says, "3, horseplay, 4,

18 paying five weeks," that is not your handwriting?

19 A      That is not my handwriting.

20 Q      Okay.  But did you type up this document?

21 A      Yes.

22 Q      All right.  And under "Related policies/

23 procedures," it has code of conduct and harassment,

24 looks like highlighted.

25 A      It appears to be, yes.

Page 59

1 Q      Did you highlight those two sections?

2 A      I don't remember.

3 Q      Okay.  And down in the "Case Facts," did you

4 type up that section?

5 A      Yes.

6 Q      And who was -- do you recall who witness 1

7 was?

8 A      I do not.

9 Q      Do you have a list somewhere that

10 corresponds to who witness 1, 2, 3, 4, so on, were?

11 A      Yes.

12 Q      Okay.  Where would that list be kept?

13 A      With the files.

14 Q      Okay.  Do you recall who witness -- well,

15 based on what it says about witness 1, does that

16 refresh your recollection as to who it could be?

17 A      Yes.  That would be Lana Potts.

18 Q      Okay.  And witness 2, if you could read that

19 and see if it refreshes your recollection as to who

20 witness 2 is.

21 A      (Reviewing document.)

22      I don't recall.

23 Q      Okay.  Do you think that one was Helen?

24 A      I don't know.

25 Q      Okay.  And witness 4 observed Susan with her

Page 60

1 breasts propped up on her desk with Tommy's face

2 approximately two inches away from them.

3      Do you recall who witness 4 is?

4 A      I don't.

5 Q      And some of these are lumped together, so

6 I'm not going to go through those, because it's kind

7 of hard to tell who did what.  But all of these

8 witness statements you typed in here, right?

9 A      Yes.

10 Q      All right.  And these were based on your

11 notes after you talked with them, correct?

12 A      Yes.

13 Q      Witness 7, if you could turn to the next

14 page.  Do you recall who that was who would have

15 told you that?

16 A      Larry Eden.

17 Q      All right.  Witness 1 you said was Lana.

18 Witness 9, do you recall who -- there are two

19 statements from witness -- there's three statements

20 from witness 9 on Page 220.

21 A      (Reviewing document.)

22      I can't say with certainty.

23 Q      Who do you think it is?

24 A      Keith Hall.

25 Q      You think witness 9 was Keith?

Page 61

1 A      I think witness 9 was Keith Hall.

2 Q      So he's observed Susan accessing his e-mail

3 for Mr. Whited, and he had said many times, you can

4 leave now if you don't like how I run things, or it

5 is my way or else.  And was asked to help identify

6 which employees made undesirable comments on the

7 employee engagement survey, on more than one

8 occasion.

9 A      Yes.

10 Q      Okay.  Now, witness 4 stated that Tommy has

11 called him a stupid son of a bitch, among other

12 things.  Was that Mr. Kulakowski?  And I'm in part

13 basing that -- or no.  Maybe it was -- I don't know

14 who it was.

15 A      Yes.  If I look at this one, witness 4 on

16 this 221 page.

17 Q      Okay.

18 A      Yes, witness 4, Michael Kulakowski.

19 Q      Or was witness -- it's got Kuli beside

20 witness 3.

21 A      I don't know whose handwriting that is.

22 Q      Okay.  But you think witness 4 was

23 Kulakowski?

24 A      Yes, I think witness 4 is Michael

25 Kulakowski.

1 Q   So would witness 3 be Jerry Harville?

2 A   I believe witness 3 is Jerry Harville.

3 Q   Okay.

4 A   Yes. Jerry Harville, witness 3.

5 Q   And I guess -- you said Eden was 7.

6     And the notes that you have written on here,

7 these were the notes that you'd obtained as of

8 8/16/2016. Is that fair to say?

9 A   Yes.

10 Q   And these were based on notes that you had

11 taken from talking to these people?

12 A   Yes.

13 Q   And after getting this report, at any point

14 in time -- before Mr. Whited's termination, at any

15 point in time, did y'all put him on suspension while

16 you were investigating these things or place him out

17 of the workplace?

18 A   I don't recall.

19 Q   Well, that should be documented somewhere if

20 y'all had suspended him pending investigation,

21 right?

22 A   Yes. I don't recall.

23 Q   You just don't recall if he was suspended

24 pending --

25 A   I don't recall, correct.

1 Q   And while you're investigating, employees

2 indicated they were fearful of Mr. Whited, right?

3 A   Yes.

4 Q   What were they fearful of, that you can

5 recall?

6 A   Being terminated, I recall that. And one

7 indicated he thought he might get him.

8 Q   Was that Mr. Kulakowski?

9 A   Yes.

10 Q   So, he was afraid of some sort of physical

11 violence or harm?

12 A   Yes. He made mention.

13 Q   After you terminated -- after y'all had made

14 the decision to terminate Mr. Whited, is that why

15 y'all brought security out to the plant?

16 A   We did bring security, yes.

17 Q   Why did you do that?

18 A   I wasn't on that call.

19 Q   Okay. How long was security posted out at

20 the plant?

21 A   I don't remember.

22 Q   Who would know about that?

23 A   Melinda McGraw.

24 Q   As far as you know, she was the one involved

25 in that decision?

1 A   The best I recall. I really don't remember

2 who all was involved. I just don't remember.

3 Q   Okay. Do you recall if you received any

4 e-mails about -- that security was going to be

5 posted out at the plant or any new procedures or

6 anything like that?

7 A   I don't remember.

8 Q   Have you experienced that before, where

9 y'all have had to terminate an employee and post

10 security at a plant?

11 A   Yes.

12 Q   What other times have y'all done that?

13 A   We have done it one other time in Gallatin.

14 Q   Who was the employee that y'all had

15 terminated?

16 A   J.R. Sanders.

17 Q   Why did y'all do it when J.R. Sanders was

18 terminated?

19 A   Because of the allegations.

20 Q   What was the allegation?

21 A   I don't recall specifically other than it

22 obviously had something to do with -- it was

23 violence.

24 Q   Okay. So, he had either committed violence

25 or engaged in threats of violence?

1 A   I don't know. Keith Hall and Al Hasbrouck,

2 the plant manager and general manager, had concerns.

3 I don't remember his specific termination reason,

4 but they had concerns.

5 Q   Okay. Do y'all have a particular custom or

6 policy that y'all would follow when you decide that

7 you need to post security out at a facility after

8 the termination of an employee?

9 A   I don't understand the question.

10 Q   Well, do y'all have a specific policy in

11 place that if certain types of allegations have been

12 made, we're going to post security or anything like

13 that? Or is it just a case-by-case basis?

14 A   There may be something in our safety policy,

15 but I don't -- I don't recall at this time.

16 Q   Okay. Would you say that it's more an

17 unusual thing for y'all to post security out at a

18 facility after an employee's termination?

19 A   I wouldn't consider it unusual, no.

20 Q   So y'all do that frequently?

21 A   I didn't say that. I just don't feel that

22 it's unusual.

23 Q   Why do you not feel it's unusual?

24 A   Because in this day and time, if we need to,

25 we will. But I don't think it's unusual.

Page 66

1  Q      Well, you've only had it happen twice.
2  A      That I can recall.
3  Q      That you can recall, okay.
4  A      And that's just the facilities that I am
5  responsible for.
6  Q      Sure.
7  A      I remembered another time.
8  Q      Okay.  You said you remembered another time.
9  Tell me about that.
10  A      At Chattanooga, we had security come out.
11  Q      Okay.  What was the context of that
12  situation?
13  A      It was a termination of an employee.
14  Q      Were they -- was it a violent -- concerns
15  about violence with them, too?
16        MS. DOHNER SMITH:  Objection.
17        THE WITNESS:  I don't recall, but I
18  remember we did have security at that facility at
19  one time on a termination.
20  BY MS. COLLINS:
21  Q      Was it -- do you recall if it was a
22  high-level employee?
23  A      No.  I recall that it was an hourly
24  employee.
25  Q      Okay.  And J.R. Sanders, he was an hourly

Page 67

1  employee as well, right?
2  A      Yes.
3  Q      So it's not something y'all just do if it's
4  a general manager, right?
5        MS. DOHNER SMITH:  Objection.
6        THE WITNESS:  Rephrase.  Or please
7  re-ask the question.
8  BY MS. COLLINS:
9  Q      Having security brought out to a plant after
10  a termination, that's not something y'all do as a
11  matter of course or just because you've let go a
12  plant manager, right, or general manager?
13  A      Correct.
14  Q      It depends on the situation.
15  A      Yes.
16  Q      Okay.  Or I guess I should say, it depends
17  on the employee and the context of that situation.
18  A      Not necessarily the employee.  The
19  situation.
20  Q      Right.  What happened with that employee,
21  right?
22  A      Yes.
23  Q      Okay.
24        MS. COLLINS:  Let's mark the next
25  document as Exhibit 17.

