**In the Matter Of:**

**KULAKOWSKI vs WESTROCK SERVICES**

**JEB BELL**

*December 18, 2017*



BRENTWOOD COURT
REPORTING SERVICES
www.brentwoodcourtreporting.com
(615) 791-6983

Case 3:16-cv-02510   Document 39-3   Filed 02/26/18   Page 1 of 11 PageID #: 660

```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF TENNESSEE
                   NASHVILLE DIVISION




MICHAEL KULAKOWSKI,              )
                                 )
     Plaintiff,                  )
                                 )
vs.                              )CASE NO.
                                 )3:16-CV-02510
                                 )
WESTROCK SERVICES, INC.,         )
                                 )
     Defendant.                  )
_____




                    DEPOSITION OF

                       JEB BELL

           Taken on Behalf of the Plaintiff

                 December 18, 2017

               Commencing at 1:00 p.m.




_____



Reported by:  Elisabeth A. Miller Lorenz, RMR, CRR
Tennessee LCR No. 66
Expires:  6/30/2018
```

Page 2

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3      HEATHER MOORE COLLINS
        Collins & Hunter
 4      7000 Executive Center Drive
        Building 2, Suite 320
 5      Brentwood, Tennessee  37027
        (615) 724-1996
 6      heather@collinshunter.com
 7
    For the Defendant:
 8
        MARY DOHNER SMITH
 9      Constangy, Brooks, Smith & Prophete
        1010 SunTrust Plaza
10      401 Commerce Street
        Nashville, Tennessee  37219
11      (615) 320-5200
        mdohner@constangy.com
12      nsuarez@constangy.com
```

Page 3

```
 1            I N D E X
 2         INDEX OF EXAMINATIONS
 3                                             Page
 4  WITNESS: JEB BELL
 5  Examination By Ms. Collins ..................5
 6  Examination By Ms. Dohner Smith ............31
 7            MARKED EXHIBITS
 8  Exhibit    Description                      Page
 9  No. 29    ALERTLINE System Report .........17
10
11
12       PREVIOUSLY MARKED EXHIBITS
           PRESENTED TO WITNESS
13
    Exhibit    Description                      Page
14
    No. 15   Complaint .........................16
15
    No. 16   Whited Invesigation Docs ..........29
```

Page 4

```
 1            The deposition of JEB BELL was taken on
 2  behalf of the Plaintiff on December 18, 2017, in the
 3  offices of Constangy, Brooks, Smith & Prophete,
 4  1010 SunTrust Plaza, 401 Commerce Street, Nashville,
 5  Tennessee, for all purposes under the Federal Rules
 6  of Civil Procedure.
 7            The formalities as to notice, caption,
 8  certificate, et cetera, are waived.  All objections,
 9  except as to the form of the questions, are reserved
10  to the hearing.
11            It is agreed that Elisabeth A. Miller
12  Lorenz, being a Notary Public and Court Reporter for
13  the State of Tennessee, may swear the witness, and
14  that the reading and signing of the completed
15  deposition by the witness are reserved.