Page 68

1        (Marked Exhibit No. 17.)
2  BY MS. COLLINS:
3  Q      Do you recognize this document?
4  A      Yes.
5  Q      Who was this that you had talked to?  "I
6  just got off the phone with J.C."
7  A      J.C. Cox.
8  Q      Okay.  And this e-mail that you sent on
9  August 18th, that was the day that you talked with
10  Mr. Cox?
11  A      Yes.
12  Q      Is this the only time that you talked with
13  Mr. Cox with respect to the Whited investigation?
14  A      Yes.
15  Q      Now, you noted in this e-mail -- first, were
16  these the only notes that you created from this
17  conversation?
18  A      I don't recall.
19  Q      Okay.  If you had created other notes, would
20  you have put them in your file?
21  A      Yes.
22  Q      Okay.  And he mentioned -- or you recorded
23  in this e-mail that he had said he has seen
24  horseplay, but nothing that would be considered
25  inappropriate.

Page 69

1        Do you recall any specifics as to what sort
2  of horseplay he had seen?
3  A      I don't recall.
4  Q      Did you ask him who had engaged in
5  horseplay?
6  A      I don't recall.
7  Q      Would there be anything else you could look
8  at to help refresh your recollection as to what you
9  talked about with J.C. Cox?
10  A      Maybe.
11  Q      What?
12  A      The investigation notes.
13  Q      The ones we just went through?  Well, the
14  ones that came after this?
15  A      Yes.
16  Q      Okay.  All right.  And when you have the
17  initials in this report, "he has no proof nor seen
18  anything between S.H. and T.W...." is that Susan
19  Hart and Tommy Whited?
20  A      Yes.
21  Q      And at the bottom of this e-mail from
22  August 18, 2016, Ms. McGraw says, "I think you may
23  have to bite the bullet and go investigate because
24  who knows if they'll call you back."
25        So, up to this point, had you just made

Page 70

```
1   phone calls about -- with employees about what was
2   going on or had you --
3   A        No.
4   Q        Okay.  You'd gone out to the plant?
5   A        Yes.
6   Q        And was it to talk with the people we've
7   already talked about, Lana Potts and Jerry Harville
8   and those six?
9   A        Repeat the question.
10  Q        Before August 18th, had you already gone
11  out and talked -- had you already gone out to the
12  plant and met with some of the employees?
13  A        Yes.
14  Q        Okay.
15           MS. COLLINS:  All right.  Let's mark
16  the next document as Exhibit 18.
17           (Marked Exhibit No. 18.)
18  BY MS. COLLINS:
19  Q        Are these your other notes that you
20  mentioned a minute ago?
21  A        These are additional notes, yes.
22  Q        Okay.  And did you create these notes as you
23  were talking to the people or after you talked to
24  the people?
25  A        I don't recall.
```

Page 71

```
1   Q        All right.  The -- for each name, you have a
2   date that looks like it was longer ago.  Is that
3   when they started working for WestRock or RockTenn?
4   Like by Donnie Taylor, it says 8/8/94.
5   A        I can only assume.  That appears to being
6   their hire date.
7   Q        But these are your notes, right?
8   A        These are my notes.
9   Q        And you created this document, right?
10  A        Yes.
11  Q        So, when you talked with J.C. Cox, you said,
12  "When asked about inappropriate horseplay, he said
13  they cut up but nothing physical."
14           Did you get any specifics from him by what
15  he meant by horseplay or how they cut up?
16  A        Repeat the question, please.
17           (The requested question was read back
18  by the court reporter as follows:
19           "Question:  So, when you talked with
20  J.C. Cox, you said, 'When asked about inappropriate
21  horseplay, he said they cut up but nothing
22  physical.'
23           Did you get any specifics from him by
24  what he meant by horseplay or how they cut up?")
25           THE WITNESS:  I don't recall.
```

Page 72

```
1   BY MS. COLLINS:
2   Q        Do you know if you would have provided him
3   examples of what you meant by horseplay?
4   A        It's possible.
5   Q        But you just don't know?
6   A        I don't recall.
7   Q        All right.  Did you record any of these
8   conversations, audio record them?
9   A        No.
10  Q        And then it says, "When asked did you
11  witness horseplay that resulted in an employee
12  ending up on the ground, he said no..."
13           Was that -- did you give him any specifics
14  about that or did you just say exactly what you have
15  recorded there?
16  A        I would have asked exactly what is right
17  there.
18  Q        Okay.  All right.  August 18th, was that
19  the day that you spoke with Terry Stafford?
20  A        Yes.
21  Q        About how long was your conversation with
22  Terry Stafford?
23  A        His would have -- brief.  Maybe 10, 15
24  minutes max.
25  Q        Doesn't look like he had a lot to say other
```

Page 73

```
1   than naw.  Is that fair to say?
2   A        That's fair to say.
3   Q        Did it seem like he didn't want to get
4   involved?
5   A        I don't know.
6   Q        Okay.  Did you ask him specifically if he'd
7   witnessed Tommy Whited kicking Michael Kulakowski in
8   the groin?
9   A        I did not use Kulakowski's name.
10  Q        Did you ask him specifically if he had seen
11  Tommy Whited kick another employee in the groin?
12  A        No.
13  Q        Okay.  And Donnie Taylor, when you met with
14  him, about how long did you talk with him?
15  A        I believe this phone conversation was
16  possibly 30 minutes.
17  Q        Okay.  Were all three of these phone
18  conversations?
19  A        Yes.
20  Q        And he said that he had witnessed
21  inappropriate behavior in the form of Tommy kicking
22  W4, an employee, W4.  And that would be Michael
23  Kulakowski, right?  Or was W4 Jerry Harville?
24           MS. DOHNER SMITH:  I think W4 was
25  Mr. Kulakowski.
```

Page 74

1 BY MS. COLLINS:
2 Q       Yeah.  W4 was Kulakowski, right?
3 A       Yes.
4 Q       So he specifically identified Michael
5 Kulakowski?
6 A       Yes.
7 Q       All right.  And he also stated that he had
8 witnessed the kicking in the groin area on more than
9 one occasion?
10 A       Yes.
11 Q       That's a violation of WestRock policy,
12 right, the kicking in the groin?
13 A       Yes.
14 Q       Did you talk with him again after this phone
15 conversation?  Did you meet with him?
16 A       Yes.
17 Q       Out at the sheet plant?
18 A       No.
19 Q       Where did you meet with him?
20 A       Fulfillment.
21 Q       Okay.  Was that before Mr. Whited was fired?
22 A       Yes.
23 Q       Other than Lana Potts, do you recall if you
24 got a signed or written statement from any of these
25 other employees?

Page 75

1 A       I don't recall, no.
2 Q       Okay.  And you didn't have any handwritten
3 notes that you base this off of, did you?
4 A       I don't recall.
5 Q       Okay.
6         MS. COLLINS:  Let's mark the next
7 document as Exhibit 19.
8         (Marked Exhibit No. 19.)
9 BY MS. COLLINS:
10 Q       Have you seen this document before?
11 A       Yes.
12 Q       Okay.  And was this the final investigation
13 summary report that you did?
14 A       It appears to be.
15 Q       And so this one would have incorporated
16 additional information that you had obtained since
17 you did the initial draft, right?
18 A       Yes.
19 Q       Who did you send this report to?
20 A       I don't remember.
21 Q       Who would you typically send a report like
22 this to?
23 A       It could have been my boss.  It could have
24 been her boss.  It could have been legal.
25 Q       Okay.  And your boss is Melinda McGraw,

Page 76

1 right?
2 A       At that time, yes.
3 Q       And her boss at that time was?
4 A       Joy Jones.
5 Q       And who would legal have been?
6 A       Stacey Moulton.
7 Q       Is Ms. Moulton no longer with the company?
8 A       Correct.
9 Q       And on the last page of the document, the
10 Summary of Findings/Conclusion, were these all the
11 policies that he had violated?
12 A       Conflict of interest was not confirmed.
13 Q       Okay.  But the others were?
14 A       Yes.
15 Q       Okay.  And where it says, Workplace
16 Violence/Horseplay, was that with respect to him
17 kicking and hitting other male employees in the
18 groin?
19 A       Yes.
20 Q       Why wasn't that a violation of -- why didn't
21 y'all note that as a violation of the sexual
22 harassment policy?
23         MS. DOHNER SMITH:  Objection.
24         THE WITNESS:  I don't know.
25