21                      * * *
```

Page 5

```
 1                   JEB BELL
 2  was called as a witness, and after having been first
 3  duly sworn, testified as follows:
 4            E X A M I N A T I O N
 5  BY MS. COLLINS:
 6  Q    Could you state your full name for the
 7  record, please?
 8  A    James Ellingwood Bell, Jr.
 9  Q    And do you go by Jeb?
10  A    Uh-huh.
11  Q    Okay.  What is your address?
12  A    25 Adair Road, Jackson, Tennessee, 38305.
13  Q    And what is your phone number?
14  A    (731)694-7591.
15  Q    Where do you currently work, Mr. Bell?
16  A    WestRock.
17  Q    How long have you been with WestRock?
18  A    I've been with WestRock and its legacy
19  companies since '97.
20  Q    What is your current job title?
21  A    I'm an area vice president.
22  Q    Are you an area vice president over a
23  particular area?
24  A    Area vice president of the midsouth.
25  Q    What do you do as area vice president over
```

Page 6

1  the midsouth?
2  A     It's comprised of facilities in Mississippi,
3  Alabama, Tennessee.  There are 9 manufacturing
4  sites, 2 specialty sites; 11 facilities.  And I am
5  responsible for the P&L.  I have oversight of all
6  manufacturing, sales, engineering, design.
7        There's only two functions that don't report
8  to me directly but indirectly on a dotted line.
9  That would be the HR and the finance.
10 Q     But you said HR reports indirectly to you?
11 A     Yes.
12 Q     Through who?
13 A     I'm not following.
14 Q     You said they report indirectly.
15       How do they indirectly report to you?  Who
16 is it through?
17 A     There is an HR lead that is assigned to the
18 midsouth.  So there's an area HR manager who
19 functionally reports up through the HR function and
20 has a dotted line to the operational lead that they
21 are working with.
22 Q     How long have you been in this role as area
23 vice president of midsouth?
24 A     2014.  October or so of 2014.
25 Q     What was your job title before you were area

Page 7

1  vice president of midsouth?
2  A     It's what they call business unit general
3  manager.
4  Q     As the area VP of the midsouth, are you over
5  the WestRock Gallatin plant?
6  A     Gallatin would be one of the facilities that
7  I have responsibility for.
8  Q     And what is the chain of command before it
9  gets to you from Gallatin?
10 A     There is a general manager of the facility,
11 there is a business unit general manager, and then
12 there's an AVP.
13 Q     Now, I'm specifically referring to the time
14 when Tommy Whited was there.
15       Was he the general manager?
16 A     Yes.
17 Q     Who is the business unit general manager
18 while he was there, specifically in 2016 and '15?
19 A     A gentleman by the name of Tom Pedine.
20 Q     As the area vice president of midsouth, do
21 you have authority to hire and fire employees?
22 A     Yes.
23 Q     What sort of situations would you typically
24 exercise that authority for?  Who -- who would you
25 typically exercise that authority for?

Page 8

1  A     Hiring or firing?
2  Q     Yes.
3  A     Well, hiring would be a direct report to me;
4  would also be what I consider key functional
5  businesses -- leaders, whether that's a GM or a
6  plant manager.
7        On the sales side of it, sales managers, I
8  exercise veto power.  I don't typically tell a
9  business leader that you're going to hire this
10 person.  Then I own it; they don't.  But if I have a
11 problem with them, I would exercise my veto.
12       In the case of terminations, they're
13 typically for nonperformance.
14 Q     Were you involved in the decision to
15 terminate Tommy Whited?
16 A     I was.
17 Q     Were you the final decision-maker?
18 A     No.  I was one of several senior people who
19 made that decision.
20 Q     Who were the several senior people who made
21 that decision?
22 A     Gentlemen -- well, it would have gone all
23 the way to the chairman, Steve Voorhees; the
24 president of the corrugated packaging segment, which
25 would have been Jeff Chalovich; but the primary

Page 9

1  would be Rick Parris, who I report to, who's the
2  senior vice president of the central region;
3  Jill Horner, who is the vice president of HR reports
4  to Jeff Chalovich; Joy Jones, who is the regional
5  HR, who reports to my boss -- or actually reports to
6  Jill but is assigned to be the HR lead for
7  Rick Parris.
8  Q     How did that process play out?  Was there
9  some sort of form y'all had to check that you agreed
10 he should be terminated, Mr. Whited?
11 A     The decision to terminate Tommy came from
12 the results of an investigation that occurred from
13 an anonymous 800 call to the hotline.  Investigation