Page 77

1 BY MS. COLLINS:
2 Q       Who made the decision to put that Workplace
3 Violence/Horseplay?
4 A       That note?
5 Q       Yes.
6 A       That's my note.  I put that in there.
7 Q       Okay.  And that was confirmed, that he had
8 violated that policy, right?
9 A       Yes.
10 Q       And what would be your definition, or what
11 did you consider horseplay to be?
12 A       My definition of horseplay?
13 Q       Yeah.  When you listed Workplace
14 Violence/Horseplay, what did you consider to be
15 horseplay?
16 A       Goofing off.
17 Q       What does that consist of?
18 A       Could consist of a lot of things, I guess.
19 Q       Well, with respect to what you wrote here,
20 Workplace Violence/Horseplay, what horseplay?
21 A       Punching in the shoulder or, you know,
22 there's lots of things that horseplay could be.
23 Q       I'm talking about specifically what you
24 reference here that was a confirmed violation of
25 company policy, and you have horseplay specifically

Page 78

1  listed.
2          So specifically with respect to Tommy
3  Whited, what horseplay constituted a policy
4  violation?  What conduct did he engage in that
5  constituted horseplay?
6  A       Kicking an employee out of their chair
7  constitutes horseplay.  Private areas, knocking a
8  bump cap off an employee's head.
9  Q       When you said private areas, what do you
10 mean?
11 A       The groin area.
12 Q       Okay.  What else?
13 A       That's all I recall from this.
14 Q       Okay.
15         MS. COLLINS:  Let's mark the next
16 document as Exhibit 20.
17         (Marked Exhibit No. 20.)
18 BY MS. COLLINS:
19 Q       Have you seen this document before?
20 A       Yes.
21 Q       Is that your company e-mail address?
22 A       Yes.
23 Q       Okay.  So, it looks like on August 26, you
24 told Ms. McGraw that -- you said you added kicked.
25 What did you add kicked to?

Page 79

1  A       The list of questions she was going to ask
2  Tommy.
3  Q       Okay.  Were you present when she met with
4  him to question him?
5  A       Yes.
6  Q       Who else was present?
7  A       Tom Pedine.
8  Q       So, on Friday, August 26, was that the date
9  that you met with Tommy Whited?
10 A       Yes.
11 Q       Okay.
12         MS. COLLINS:  Let's mark the next one
13 as Exhibit 21.
14         (Marked Exhibit No. 21.)
15 BY MS. COLLINS:
16 Q       Have you seen this document before that's
17 been marked as Exhibit Number 21?
18 A       Yes.
19 Q       And are these notes that you created?
20 A       Yes.
21 Q       Let's start at the top.  On August 26, 2016,
22 it says "M.K."  Is that Michael Kulakowski?
23 A       Yes.
24 Q       And did you meet with him at 3:10 p.m.?
25 A       Yes.

Page 80

1  Q       These are notes from your conversation with
2  him?
3  A       These are notes on a conversation where
4  Melinda McGraw and Tom Pedine were present.
5  Q       Did you talk with him or did they primarily
6  talk to him?
7  A       I don't remember, but we were all three
8  together in the same room.
9  Q       Where were y'all?
10 A       Fulfillment.
11 Q       Did you take any other notes besides these?
12 When you were meeting with Michael Kulakowski on
13 August 26 at 3:10 p.m.?
14 A       No.  These would be the notes that I took.
15 Q       Did you take any handwritten notes?
16 A       No.
17 Q       Did Mr. Pedine or Melinda McGraw take any
18 notes?
19 A       I don't remember.
20 Q       So these are all the -- everything that you
21 recorded here were things that Mr. Kulakowski said
22 during the meeting, right?
23 A       Yes.
24 Q       Do you recall Mr. Pedine asking him why
25 didn't he just quit if it was that bad, or something

Page 81

1  to that effect?
2  A       Something to that effect, yes.
3  Q       Tell me what you recall.
4  A       I don't recall the exact words, but
5  something of the nature of if it was this bad, you
6  know, why would you not have quit?  And again, I
7  don't recall -- that's not verbatim.
8  Q       Sure.  Do you recall Mr. Kulakowski's
9  response?
10 A       Only if it's in this.
11         (Reviewing document.)
12         It doesn't appear.
13 Q       That you recorded his response,
14 Mr. Kulakowski's response?
15 A       Not at first glance.
16 Q       Okay.  And you didn't record that Mr. Pedine
17 asked him that question, right?  You just recall
18 that he did ask him something to that effect?
19 A       Correct.
20 Q       Okay.  Do you think that was an appropriate
21 thing to be asked?
22         MS. DOHNER SMITH:  Objection.
23         THE WITNESS:  No.
24 BY MS. COLLINS:
25 Q       Okay.  Why not?

Page 82

1  A      Well, I can't speak for Tom, but he was
2  asking -- he was trying to figure out what was going
3  on with Kulakowski and his thought process.  But I
4  can't speak for Tom.
5  Q      You would agree with me that an employee who
6  is being harassed or kicked by their boss shouldn't
7  have to quit to get away from it, right?
8  A      I agree.
9  Q      Okay.  And you also have that -- going down
10 the page, you have Donnie Taylor at 4:10 p.m.
11 A      Yes.
12 Q      So was that when y'all -- did all three of
13 y'all meet and talk with Donnie Taylor as well, or
14 just you?
15 A      I believe the three of us were in the room.
16 Someone could have left.  I don't recall
17 specifically.  But it was the same day.
18 Q      Now, did you find Mr. Taylor to be credible?
19 A      Yes.
20 Q      Did you find Mr. Kulakowski to be credible
21 when y'all met with him?
22 A      Yes.
23 Q      And did you record -- is this the general
24 substance of the things that Mr. Taylor told you on
25 that day?

Page 83

1  A      Yes.
2  Q      And this was also on August 26th, correct?
3  A      Yes.
4  Q      And this was an in-person meeting, right?
5  A      Yes.
6  Q      And he had verified that he had seen
7  Mr. Kulakowski get slapped on the back of the head,
8  slapped in the nuts, kicked in the nuts, right?
9  A      Yes.
10 Q      And he also said that he'd never heard
11 Mr. Whited apologize to Mr. Kulakowski for doing
12 those things, right?
13 A      Correct.
14 Q      Okay.  And he also stated that "I have heard
15 Tommy say, I ought to just fire him," referring to
16 Michael Kulakowski, and he "puts a lot of pressure
17 and jobs on Kuli."
18 A      Yes.
19 Q      Was there anything else about that that you
20 can recall him saying?
21 A      I don't recall.
22 Q      And he said that he messes with a lot of
23 people, but further on down the line he is serious
24 and isn't horseplay anymore.
25         What did that mean?  Or did y'all ask him

Page 84

1  more about that?
2  A      I don't recall.
3  Q      But did you get the impression from
4  Mr. Taylor that it wasn't funny, what Mr. Whited was
5  doing to these people, when he would hit them and
6  kick them?
7  A      Yes.
8  Q      And he also, Mr. Taylor also said that -- if
9  you go to the next page, 233, that he had also been
10 slapped in the head.
11 A      Yes.
12 Q      And it says, "He slapped T.W. in leg," and
13 "slapped him in nuts."
14         Does that mean that Tommy Whited had also
15 hit him in the testicles?
16 A      Repeat the question, please.
17 Q      Had he also complained that Tommy Whited had
18 hit him in the testicles?
19 A      Yes.
20 Q      Is he still working there?
21 A      Donnie?
22 Q      Yes, Donnie.
23 A      Yes.
24         MS. COLLINS:  The next document, let's
25 mark this as Exhibit 22.

Page 85

1         (Marked Exhibit No. 22.)
2  BY MS. COLLINS:
3  Q      Okay.  Do you recognize this document?
4  A      Yes.
5  Q      Did you create this document?
6  A      Yes.
7  Q      Did you have any help creating this or were
8  these just contemporaneous notes you made during
9  your meeting with Tommy Whited?
10 A      I'm not sure I understand.
11 Q      Are these the notes that you took at the
12 time that you met with Tommy Whited?
13 A      Yes.
14 Q      Was Mr. Pedine and your supervisor, Melinda
15 McGraw, also present?
16 A      Yes.
17 Q      And this meeting, did it take place at the
18 fulfillment center?
19 A      Yes.
20 Q      Okay.  So it looks like there's questions
21 and then you recorded answers that he gave, right?
22 A      Yes.
23 Q      Did you record this meeting with an audio?
24 A      No.
25 Q      If you could turn to the second page,

Page 86

1 Page 235 down at the bottom, did you ask the
2 questions or did one of the others ask the
3 questions?
4 A        I did not ask the questions.
5 Q        Who asked the questions?
6 A        Melinda McGraw.
7 Q        It looks like Ms. McGraw asked him, "Have
8 you participated in horseplay with an employee?"
9 A        Yes.
10 Q        And he said, "I have not participated in
11 horseplay under the definition that I gave."
12        What does that mean?  Did she define
13 horseplay for him?
14 A        I don't recall that she did that.
15 Q        What does that mean, "I have not participate
16 in horseplay under the definition that I gave"?
17 A        I don't know.
18 Q        The question was also, "Have you ever hit or
19 grabbed an employee," and he admitted that he had
20 but that -- it looks like he just smacked people on
21 the backs or on the shoulder?
22 A        On the shoulder, yes.
23 Q        Do you recall if y'all specifically asked
24 him if he had hit people in the groin?
25 A        I don't recall.