14 ensued, and the findings from that investigation led
15 to his termination.
16 Q     Did all of the people that you just
17 mentioned, Rick Parris and Jill Horner and Joy Jones
18 and yourself, all have to agree; or did anyone
19 disagree that he should be terminated?
20 A     No one disagreed.  It was consensus.
21       Do other voices outweigh others?
22       The most senior person in that decision
23 group would be Rick Parris, but there wasn't any
24 dissension at all.
25 Q     Did y'all have a phone conference to discuss

Page 10

1 the findings of the investigation, or how did that
2 come about?
3 A    There were several conference calls.  Our
4 legal counsel along with HR were leading the
5 investigation.  So when I say there were several
6 conference calls, once the initial call came into
7 the hotline, it was really regarding the issue that
8 employees were leaving and that we should look into
9 that matter.
10       So the investigation ensued, took place, and
11 kind of -- it's like opening Pandora's box.  One
12 thing led to another and another and another, and
13 employees came forward at that point in time to the
14 HR.
15       So those conference calls take place to
16 advise the current status of the investigation.
17 Q    Was WestRock's attorney on all of those
18 calls?
19 A    Yes.
20 Q    Did you take any notes from those phone
21 calls?
22 A    No.
23 Q    Do you typically get Global Compliance
24 hotline reports?
25 A    Me personally?  No.

Page 11

1 Q    Who typically gets those?
2 A    Go into an 800 number, and they're directed
3 either to the employment legal counsel, who
4 distributes to the HR leader of the business.  It's
5 typically contained within the HR and legal group.
6 Q    Are you familiar with Tommy -- had you --
7 well, are you familiar with WestRock's employment
8 policies?
9 A    Yes.
10 Q    And was one of the reasons he was terminated
11 due to a violation of its sexual harassment policy?
12 A    I would say it was conduct unbecoming of
13 leadership that was a violation of the core values
14 of the company.  There may have been kind of what we
15 perceived as workplace violence.
16 Q    What about his conduct was unbecoming?
17 A    Well, based on the investigation, there were
18 incidents where Tommy behaved in a manner that we,
19 you know, don't think holds respect or integrity.
20       There was the incident with Michael.  That
21 was probably the overwhelming issue.  There were
22 actions that he did with Michael.
23 Q    Was that considered by the company to be
24 sexual harassment since it was just directed towards
25 a male employee?

Page 12

1       MS. DOHNER SMITH:  Object to the form.
2       THE WITNESS:  What?
3       MS. DOHNER SMITH:  I objected.  You can
4 answer if you are able.
5       THE WITNESS:  Can you repeat the
6 question?
7       MS. COLLINS:  Sure.
8       (The requested question was read back
9 by the court reporter as follows:
10      "Question:  Was that considered by the
11 company to be sexual harassment since it was just
12 directed towards a male employee?")
13      THE WITNESS:  No, I don't -- I don't
14 think it was anything sexual because it wasn't just
15 him.  There were other types of behavior that were
16 going on with other employees as well.
17      It seemed that Michael was the
18 recipient of some more physical behavior, hitting,
19 kicking.
20 BY MS. COLLINS:
21 Q    Did --
22 A    Kicking a chair out from under him.
23 Q    To your knowledge, did any female employees
24 complain of Mr. Whited hitting, kicking them?
25 A    No.

Page 13

1 Q    And based on WestRock's policies, can
2 horseplay constitute sexual harassment to your
3 knowledge?
4 A    I suppose it could.  It depends on the
5 context that transpired.
6 Q    What would you consider horseplay to be?
7 A    Horseplay is behavior that is inappropriate
8 for the workplace, so examples would be hitting,
9 using language, banter that gets out of hand,
10 arguments, but basically as it applies to create an
11 unsafe work environment.
12 Q    When was the last time you went to the
13 Gallatin plant before -- when it was still during
14 Tommy Whited's tenure?
15 A    I try to go to facilities once every six to
16 eight weeks.  So I can't time-wise nail that down
17 for you of when the investigation started.
18 Q    When you go to plants every six to eight
19 weeks, is it announced ahead of time; or do you go
20 there for a specific purpose?
21 A    Well, it's not always announced.  But most
22 of the time out of respect, I let folks know.  I
23 could be traveling in the area and show up.  But the
24 agenda is typically about operational performance.
25 Q    When you would go out to the Gallatin

Page 14