Page 87

1 Q        Okay.  Actually, it's on the next page.
2 Y'all asked him if he had ever hit an employee with
3 a broom, and he didn't recall that, right?  He
4 didn't recall hitting anybody with a broom?  It
5 starts at the bottom of 235 and goes to the top of
6 236.
7 A        Okay.  Please repeat the question.
8 Q        So y'all asked him if he had ever hit an
9 employee, it says in the ass with the broom, and he
10 denied recalling doing so, right?
11 A        He doesn't recall.
12 Q        Did you find him to be credible when y'all
13 interviewed him?  Did you find him to be honest?
14 A        In the investigation?
15 Q        Yes, Mr. Whited.
16 A        No.
17 Q        Okay.  And it looks like -- I just asked you
18 a second ago about the groin question.  You
19 recorded, "How about in the groin/private area, have
20 you ever hit or kicked an employee there"?
21 A        Okay.
22 Q        And it looks like he gave y'all kind of a
23 vague answer.  Is that fair to say?
24        MS. DOHNER SMITH:  Objection.
25        THE WITNESS:  No.

Page 88

1 BY MS. COLLINS:
2 Q        What does this mean?
3 A        He gave an answer.
4 Q        "The action of going to do it, but they
5 don't do it, so they act like it, walking up to
6 someone and acting like it but not, and it is all
7 understood."
8        What does that mean?
9 A        I remember him saying, acting like they were
10 going to do something to someone, but not physically
11 touching someone.
12 Q        Okay.  So he did not admit to hitting other
13 employees in the groin?
14 A        He did not.
15 Q        And he didn't recall hitting a hat off of
16 another employee?
17 A        Not that he recalls.
18 Q        And he denied kicking a chair out from under
19 an employee, right?
20 A        He denied kicking the chair out.
21 Q        I think you said you didn't believe some of
22 his responses.  Is that right?
23        MS. DOHNER SMITH:  Objection.
24        THE WITNESS:  You asked if I found him
25 credible.

Page 89

1 BY MS. COLLINS:
2 Q        And you said no, correct?
3 A        Yes.
4 Q        And did you believe some of his responses?
5 A        I don't remember.
6 Q        Do you believe -- did you believe him when
7 he said he hadn't done some of those things?
8 A        I don't remember specifically.
9 Q        What about sitting here today?
10 A        I don't understand.
11 Q        Do you believe -- where he denied doing some
12 of these things, do you believe him?
13 A        I do not -- I don't know if I believe.
14 Q        Why not?
15 A        Because it's what I could prove, not what I
16 believe.
17 Q        Okay.  Multiple other employees disputed the
18 testimony that -- or the statements that he gave,
19 right?
20        MS. DOHNER SMITH:  Objection.
21 BY MS. COLLINS:
22 Q        About hitting in the groin?
23 A        Rephrase the question.
24 Q        Multiple other employees disputed his
25 testimony about hitting in the groin, correct?

Page 90

1          MS. DOHNER SMITH:  Objection.
2          THE WITNESS:  Yes.
3  BY MS. COLLINS:
4    Q      And it looks like y'all interviewed Susan
5  after that, right, on Page 237?
6    A      Yes.
7    Q      Do you know if y'all asked her if she had
8  ever seen him, Tommy Whited, hit or kick employees
9  in the groin?  I didn't see it on here.
10   A      I don't recall.  It does not appear that
11  we --
12          (Overlapping speech.)
13   Q      Did you find her to be credible?
14   A      I don't recall.
15   Q      You don't recall if you thought that she was
16  credible?
17   A      I don't.
18          MS. COLLINS:  Let's mark the next
19  document as Exhibit 23.
20          (Marked Exhibit No. 23.)
21  BY MS. COLLINS:
22   Q      Have you seen this document before?
23   A      I believe so.
24   Q      Okay.  And after -- well, before y'all
25  terminated Mr. Whited, it looks like he had

Page 91

1  communicated to Mr. Pedine -- or Ms. McGraw that he
2  wanted to transfer Mr. Kulakowski.
3    A      I don't remember the specifics, but yes, I
4  believe they had a conversation.
5    Q      Okay.  And that was -- that attempt was
6  blocked, to transfer him to another -- to transfer
7  Mr. Kulakowski to another position, correct?
8    A      Correct, yes.
9    Q      Why was that?  Why did y'all block that
10  move?
11   A      I wasn't involved in that exact discussion
12  to recall exactly.
13   Q      Did you have an understanding as to why they
14  blocked that?
15   A      I don't remember.
16          MS. COLLINS:  Let's mark the next
17  document as Exhibit 24.
18          (Marked Exhibit No. 24.)
19  BY MS. COLLINS:
20   Q      Have you seen this document before?
21   A      Yes, ma'am.
22   Q      Were you present the day Tommy Whited was
23  terminated?
24   A      Yes.
25   Q      Okay.  Who all was present?

Page 92

1    A      Myself, Melinda McGraw, Jeb Bell, and Tom
2  Pedine.
3    Q      Okay.
4    A      And Tommy Whited.
5    Q      Okay.  Who filled -- who typed up this
6  document?  Did you type this up?
7    A      I did not.
8    Q      Okay.  And it looks like "involuntary
9  separation" was written on there.  Whose initials
10  are those?
11   A      Melinda McGraw.
12   Q      What did it say before that?
13   A      I have no idea.
14   Q      It looks like at the top the reason for
15  separation, the quit box was initially checked, and
16  then the discharge box was checked and circled.
17          Do you know if he was initially offered the
18  opportunity to resign?
19   A      Yes.
20   Q      Why was that?
21   A      I don't know.
22   Q      Was he offered a separation package or a
23  severance agreement?
24   A      Not to my knowledge.
25   Q      Did he decline to resign voluntarily?

Page 93

1    A      Per this document, it appears that way.
2    Q      Okay.  Do you know why he was given that
3  choice?
4    A      I do not.
5    Q      Were you involved in any discussions about
6  giving him the choice?
7    A      I was not.
8    Q      Who would be involved in that?
9    A      I can only assume Melinda McGraw, maybe Tom,
10  maybe Jeb Bell.  I don't know.
11          MS. COLLINS:  Okay.  Let's mark the
12  next one as Exhibit 25.
13          (Marked Exhibit No. 25.)
14  BY MS. COLLINS:
15   Q      Have you seen this document before?
16   A      Yes.
17   Q      Okay.  I'm going to start on the seventh
18  page, which is the earliest in time, the last page.
19  Was this the Speak Up! e-mail that you were talking
20  about --
21   A      Yes.
22   Q      -- that started everything?
23   A      Yes.
24   Q      Okay.  And if you could just -- we're going
25  to go through them backwards to forwards.

Page 94

1   A       All right.

2   Q       So, the first time you got this complaint,

3   is it fair to say you got it on August 11th, or do

4   you think you got it before that?

5   A       I'm not sure.

6   Q       Okay.  Now, if you could turn to the next

7   page, 201 down at the bottom, it looks like on

8   August 11th, you said you were going out there

9   tomorrow.  And that was the Gallatin plant, right?

10  A       Yes.

11  Q       And you said, "She didn't want to talk on

12  the phone, as it was not private, but she was loud

13  when she said, 'escaping from a toxic environment

14  and had a better job opportunity...'"

15          Was that Lana?

16  A       No, ma'am.

17  Q       Who was that?

18  A       Johanna Crowder.

19  Q       Johanna, okay.  And at this point, do you

20  recall if you had talked with any other employees,

21  on August 11th, beside Johanna?

22  A       It appears -- no.

23  Q       And then it looks like that later that

24  afternoon, Joy Jones said, you know, there was at

25  least enough to let them know there was a problem.

Page 95

1   And then at that point did you proceed further with

2   the investigation?

3   A       Yes.

4   Q       And on August 19th, it looks like Melinda

5   McGraw wrote to Joy that you had spoken with two of

6   the four alleged witnesses, but neither had

7   substantiated Mike's statement.

8           What Mike are you referring to?  Michael

9   Kulakowski or Mike White or who?

10  A       Melinda wrote that.  I can only assume she

11  meant Michael Kulakowski.