```
 1  facility, would you typically go over to the
 2  fulfillment center; or would you pretty much stay at
 3  the main plant?
 4  A     Both.
 5  Q     About how many times do you think you went
 6  to the fulfillment center in Gallatin in 2016?
 7  A     Three to four.
 8  Q     To your knowledge, were any other managers
 9  that -- well, to your knowledge, did any other
10  managers at the facility witness Tommy Whited
11  kicking Michael Kulakowski?
12  A     To my knowledge, no.
13  Q     So were there any other managers that were
14  out at the Gallatin facility or facilities
15  disciplined for not reporting Tommy Whited's
16  behavior towards subordinate employees?
17  A     No.
18  Q     Did you know that a complaint of harassment
19  had been made against Tommy Whited in 2013?
20  A     I was aware that -- an 800 call in 2013.  I
21  don't know the specifics of it, but...
22  Q     When did you become aware of that?
23  A     At the time of the complaint on the 16th.
24  Q     The time of the 2016 investigation?
25  A     Uh-huh.
```

Page 15

```
 1  Q     So to your knowledge, was there any sort of
 2  investigation or additional oversight as a result of
 3  the 2013 complaint against Tommy Whited?
 4  A     I don't know.  I mean, I don't know the
 5  complaint.
 6        800 calls don't necessarily come through me.
 7  They go to HR, and they investigate.  Whether I need
 8  to be brought into the loop is a call that's made by
 9  legal and HR.  Most calls come in anonymously, so...
10  Q     What typically would rise to the level where
11  you would get involved?
12  A     The -- as it applies to this, the call came
13  in anonymously -- anonymously for the complaint
14  about employees leaving Gallatin.  That really
15  didn't rise to the level of my involvement.
16        What transpired is when they went in to
17  investigate and discussed with employees, other
18  things began to come out.  That's when I was brought
19  further into the situation.
20  Q     Have you seen the 2013 complaint that was
21  made against Mr. Tommy Whited?
22  A     Not that I recall, no.
23  Q     First, let's go to -- if you could turn in
24  this book to Exhibit No. 15.
25  A     As it's in the tabs here?
```

Page 16

```
 1  Q     Yes.
 2        (Presented Exhibit No. 15.)
 3  BY MS. COLLINS:
 4  Q     Just take a moment to review that, and let
 5  me know when you're done.
 6  A     I remember this now.
 7  Q     Did you receive a copy of this complaint in
 8  2015?
 9  A     I don't recall receiving a copy, but I
10  remember a complaint that was reported about an
11  anonymous call that Tommy was having an affair that
12  happened in 1999.  But I don't know that anything --
13  I wasn't a part of any decision-making here.
14  Q     Well, to your knowledge, was anything done
15  to Tommy Whited as a result of this complaint that
16  was made in 2013?
17  A     To my knowledge, no.
18  Q     And you would have known if something were
19  done to him, right?
20        MS. DOHNER SMITH:  Objection.
21        THE WITNESS:  Yes.
22  BY MS. COLLINS:
23  Q     Do you know if the company initiated an
24  investigation as a result of this complaint?
25  A     I assume they did because there was a
```

Page 17

```
 1  compliance call in there.
 2  Q     Okay.
 3        MS. COLLINS:  I'm going to mark this
 4  next document as Exhibit 29.
 5        (Marked Exhibit No. 29.)
 6  BY MS. COLLINS:
 7  Q     Just let me know when you've had a moment to
 8  review this.
 9        Have you seen this document before?
10  A     Huh-uh.
11  Q     No?
12        But to your knowledge, in 2013 Mr. Whited
13  wasn't suspended or disciplined in any sort of
14  formal way as a result of the complaint that was
15  initiated?
16  A     No.
17        MS. DOHNER SMITH:  I'm just going to
18  object quickly to the extent this is being admitted.
19  I'm fine with it being marked as No. 29 for
20  identification purposes, but I don't think it's been
21  authenticated.
22  BY MS. COLLINS:
23  Q     And this document that you're holding,
24  Exhibit No. 29, have you seen a form like this
25  before?
```

Page 18