12  Q       Okay.  And just skipping to the first page,

13  it looks like on August 22nd, you sent them an

14  e-mail saying you just got off the phone with the

15  third employee.

16          Who was that?

17  A       I don't know.

18  Q       Was that Jerry Harville?

19  A       No.  I talked to Jerry Harville in person.

20  Q       Okay.  And you also noted that "it may be

21  that he is unwilling to call me due to being related

22  to the facility manager, Mike White, as Mike is very

23  tight with Tommy."

24          When you were saying I've still not been

25  able to touch base with the fourth, who was that?

Page 96

1   A       I don't recall.  I would need to look at

2   notes.

3   Q       What notes would you need to look at?

4   A       One of the previous ones that we had, that

5   had the -- there was one that had four people that I

6   talked to via phone.

7   Q       Okay.  It wasn't one of the ones we've

8   already gone over?

9   A       Yes.

10  Q       It was one of the ones we've already gone

11  over?

12  A       Yes.

13  Q       Was it Exhibit Number 18 where you had

14  "Tommy Davis, not able to touch base with him"?  Was

15  it him?

16  A       I can't say with certainty, but based on

17  this e-mail, I never spoke with him.  He never

18  returned my call.

19  Q       You never talked to Tommy Davis?

20  A       Not -- no, I did not.

21  Q       Okay.  Who told you that Mike White is very

22  tight with Tommy?

23  A       I don't remember.

24  Q       And on August 22nd, you state in this

25  e-mail that "this employee stated that he has

Page 97

1   witnessed inappropriate behavior/horseplay in the

2   form of Tommy kicking an employee (W4) in the groin,

3   smacking the employee in the back of the head and

4   punching the employee in the arm/shoulder area.  He

5   can't recall the dates, but the most recent was a

6   few months ago.  He stated he has witnessed the

7   kicking in the groin area on more than one

8   occasion."

9           Do you recall -- do you know who that was?

10  Does that help refresh your recollection?

11  A       If I could see that.

12  Q       Sure.  Exhibit 18.

13  A       Donnie Taylor.

14  Q       Okay.

15          MS. COLLINS:  Let's mark the next one

16  as Exhibit 26.

17          (Marked Exhibit No. 26.)

18  BY MS. COLLINS:

19  Q       Do you recognize this document?

20  A       Uh-huh.

21  Q       Are these some more of your notes and

22  e-mails you sent about the Whited investigation?

23  A       Yes.

24  Q       And on August 17th, you had talked -- had

25  you talked with Michael Kulakowski that day?

Page 98

1  A        Yes.
2  Q        Was this the day that you talked with him on
3  the phone?
4  A        I don't know for sure.
5  Q        Okay.  Now, on the next page, Page 207,
6  there's an e-mail from Joy Jones to Melinda McGraw,
7  and it asks, "Do you know the names of the employees
8  referenced below?"
9          Do you know if there were any employees
10 referenced initially?
11 A        In the Speak Up! call?
12 Q        Yes.
13 A        Their names were not referenced in the
14 Speak Up! call.
15 Q        Are there any names that were previously
16 referenced before August 9th that you can think of
17 or know of?
18 A        I'm not sure I understand.
19 Q        Well, on August 9th, had you gotten -- you
20 probably just don't know.  I mean, it's not -- I was
21 just trying to figure something out.  It's okay.
22 Let's move on.
23          MS. COLLINS:  Let's mark the next
24 document as Exhibit 27.
25          (Marked Exhibit No. 27.)

Page 99

1  BY MS. COLLINS:
2  Q        Do you recognize this document?
3  A        Yes.
4  Q        And are these more notes that you had sent?
5  A        These are the notes from the investigation
6  and I sent them to myself, my typed notes.
7          MS. COLLINS:  You know what, Mary, we
8  were talking earlier about the disconnect between
9  the pages.
10         MS. DOHNER SMITH:  Yes.
11         MS. COLLINS:  I think that this -- the
12 first page of Exhibit 26 is the first page of this
13 one.  And so then I'm just not sure what the -- what
14 207 goes to, but I think it looks like this is what
15 the first page, looks like 208, because these are
16 her notes from Kulakowski.
17         MS. DOHNER SMITH:  Yeah.
18         MS. COLLINS:  Does that sound right to
19 you?
20         MS. DOHNER SMITH:  That looks like,
21 yes.
22         MS. COLLINS:  Okay.  Let's go off the
23 record for one second.
24         (Discussion off the record.)
25         MS. COLLINS:  Let's go back on the

Page 100

1  record.
2          We just fixed Exhibits 26 and 27.  So
3  now Exhibit 26, it's Bates range 207 and 206.  And
4  then Exhibit Number 27 is Bates range 208 to 214.
5  BY MS. COLLINS:
6  Q        All right.  Ms. Henley, now, we've gone
7  through the first page that's labeled page --
8  WestRock 208.  These are your notes from
9  August 17th with Michael Kulakowski, correct?
10 A        Yes, they're notes from Kulakowski.
11 Q        And you met with him on August 17th, 2016,
12 correct?
13 A        I don't remember which date I talked to him
14 on the phone and which date was in person.
15 Q        Okay.  And your notes from your conversation
16 with him go through what's labeled WestRock 208
17 through 209, correct?  Well, and the top of 210.
18 A        Yes, to the top of 210.
19 Q        Okay.  And when you talked with him on
20 August 17th, 2016, he had told you about the name
21 calling and the hitting and the smacking and the
22 kicking by Mr. Whited against him, right?
23 A        Repeat the question, please, ma'am.
24 Q        When you talked with Mr. Kulakowski on
25 August 17th, 2016, he told you that he was afraid

Page 101

1  of Mr. Whited, right?  That's on the first page.
2  A        Yes.
3  Q        And he also told you that Mr. Whited called
4  him different names and threw a helmet at him.  It's
5  on the first page.
6  A        Yes.
7  Q        Okay.  And that he had been kicked in the
8  groin.
9  A        Yes.
10 Q        And that Mr. Whited had grabbed his zipper
11 and asked him to come into the bathroom to do this.
12          Do you know what he meant by that?
13 A        He stated Tommy grabbed Tommy's zipper.
14 Q        Tommy grabbed his own zipper?
15 A        Yes.
16 Q        And asked Mr. Kulakowski to come into the
17 bathroom and, quote, do this?
18 A        Yes, that is what Kulakowski said.
19 Q        Did you ask him what he meant by do this?
20 A        I don't recall if I asked him that
21 specifically.
22 Q        What did you take that to understand that
23 meant?
24 A        I didn't know at this time.  When he first
25 told it to me, I didn't understand.  I misunderstood

Page 102

1  him on the phone conversation.
2  Q        What do you mean?
3  A        I thought that he meant that Tommy had
4  grabbed his zipper.  I misunderstood him.  He later
5  explained -- and I don't recall if it's in this --
6  that Tommy grabbed his own zipper while going into
7  the bathroom.
8  Q        And said something -- it says, "shake in his
9  pants."  "Asking him to come into the bathroom to do
10  this; shake in his pants."
11  A        Grab the zipper, shook it, like his pants.
12  Q        So it was like he was requesting
13  Mr. Kulakowski come in the bathroom with him?
14  A        I don't know exactly what he was doing.
15  Q        Is that what you took that to mean?
16  A        Repeat it, the question.
17  Q        Is that what you took that to mean, that he
18  was shaking his -- that Mr. Whited was shaking his
19  groin area and telling him to come into the
20  bathroom?
21          MS. DOHNER SMITH:  Objection.
22          THE WITNESS:  I don't know what Tommy
23  meant, so I don't know.
24  BY MS. COLLINS:
25  Q        But if Mr. Whited was shaking his -- shaking

Page 103

1  his own groin area and telling Mr. Kulakowski to
2  come into the bathroom with him, implying some sort
3  of sexual favor, that would be --
4          MS. DOHNER SMITH:  Objection.
5  BY MS. COLLINS:
6  Q        -- inappropriate, correct?
7  A        Yes.
8  Q        And that would be sexual harassment,
9  correct?
10         MS. DOHNER SMITH:  Objection.
11  BY MS. COLLINS:
12  Q        If he were implying a request for a sexual
13  favor.
14  A        Yes.
15  Q        And Mr. Kulakowski also told you that
16  Mr. Whited had done -- had also hit Jerry Harville
17  in the groin area, right?
18  A        Yes.
19  Q        And you were able to substantiate that
20  allegation, correct?
21  A        Yes.
22  Q        And when he told you that he was told to
23  report things to Jerry, to Larry, to Tommy, what do
24  you mean -- what does that mean?
25  A        I believe I asked him his reporting

Page 104

1  structure.
2  Q        Okay.
3  A        He was told to report things to Jerry,
4  referring to Jerry Harville, then Jerry would report
5  to Larry Eden, and Larry would report to Tommy
6  Whited.
7  Q        Did he say that -- did Mr. Kulakowski tell
8  you that he had reported some of the things that had
9  happened to him by Mr. Whited to those people?
10  A        He told me he told Jerry Harville.
11  Q        Did he also tell you that he told Larry Eden
12  what had been going on with him?
13  A        I don't think so.  I don't know.
14  Q        And Donnie Taylor substantiated the reports
15  that Mr. Kulakowski made about him being kicked,
16  right?
17  A        Yes.
18  Q        On the next page, it also looks like you
19  spoke with Cindy Rosas.
20  A        Yes.
21  Q        Is she still there?
22  A        I believe so.
23  Q        Did you ask her if she had witnessed any
24  hitting or kicking by Tommy Whited towards any of
25  the male employees?