```
 1  A       A -- a compliance?
 2  Q       Yes.
 3  A       Yes.
 4  Q       Is this a business document of WestRock,
 5  these Global Compliance ALERTLINE system reports?
 6          MS. DOHNER SMITH:  Objection.
 7          THE WITNESS:  I don't know that it's a
 8  WestRock form.  I think this is a third party that
 9  administers this compliance, so it's a form they use
10  I guess to alert what the call was, the time, and
11  what...
12  BY MS. COLLINS:
13  Q       And this is how WestRock is provided the
14  reports from the third-party administrator; is that
15  correct?
16          MS. DOHNER SMITH:  Objection.
17          THE WITNESS:  I believe so.
18  BY MS. COLLINS:
19  Q       Now, as far as reporting sexual harassment,
20  if a manager at a facility witnesses sexual
21  harassment, do they have a duty to report that?
22  A       Absolutely.
23  Q       Do they have a duty to report it if they see
24  another manager hitting or kicking an employee?
25  A       Yes, although it's spelled out in the policy
```

Page 19

```
 1  of the company.
 2  Q       Which managers at the company, other than
 3  general managers at a facility, would that
 4  responsibility go to?
 5  A       Well, it goes down to every employee.
 6  That's -- the training that everyone receives is on
 7  the workplace code of conduct, workplace harassment.
 8  So that training is done annually, and then it's
 9  posted for...
10  Q       And there are both men and women that work
11  at the Gallatin facility, right?
12  A       Correct.
13  Q       Were you immediately notified when WestRock
14  received the 2016 complaint against Tommy Whited?
15  A       I was notify -- I don't know immediately,
16  but I was notified before the investigation was
17  started by my HR lead, that they had received a
18  compliance call.
19  Q       While that investigation took place, did
20  Tommy Whited continue to report to work?
21  A       Yes.
22  Q       Do you know if he was notified that he was
23  under investigation?
24  A       I don't know that, no.  I don't know that he
25  was directly contacted.  I think that they were --
```

Page 20

```
 1  HR was doing a -- you know, notifying that they were
 2  doing an investigation.
 3  Q       So you think HR did not notify him that he
 4  was under investigation?
 5  A       I can't -- I don't know.
 6  Q       Did you notify him that he was under
 7  investigation?
 8  A       No, because at the point -- at the point in
 9  time when the compliance call came in, it was about
10  employees leaving because of dissatisfaction to
11  work.
12          You know, I took it initially the complaint
13  or compliance call was a work-life balance issue.
14  People were working excessive overtime and were
15  quitting the job.
16          It's only after they began investigating,
17  you kind of open one door and the next door and
18  other things kept coming up, you began to understand
19  the severity of what was going on.
20  Q       And were you kept apprized along the way as
21  more and more egregious things came up?
22  A       There were -- the investigation, and then
23  there were conference calls that took place that I
24  was invited to or participated in.  But the -- the
25  actual investigation was led by the HR and legal
```

Page 21