Page 105

1  A        Repeat the question, please, ma'am.
2          (The requested question was read back
3  by the court reporter as follows:
4          "Question:  Did you ask her if she had
5  witnessed any hitting or kicking by Tommy Whited
6  towards any of the male employees?")
7          THE WITNESS:  No.
8  BY MS. COLLINS:
9  Q        Why not?
10  A        I asked if she witnessed any inappropriate
11  behavior.  I didn't specifically use Tommy's name in
12  any of these questions, it appears.
13  Q        Okay.  And you also didn't ask her
14  specifically if she had witnessed any hitting or
15  kicking of any other employees in the groin in the
16  workplace, did you?
17  A        I'm not sure.
18  Q        On Page 4, it's got WestRock 211 down at the
19  bottom.  Are these your notes from when you talked
20  to Jerry Harville?
21  A        Yes.
22  Q        And he substantiated that Tommy Whited had
23  hit him in his private area, correct?
24  A        He substantiated?
25  Q        That Tommy Whited had hit him in his private

1  area.
2  A       He stated Tommy had hit him in the private
3  area, yes.
4  Q       And he didn't report it because if he had
5  turned it in, he thought he would lose his job,
6  right?
7  A       Yes.
8  Q       And he was also one of the ones that
9  substantiated that he had kicked Michael Kulakowski
10 in his privates, right?
11 A       I don't recall if it was kicked or hit.
12 Q       It says, "Inappropriate behavior - kicked
13 Kuli in privates as well."
14 A       Okay.
15 Q       So yes?
16 A       Yes.
17 Q       Okay.  Were these the only notes you took
18 from your conversation with Jerry Harville?
19 A       Yes.
20 Q       Would these have been on the same day that
21 you talked with Ms. Rosas on August 15th?
22 A       Yes.
23 Q       Where did you speak with Mr. Harville?  In
24 person or on the phone?
25 A       In person.

1  Q       Where?
2  A       Sheet plant.
3  Q       And Mr. Harville told you that he had
4  reported to Larry Eden that his next step was going
5  out the door, right?
6  A       Repeat the question, please.
7  Q       It says right here, "Told Larry to tell
8  Jerry - my next step is out the door - he bullies
9  and is intimidating."
10         Right?
11 A       Tommy told Larry to tell Jerry.  That's what
12 Jerry stated.
13 Q       Tommy told Larry that my next step is out
14 the door?
15 A       Tommy told Larry to tell Jerry, his next
16 step is out the door.
17 Q       So Jerry's job was threatened?  Is that what
18 you're saying?
19         MS. DOHNER SMITH:  Objection.
20         THE WITNESS:  I'm not saying that.  I'm
21 stating that Jerry told me that Tommy told Larry to
22 tell Jerry, my next step is out the door.
23 BY MS. COLLINS:
24 Q       That Jerry's next step was to go out the
25 door, right?

1  A       Yes.
2  Q       Okay.  And it also says, "He bullies and is
3  intimidating."
4          Is that what Mr. Harville said about
5  Mr. Whited?
6  A       Yes.
7  Q       Okay.  Did Mr. Harville indicate to you that
8  he had complained about Mr. Whited to Larry?
9  A       I don't recall.
10 Q       On the next page at WestRock 212, at the top
11 of the page, it says, "Hourly employees being called
12 all hours of the night and weekend making them work
13 but not paid."
14         Did Mr. Harville report that to you?
15 A       Yes.
16 Q       Did y'all investigate that, where that was
17 actually going on?
18 A       Yes.
19 Q       What did y'all find out about that?
20 A       I don't recall.
21 Q       Who investigated that aspect of it?
22 A       I would have.
23 Q       Was that part of this Whited investigation
24 or a separate investigation that employees were
25 being called all hours of the night and weekend and

1  made to work but not paid?
2  A       It was part of this.
3  Q       Did y'all take any steps in response to that
4  allegation or substantiate that allegation?
5  A       Yes.
6  Q       What happened?
7  A       We asked questions -- we asked them -- the
8  names of the employees that were given, we asked
9  them if that was the case or not.
10 Q       And what did y'all find out?
11 A       I don't recall.
12 Q       Do you recall who you asked about that?
13 A       I don't.
14 Q       Did y'all go back and make any adjustments
15 to employees' paychecks that claim they had been
16 called in all hours of the night and weekend and
17 made to work off the clock?
18 A       No.
19         MS. DOHNER SMITH:  Objection.
20 BY MS. COLLINS:
21 Q       And the Larry that you referred to here, was
22 that Larry Eden?
23 A       Yes.
24 Q       Did you talk to him the same day, on
25 August 15th, as you talked with Ms. Rosas and

Page 110

1 Mr. Harville?
2 A      Yes.
3 Q      Was this in person or on the phone?
4 A      In person.
5 Q      Now, it looks like you had asked him if he
6 had witnessed any inappropriate behavior.  But do
7 you recall specifically asking him if he had seen
8 any employees hitting or kicking other employees, in
9 particular hitting or kicking them in the groin?
10 A      I didn't -- no, I don't recall doing that.
11 Q      Why not?
12 A      I don't recall when I spoke to him how much
13 I knew at that time.
14 Q      Did you circle back with him and ask him
15 specifics like that?
16 A      I don't recall.
17 Q      But if you would have, you would have
18 recorded it in your notes somewhere, right?
19 A      If I did, yes.  I would assume it would be
20 somewhere in the notes.
21 Q      And on the next page, there's another --
22 there's a line there, and it says, "Scruggs, Kuli,
23 Hall, Eden."
24        What is the context of this?  Is this an
25 interview or are these just more notes?

Page 111

1 A      They appear to be notes.
2 Q      Okay.  Do you know what these notes are
3 from?
4 A      Not specifically.
5 Q      And you have as one of the notes, "Kuli told
6 Lana - that T.W." -- and that's Tommy Whited, right?
7 A      Yes.
8 Q      -- "has kicked him in the balls - he has
9 medical condition now because of it."
10        Would that have been information that Lana
11 gave you or that Michael Kulakowski gave you?
12 A      Lana.
13 Q      And it also states, "Jerry Harville - kicked
14 in the balls by T.W."
15        Who gave you that information?
16 A      Lana.
17 Q      Okay.  And going down on the e-mail chain,
18 it looks like you e-mailed yourself on
19 August 12th, 2016, based on conversations that you
20 had with Johanna and Helen.  Is that what you were
21 talking about earlier when you were talking about
22 your notes from talking to those two women?
23 A      Yes.
24 Q      Okay.  And by Helen, you have here that
25 "Survey - meeting before and said just remember, I

Page 112

1 can figure out who said what - calling the hotline,
2 y'all can call the hotline if you want to - he gets
3 them and knows what is on them and who calls - she
4 thinks he is trying to get her to quit."
5        Is that what you were talking about earlier,
6 that she had stated that things that Tommy Whited
7 had said to her or to other employees about calling
8 the hotline or filling out the surveys?
9 A      Yes.  Helen stated -- that's the
10 conversation I had with Helen.  Whether or not she
11 was referencing she overheard him say that to the
12 other employees or if this was items that he
13 specifically said to her, these are things -- so the
14 survey meeting before and said just remember, I can
15 figure out who said what.  She's saying that she
16 heard that from Tommy.
17 Q      Okay.  On the next page it says, "Head count
18 for salary, people in Gallatin; vacation - no one
19 gets to take it like they should - they are afraid
20 to turn it in - Larry is afraid to ask for him."
21        What is that about?
22 A      It appears it's a note that I made to myself
23 to look into the head count for salary people in
24 Gallatin, but I'm not sure.
25 Q      Were there complaints that people were

Page 113

1 afraid to take their vacation?
2 A      Yes.
3 Q      It also says down here that "Jerry - was
4 afraid to report his injury because he was scared
5 Tommy would fire him."
6        Was that Jerry Harville?
7 A      Yes.
8 Q      Would that be a violation of WestRock policy
9 for a manager to encourage an employee not to report
10 a workplace injury?
11 A      Yes.
12        MS. COLLINS:  Let's mark this as
13 Exhibit Number 28.
14        (Marked Exhibit No. 28.)
15 BY MS. COLLINS:
16 Q      Is this an e-mail that you sent on
17 August 29, 2016?
18 A      Yes.
19 Q      And you confirmed to Tom Pedine that Donnie
20 had seen Tommy Whited slapping him in the nuts,
21 kicking him in the nuts, slapping him on the back of
22 the head?
23 A      Yes.
24 Q      And that was based on things that you found
25 in your investigation, right?