```
 1  group.
 2          So at what point they had the conference
 3  calls or made the decisions to have the conference
 4  calls, you know, I don't know.
 5  Q       When you participated in those conference
 6  calls, did you get, like, a meeting request for
 7  that?  How did -- how were you notified that a
 8  conference call was going to take place?  Was it put
 9  on your calendar?
10  A       I believe it was put on my calendar.
11  Q       Would those dates that you participated in
12  conference calls still be reflected on your 2016
13  calendar?
14  A       I don't know.  I just -- I don't know.
15  Q       What HR person did you talk to directly
16  about the investigation?
17  A       My HR lead would have been Melinda McGraw.
18  Q       And is she still with the company?
19  A       No.
20  Q       Why did she leave?
21          MS. DOHNER SMITH:  Objection.
22  BY MS. COLLINS:
23  Q       Do you know why she left?
24  A       Yes, I do know why she left, but I don't
25  think it's germane to this.
```

Page 22

1 Q     Why did she leave?
2       MS. DOHNER SMITH: Can we go off the
3 record for just a minute, and we can talk?
4       MS. COLLINS: Yeah.
5       (Discussion off the record.)
6       MS. COLLINS: Back on the record.
7 BY MS. COLLINS:
8 Q     Can you tell me generally, was -- did Ms. --
9 was Ms. McGraw -- did she resign, or was she
10 terminated?
11 A    She was terminated.
12 Q    And generally what was the reason why she
13 was terminated?
14 A    Her personal life and issues that she
15 experienced began to impact her work performance.
16 Q    When did she leave the company?
17 A    I guess December '16. December or
18 January -- yeah, December '16.
19 Q    Did any of the issues with her work
20 performance have to do with her heading up the
21 investigation into Tommy Whited?
22 A    Absolutely not.
23 Q    So Mr. Pedine -- is it Mr. Pedine or Pedine?
24 A    He goes by Pedine.
25 Q    Was he considered Tommy Whited's direct

Page 23

1 supervisor?
2 A     Yes.
3 Q     As plant manager, did Tommy Whited get
4 yearly evaluations?
5 A     Yes.
6 Q     Who was -- did you sign off on those, or did
7 Mr. Pedine sign off on those?
8 A     Typically, the employee's direct manager
9 does the performance review.
10 Q    Other than the 2013 Global Compliance
11 complaint against Tommy Whited, are you aware of any
12 other complaints against Tommy Whited like the ones
13 that are of the nature of the 2013 one or the 2016
14 one?
15 A    No.
16 Q    Had he been disciplined to your knowledge --
17 Mr. Whited, had he been disciplined to your
18 knowledge for any job performance issues prior to
19 2016?
20 A    Not that I'm aware of. In fact, Tommy was
21 highly regarded within the WestRock organization.
22 He led a very successful business, a business that
23 was recognized as plant of the year twice within the
24 legacy companies.
25      So my impression was -- of that team was it

Page 24

1 was a high functioning team; that it was a very,
2 very close-knit group; that they had worked together
3 for a long time. And I hate to be -- you know, that
4 they were family.
5 Q     Do you recall having any conversations with
6 Tom Pedine after the allegations came out about
7 Tommy Whited?
8 A     At what point? I mean --
9 Q     After the allegations came out about
10 Tommy Whited, did you have any specific
11 conversations with Tom Pedine that you can recall
12 about Tommy Whited's behavior or anything like that?
13 A    As the allegations were coming out, yes.
14 Q    What do you recall about those
15 conversations?
16 A    That if this kind of behavior is actually
17 going on, that Tommy is in a lot of trouble.
18 Q    Did there come a point in time where you
19 became aware that during the investigation
20 Tommy Whited was trying to move Michael Kulakowski?
21 A    I'm aware of that, yes.
22 Q    Tell me what you know about that.
23 A    During the investigation, Tommy attempted at
24 some point in time to move Michael. I can't
25 remember where he was going to move but out of the

Page 25

1 shipping department.
2      The HR lead came to me and said that was
3 going on, and I stopped it.
4 Q     And was that because that could be
5 considered retaliation if he would have done that?
6 A     As ongoing investigation, yes, it would be
7 retaliation. And there were no -- there were no
8 write-ups in Michael's employment, no things that
9 would corroborate a move or a demotion, because it
10 was going to, I think, impact pay as well.