1  A      The statement?

2  Q      Yes.

3  A      Yes.

4  Q      If you could turn to Exhibit Number 9,

5  please.

6              (Presented Exhibit No. 9.)

7  BY MS. COLLINS:

8  Q      Have you seen these documents before?

9  A      Yes.

10  Q      Tell me what these are.

11  A      They're notes.

12  Q      Well, where did you get them?

13  A      I don't recall who exactly sent them to me.

14  I received them via e-mail.

15  Q      From who?

16  A      I don't remember.  I don't remember who sent

17  them.

18  Q      When did you get them?

19  A      I don't remember the date of the e-mail.

20  Q      You don't recall who sent them to you,

21  though?

22  A      I do not.

23  Q      Was it during your investigation?

24  A      It was not.

25  Q      Was it before or after Mr. Whited was

1  terminated?

2  A      I received these after he was terminated.

3  Q      Do you still have the e-mail where you

4  received copies of these?

5  A      I should.

6  Q      The e-mail that these were attached to, were

7  they color copies or were they black-and-white

8  copies like this?

9  A      I don't remember.

10  Q      Have you ever seen the original of these?

11  A      No.

12  Q      Do you know whose handwriting this is?

13  A      I do not recognize the handwriting.

14  Q      Can you get the e-mail that these are

15  attached to to your attorney?

16  A      Yes.

17  Q      Now, prior to the investigation that y'all

18  launched in August 2016, had any of Michael

19  Kulakowski's supervisors reported that he -- that

20  they had seen him being hit or kicked by Tommy

21  Whited in the groin?

22  A      Not to me.

23  Q      Do you agree that they should have if they

24  had witnessed such conduct?

25  A      Yes.

1  Q      And you agree that pursuant to WestRock's

2  policies, they had an obligation to report that

3  conduct?

4  A      Yes.

5  Q      And by them not reporting that conduct, the

6  supervisors not reporting that conduct, they

7  violated WestRock's policies, didn't they?

8  A      Yes.

9  Q      And you agree that grabbing another man in

10  his testicles in the workplace when it's unwanted

11  can constitute sexual harassment, right?

12  A      Yes.

13  Q      Could you turn to Exhibit Number 8 in that

14  binder?

15              (Presented Exhibit No. 8.)

16  BY MS. COLLINS:

17  Q      Did you create this document?

18  A      Yes.

19  Q      Was this based on an in-person meeting you

20  had with Michael Kulakowski or a phone call?

21  A      I honestly don't remember at this point.

22  Q      Sure.  While you were conducting this

23  investigation into Mr. Whited's behavior, Michael

24  Kulakowski continued to work out at the plant with

25  him, right?

1              MS. DOHNER SMITH:  Objection.

2              THE WITNESS:  I don't know that I could

3  answer that accurately.

4  BY MS. COLLINS:

5  Q      Okay.  But you don't recall Mr. Whited being

6  suspended or being placed out of work, right?

7  A      I don't remember.

8  Q      But that should be in his personnel file if

9  he were suspended pending investigation, right?

10              MS. DOHNER SMITH:  Objection.

11              THE WITNESS:  Not necessarily.

12  BY MS. COLLINS:

13  Q      Would it be part of the investigation file?

14  A      I don't know.

15  Q      Would it be reflected in his attendance --

16  any sort of attendance or documents like that if he

17  were suspended pending an investigation?

18  A      No.

19  Q      Well, if an employee were suspended pending

20  an investigation, y'all would keep track of that

21  somehow, wouldn't you?

22  A      Yes.

23  Q      How would you keep track of that?

24  A      In our HRIS system.

25  Q      So, the HRIS system would indicate whether

Page 118

1  or not Mr. Whited was suspended pending an
2  investigation?
3  A      If he was suspended without pay, yes.
4  Q      If he was suspended with pay, would that be
5  reflected anywhere?
6  A      Not that I have access to.
7  Q      Would it be recorded anywhere that you might
8  not have access to?
9  A      If he were suspended pending investigation,
10 I would not have access to that information.  It
11 would be someone above me.
12 Q      But as far as you know, he continued to work
13 while you were investigating these allegations?
14 A      I don't remember exactly.
15 Q      If you could turn to Exhibit Number 14 for
16 me, please.
17           (Presented Exhibit No. 14.)
18 BY MS. COLLINS:
19 Q      Have you seen this document before?
20 A      Yes.
21 Q      It looks like on August 29th, Keith Hall
22 had -- had you talked to Keith Hall that day?
23 A      I'm not sure when I spoke to him.
24 Q      But he let you know that -- it sounds like
25 Tommy Whited was calling him, asking him what was

Page 119

1  going on with this investigation, right?
2  A      Yes.
3  Q      You have recorded that on Saturday that
4  "Keith stated that Tommy told him that we (M.M.,
5  T.P., and T.H.)" -- is that you, Melinda, and Tom
6  Pedine?
7  A      Tom Pedine, Terri Henley, Melinda McGraw.
8  Q      -- "had asked Tommy questions about
9  horseplay with employees and about his eating lunch
10 and breakfast with Susan."
11         Right?
12 A      That is in reference to Tommy questioning
13 Keith why we were coming to Gallatin.
14 Q      Okay.  Is pretty much the context of what
15 you talked about with Keith recorded in your notes
16 here?
17 A      Yes.
18 Q      Okay.  Is this part of the reason why y'all
19 had security come out to the plant?
20         MS. DOHNER SMITH:  Objection.
21         THE WITNESS:  Is what?
22 BY MS. COLLINS:
23 Q      Any of the things that Mr. Hall reported?
24 A      I don't know.  I didn't make the decision
25 for security to come out.

Page 120

1          MS. COLLINS:  Okay.  That's all I have.
2          MS. DOHNER SMITH:  Unfortunately, I
3  have a few.
4              E X A M I N A T I O N
5  BY MS. DOHNER SMITH:
6  Q      Ms. Henley, just a moment ago you were asked
7  about whether or not Tommy Whited was placed on
8  suspension during the investigation or whether
9  Mr. Kulakowski had to continue to work on him.
10         Mr. Kulakowski was actually on vacation at
11 the time that the investigation took place, correct?
12         MS. COLLINS:  Objection to form.
13         THE WITNESS:  He was on vacation at
14 some point during the investigation, yes.
15 BY MS. DOHNER SMITH:
16 Q      If you look on Exhibit 28, Tom Pedine had
17 asked you about Donnie Taylor confirming
18 Mr. Kulakowski's allegations on August 29th.  And
19 Mr. Whited was terminated the very next day,
20 correct, on August 30th?
21 A      According to Number 24, separation notice.
22         MS. COLLINS:  I'm just going to object
23 to form, just due to the inconsistency in the date
24 beside the initial --
25         MS. DOHNER SMITH:  Well, it says at the

Page 121

1  top of Number 24 --
2              (Presented Exhibit No. 24.)
3  BY MS. DOHNER SMITH:
4  Q      It says last date employed, from 8/31/1970
5  to 8/30/16, correct?
6  A      Yes.
7  Q      And is that the date that Mr. Whited was
8  informed of his termination, on August 30, 2016?
9  A      Yes.
10 Q      That's the day after Mr. Pedine asked you if
11 Mr. Taylor had confirmed the allegations that Tommy
12 Whited was slapping and kicking Mr. Kulakowski,
13 correct?
14 A      Yes.
15 Q      Earlier you had been asked a question about
16 Jerry Harville, indicating he didn't report Tommy
17 because he thought he would lose his job.
18         Did Mr. Harville indicate that he had hit
19 Tommy back and thought he might get in trouble
20 because of that?
21 A      Yes.
22         MS. COLLINS:  Objection to form.
23 BY MS. DOHNER SMITH:
24 Q      And when Mr. Harville is reporting that
25 Tommy Whited had apparently told Larry to tell him