11 Q    Why was Tommy Whited terminated?
12 A    Tommy was terminated because of not
13 conducting himself in a professional manner, that
14 the behaviors that the investigation found were
15 egregious enough for us to terminate a 40-year
16 tenured employee.
17     Hitting people in the groin goes beyond, you
18 know, appropriate behavior in the workplace. It's
19 not just -- it's not just horseplay that you would
20 see in an organization that is that tight knit that
21 has worked together for that length of time as a
22 team.
23 Q    Were you there the day he was terminated?
24 A    I terminated Tommy.
25 Q    What did you tell him?

Page 26

1  A      You know, basically kept it short and sweet,
2  that, I don't know, based on the findings of the
3  investigation, you're no longer employed with
4  WestRock.
5  Q      Was he provided any documents?
6  A      Not by me. I don't think the company would
7  have provided any.
8  Q      Was he offered the opportunity to resign
9  before being terminated?
10 A      No.
11 Q      Was that discussed as an option, that he
12 could -- that the company would accept his
13 resignation in lieu of termination?
14 A      It may have been a topic of conversation
15 during the conference calls when the final decision
16 was made. But the consensus was this was a
17 termination.
18 Q      Did you give him separation paperwork the
19 day you notified him of his termination?
20 A      I didn't. I left -- left and left an HR
21 team after I terminated his employment. So I don't
22 know.
23 Q      Who was the HR team that was there that day?
24 A      Melinda McGraw and Terri Henley.
25 Q      How long did the meeting with Tommy Whited

Page 27

1  last that you were a part of?
2  A      If it lasted five minutes, it was -- not
3  long. There's no discussion about it. There was
4  the...
5  Q      Who else was there besides you and
6  Terri Henley and Melinda McGraw?
7  A      I don't -- the only other person that might
8  have been there would have been Tom, and I'm not
9  certain that he was there.
10 Q      During the course of the investigation, did
11 it come out that employees were afraid of
12 Tommy Whited and that he had made threats to them
13 about their job security?
14 A      Yes.
15 Q      Was that contrary to WestRock's policies?
16 A      Absolutely.
17 Q      And I understand that WestRock placed
18 security out at the plant after he was terminated;
19 is that correct?
20 A      More than likely, yes. That's something we
21 do routinely where we have a termination that has
22 got some level of acrimony to it. Just -- in
23 today's world, it's the safest thing to do.
24 Q      What was -- I guess what do you know about
25 that, about security being placed out at the plant?

Page 28

1  Were you involved in that decision?
2  A      I would have been involved in putting some
3  type of security service in. Again, we do that
4  where there is a termination and the potential that,
5  you know, an employee could, you know, come back
6  with a gun and shoot everybody, go postal.
7  Q      Right.
8         What led you to believe there was a level of
9  acrimony?
10 A      Well, we terminated a guy who's worked 40
11 years with the company and by all appearances was
12 highly successful. In his mind, he was successful.
13 Plant of the year, a good employee.
14 Q      Who would you say made the final decision to
15 terminate Tommy Whited?
16 A      I would say it was a consensus. But if
17 there's going to be one overriding voice in that
18 situation, it's going to be Rick Parris. He's the
19 senior vice president of it. But it's going to
20 be -- you know, legal is going to play a big part in
21 it.
22        At that point, though, it was really -- it's
23 just -- everyone knew he had to go. You can't
24 conduct yourself that way.
25 Q      Was he offered a severance to your

Page 29

1  knowledge?
2  A      No. He was terminated for cause.
3         MS. COLLINS: All right. We can take a
4  quick break off the record. I'm going to review my
5  notes.
6         (Recess observed.)
7         MS. COLLINS: Let's go back on the
8  record.
9  BY MS. COLLINS:
10 Q      Mr. Bell, if you could turn to Exhibit 16 in
11 the binder, and if you could turn to the second page
12 of that document. It starts with 219.
13        (Presented Exhibit No. 16.)
14 BY MS. COLLINS:
15 Q      Just let me know when you've had a moment to
16 review that.
17 A      Am I reading the whole document or this
18 first page?
19 Q      If you want to -- well, first, have you seen