Page 122

1  his next step is out the door, that is something
2  that would have happened before he made that report
3  to you, correct?  If he was reporting it, it had to
4  have happened before?
5  A      Yes.
6  Q      Jerry Harville is not a member of
7  management, correct?  He's an hourly employee?
8  A      Correct.
9  Q      And he has no managerial authority?
10 A      Correct.
11 Q      Earlier you were asked if Tommy Whited shook
12 his groin and asked for sexual favors, would that be
13 a violation of the harassment policy, and you said
14 yes.
15        Did Mr. Kulakowski ever report to you that
16 Tommy Whited shook his groin and asked for sexual
17 favors from him?
18 A      No.
19 Q      Despite the fact that Mr. Whited denied
20 allegations that he kicked and hit employees in the
21 groin, he was terminated, correct?
22        MS. COLLINS:  Objection to form.
23        THE WITNESS:  Yes.
24 BY MS. DOHNER SMITH:
25 Q      If you take a look at Exhibit 22, what is

Page 123

1  marked as Exhibit 22.
2             (Presented Exhibit No. 22.)
3  BY MS. DOHNER SMITH:
4  Q      On the second page, you were asked questions
5  about Mr. Whited saying he had not participated in
6  horseplay under the definition.  You indicated you
7  couldn't recall what the definition is.
8         Would you go ahead and read the question
9  before that?
10 A      "What is your definition of horseplay?"
11 Q      All right.  Then he provided his definition
12 there, correct?
13 A      Yes.
14 Q      So is that the definition he was referring
15 to?
16 A      Yes.
17 Q      If you'd go ahead and grab what was marked
18 as Exhibit Number 19.
19             (Presented Exhibit No. 19.)
20 BY MS. DOHNER SMITH:
21 Q      If you look at the page, at the bottom it's
22 marked as Page 228, toward the top it says, "New
23 Information:  Workplace violence/horseplay - GM has
24 physically assaulted employees."
25        That referenced the allegations that were

Page 124

1  raised, correct?
2  A      Yes.
3  Q      Okay.  Now, if you turn back to the Summary
4  of Findings and Conclusions, where it says
5  "Workplace violence/horseplay," that's the
6  allegation that was raised, correct?
7  A      Yes.
8  Q      And then it just says, "Violation of company
9  policy."  Correct?
10 A      Correct.
11 Q      You didn't list out the actual policies that
12 it violated, correct?
13 A      Correct.
14 Q      You just noted that it was an overall
15 violation of company policy?
16 A      Yes.
17 Q      So it's not that you were saying that Tommy
18 Whited's conduct was not a violation of the
19 harassment policy; you just didn't list out the
20 policies.
21 A      Correct.
22 Q      You were asked if security was called as a
23 matter of course when a GM is let go.
24        Have you ever had another instance where a
25 general manager of one of your facilities was

Page 125

1  terminated?
2  A      No.
3  Q      So you don't know if that would be normal
4  course when a GM is let go?
5  A      Correct.
6  Q      Earlier you were asked some questions about
7  whether or not knowing about an allegation of sexual
8  harassment against Tommy Whited in 2013 had made a
9  difference, and you said no.  Is that because he was
10 terminated regardless?
11        MS. COLLINS:  Objection to form.
12        THE WITNESS:  Would you repeat the
13 question?
14 BY MS. DOHNER SMITH:
15 Q      Earlier you had said you didn't think
16 knowing of the 2013 sexual harassment complaint
17 against Tommy Whited would make a difference in this
18 situation.
19        Why wouldn't it have made a difference?
20 A      Because my investigation revealed -- because
21 of my current investigation.
22 Q      You would have conducted a thorough
23 investigation regardless?
24 A      Yes.
25 Q      And as a result of your investigation,

1  Mr. Whited was let go?
2  A      Yes.
3  Q      If you could grab for us, I think it was
4  Number 4.
5              (Presented Exhibit No. 4.)
6  BY MS. DOHNER SMITH:
7  Q      If you turn to Page 7, you were asked about
8  the complaints hotline not saying anything specific
9  about harassment.  But it does say, "Complaints
10  about suspected violations by any RockTenn
11  employee...of any law or of any RockTenn code of
12  business conduct and ethics."
13  A      Yes.
14  Q      So it basically covers anything.
15  A      Yes.
16  Q      Okay.  And if you turn to Pages 11 and 12 of
17  the harassment policy, throughout here it actually
18  says, call the compliance hotline, correct?
19  A      Yes.
20  Q      It actually says it a number of times?
21  A      Yes.
22  Q      Okay.  Now, in the policy, it says if a
23  manager is involved, harassment should be reported
24  to local HR.
25              Prior to August of 2016, did Michael

1  Kulakowski ever report anything to you indicating he
2  had been sexually harassed?
3  A      He did not.
4  Q      When Mr. Kulakowski met with you and talked
5  with you in August of 2016, did he ever tell you he
6  had been sexually harassed?
7              MS. COLLINS:  Objection to form.
8  BY MS. DOHNER SMITH:
9  Q      Did he use those words?
10  A      I don't recall.
11  Q      If that had been something he had said,
12  would you have put it in your notes?
13  A      Yes.
14              MS. COLLINS:  Objection to form.
15  BY MS. DOHNER SMITH:
16  Q      Earlier you answered a question that Michael
17  Kulakowski told you he had -- or that Michael
18  Kulakowski had reported to you that on numerous
19  occasions, he had been hit or kicked and it had been
20  witnessed by numerous people.
21              Was he saying he had reported that on
22  numerous occasions or that it had happened on
23  numerous occasions?
24  A      It had happened on numerous occasions.
25  Q      Is the safety coordinator position a

1  managerial level position?
2  A      No.
3  Q      Earlier you had been asked about a manager
4  showing his private parts to a subordinate and you
5  said, no, it wouldn't necessarily be sexual
6  harassment.
7              It would have to depend on the
8  circumstances, correct?
9              MS. COLLINS:  Objection to form.
10              THE WITNESS:  Yes.
11  BY MS. DOHNER SMITH:
12  Q      For example, if they were in a consensual
13  sexual relationship, it wouldn't amount to sexual
14  harassment?
15  A      Correct.
16  Q      WestRock doesn't consider it to be a term or
17  condition of employment to be hit or kicked in the
18  groin, does it?
19              MS. COLLINS:  Objection to form.
20  BY MS. DOHNER SMITH:
21  Q      Have you ever heard anyone in WestRock upper
22  management say, in order to work here, you have to
23  be hit or kicked in the groin?
24  A      No.
25  Q      In fact, that type of conduct is prohibited,

1  correct?
2  A      Yes.
3  Q      Earlier you had been asked if hitting
4  another employee in the groin is conduct of a sexual
5  nature.
6              Would that depend on the circumstances as
7  well?
8  A      Yes.
9              MS. COLLINS:  Objection to form.
10  BY MS. DOHNER SMITH:
11  Q      For example, two guys joking around with
12  each other, kind of locker room, smacking each other
13  with a towel type of thing, that wouldn't
14  necessarily be sexual in nature, would it?
15              MS. COLLINS:  Objection to form.
16              THE WITNESS:  Not necessarily.
17              MS. DOHNER SMITH:  I think that's it.
18              FURTHER DEPONENT SAITH NOT.
19              (Proceedings concluded at 3:10 p.m.)
20
21
22
23
24
25

Page 130

```
1              REPORTER'S CERTIFICATE
2
3          I, Jerri L. Porter, RPR, CRR, Notary
4   Public and Court Reporter, do hereby certify that I
5   recorded to the best of my skill and ability by
6   machine shorthand all the proceedings in the
7   foregoing transcript, and that said transcript is a
8   true, accurate, and complete transcript to the best
9   of my ability.
10         I further certify that I am not an
11  attorney or counsel of any of the parties, nor a
12  relative or employee of any attorney or counsel
13  connected with the action, nor financially
14  interested in the action.
15         SIGNED this 27th day of November, 2017.
16
17
18
19
20  _____
21         Jerri L. Porter, RPR, CRR
22  My Notary commission expires:  2/19/2018
23  Tennessee LCR No. 335
    Expires:  6/30/2018
24
25
```

Page 131

```
1              E R R A T A
2
3      I, TERRI HENLEY, having read the foregoing
    deposition, Pages 1 through 129, taken
4   November 15, 2017, do hereby certify said
    testimony is a true and accurate transcript,
5   with the following changes, if any:
6   PAGE    LINE      SHOULD HAVE BEEN
7   _____   _____     _____
8   _____   _____     _____
9   _____   _____     _____
10  _____   _____     _____
11  _____   _____     _____
12  _____   _____     _____
13  _____   _____     _____
14  _____   _____     _____
15  _____   _____     _____
16  _____   _____     _____
17
18      _____
19             TERRI HENLEY
20
21
22  _____
        Notary Public
23  My commission expires:  _____
24
25
```

Case 3:16-cv-02510   Document 39-1   Filed 02/26/18   Page 35 of 35 PageID #: 633