20 this document before?
21 A      This format doesn't look familiar.
22 Q      Okay.
23 A      But the information I've -- I've seen
24 before.
25 Q      But have you seen this particular form as it

Page 30

1 pertained to the Tommy Whited investigation?
2  A      Was this put in, this part here?
3         This looks familiar.
4  Q      By this, you're pointing to the witness
5  statements on Page 220?
6  A      Everything above the case facts.
7  Q      Does not look familiar to you?
8  A      That would not have been the format that I
9  saw.
10 Q      Okay.  So you don't recall seeing a document
11 where code of conduct or harassment were
12 highlighted?
13 A      I just recall seeing the notes from the
14 investigation.
15 Q      Okay.
16 A      And it was formatted in such, Witness 4, 5,
17 6 so that we'd know the names.
18 Q      And on the page that has 221 down at the
19 bottom, down at the bottom of that page, it has
20 Summary of Findings and Conclusion.
21        Had you seen -- do you recall if you had
22 seen this section before?
23 A      Are you talking about the Summary of
24 Findings?
25 Q      Yes.

Page 31

1  A      As it pertains to individuals -- the temps
2  working?
3  Q      It has inappropriate relationship, conflict
4  of interest, company accounting number for
5  reporting, and going into the next page, privacy,
6  respect, and guidance and reporting.
7         Do you recall if you've seen those?
8  A      I don't recall seeing it.  I recall
9  discussing those issues, yes.
10        MS. COLLINS:  That's all I have.
11        MS. DOHNER SMITH:  I think I just have
12 one follow-up.
13            E X A M I N A T I O N
14 BY MS. DOHNER SMITH:
15 Q      I think earlier you indicated that hitting
16 in the groin goes beyond horseplay.
17        If, for example, there were, you know, two
18 long-term friends and they kind of engaged in this
19 type of behavior, you know, toward each other,
20 laughed about it, you know, it was joking to them,
21 could that be considered still inappropriate in the
22 workplace but horseplay?
23        MS. COLLINS:  Objection to form.
24        THE WITNESS:  Yes, that could be.  The
25 banter and activity that goes on in a close-knit

Page 32

1  group is perceived one way.  At any point in time,
2  an individual who does not want that kind of
3  attention or -- you know, they need to speak up.
4         That's in the protocol that's for
5  harassment, is that the employee or person or object
6  of that kind of behavior speak to the individual
7  directly.
8         If that does not work, they report it
9  to a manager.  That manager, you just keep cascading
10 until you get to an 800 hotline number.  Then any
11 possibility of any internal investigation to that
12 plant is removed.  It becomes an investigation
13 conducted by outside resources.
14        MS. COLLINS:  We're done.
15        FURTHER DEPONENT SAITH NOT.
16        (Proceedings concluded at 1:55 p.m.)

Page 33

1            REPORTER'S CERTIFICATE
2
3         I, Elisabeth A. Miller Lorenz, RMR,
4  CRR, Notary Public and Court Reporter, do hereby
5  certify that I recorded to the best of my skill and
6  ability by machine shorthand all the proceedings in
7  the foregoing transcript, and that said transcript
8  is a true, accurate, and complete transcript to the
9  best of my ability.
10        I further certify that I am not an
11 attorney or counsel of any of the parties, nor a
12 relative or employee of any attorney or counsel
13 connected with the action, nor financially
14 interested in the action.
15        SIGNED this 21st day of December, 2017.

*Elisabeth A Miller Lorenz* (signature)

21        Elisabeth A. Miller Lorenz, RMR, CRR
22 My Notary commission expires:  3/10/2019
23 Tennessee LCR No. 66
   Expires:  6/30/2018

```
 1              E R R A T A
 2
 3      I, JEB BEL, having read the foregoing
    deposition, Pages 1 through 34, taken December 18,
 4  2017, do hereby certify said testimony is a true and
    accurate transcript, with the following changes, if
 5  any:
 6  PAGE    LINE       SHOULD HAVE BEEN
 7  _____   _____      _____
 8  _____   _____      _____
 9  _____   _____      _____
10  _____   _____      _____
11  _____   _____      _____
12  _____   _____      _____
13  _____   _____      _____
14  _____   _____      _____
15  _____   _____      _____
16  _____   _____      _____
17
18                     _____
19                     JEB BEL
20
21
    _____
22      Notary Public
23  My commission expires:  _____
24
25
```