**In the Matter Of:**

KULAKOWSKI vs WESTROCK SERVICES

---

**WILLIAM WHITED**

*December 21, 2017*

---



**BRENTWOOD COURT
REPORTING SERVICES**
www.brentwoodcourtreporting.com
(615) 791-6983

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MICHAEL KULAKOWSKI,                    )
                                       )
    Plaintiff,                         )
                                       )
vs.                                    )CASE NO.
                                       )3:16-CV-02510
                                       )
WESTROCK SERVICES, INC.,               )
                                       )
    Defendant.                         )
_____



VIDEOTAPED DEPOSITION OF

WILLIAM LEE "TOMMY" WHITED

Taken on Behalf of the Plaintiff

December 21, 2017

Commencing at 9:14 a.m.


_____


Reported by:  Jerri L. Porter, RPR, CRR
Tennessee LCR No. 335
Expires:  6/30/2018

Page 2

```
1  APPEARANCES:
2  For the Plaintiff:
3       HEATHER MOORE COLLINS
        ANNE HUNTER
4       PAIGE LYLE
        Collins & Hunter
5       7000 Executive Center Drive
        Building 2, Suite 320
6       Brentwood, Tennessee  37027
        (615) 724-1996
7       heather@collinshunter.com
        anne@collinshunter.com
8       paige@collinshunter.com
9
   For the Defendant:
10
        MARY DOHNER SMITH
11      Constangy, Brooks, Smith & Prophete
        1010 SunTrust Plaza
12      401 Commerce Street
        Nashville, Tennessee  37219
13      (615) 320-5200
        mdohner@constangy.com
14
15 For the Witness:
16      DOUG JOHNSTON
        Barrett Johnston Martin & Garrison
17      414 Union Street
        Suite 900
18      Nashville, Tennessee  37219
        (615) 244-2202
19      djohnston@barrettjohnston.com
20
21 Also Present:
22 Sophia Gordon, Videographer
23
24
25
```

Page 3

```
1              I N D E X
2         INDEX OF EXAMINATIONS
3                              Page
4  Examination By Ms. Collins ....................6
5  Examination By Ms. Dohner Smith .............60
6  Examination By Ms. Collins ..................82
7  Examination By Ms. Dohner Smith .............85
8  Examination By Mr. Johnston .................86
9
10
11
12
13      PREVIOUSLY MARKED EXHIBITS
          PRESENTED TO WITNESS
14
15 Exhibit    Description           Page
16 No. 24   8/30/16 Whited Separation Notice ........23
           Bates WestRock 000246
17
18
19
20
21
22     Reporter's Note:  All proper names in the
23     transcript are spelled phonetically, unless
24     spelling is provided by counsel or witness.
25
```

Page 4

```
1          The videotaped deposition of WILLIAM
2  LEE "TOMMY" WHITED was taken on behalf of the
3  Plaintiff on December 21, 2017, in the offices of
4  Barrett Johnston Martin & Garrison, 414 Union
5  Street, Suite 900, Nashville, Tennessee, for all
6  purposes under the Federal Rules of Civil Procedure.
7          The formalities as to notice, caption,
8  certificate, et cetera, are waived.  All objections,
9  except as to the form of the questions, are reserved
10 to the hearing.
11         It is agreed that Jerri L. Porter,
12 being a Notary Public and Court Reporter for the
13 State of Tennessee, may swear the witness, and that
14 the reading and signing of the completed deposition
15 by the witness are reserved.
16
17
18
19
20
21                    * * *
22
23
24
25
```

Page 5

```
1         P R O C E E D I N G S
2          VIDEOGRAPHER:  We are now on the
3  record.  The time on the monitor is 9:14 a.m.
4  Today's date is December 21st, 2017.  This marks
5  the beginning of Disk 1 of the deposition of William
6  Tommy Whited.
7          Would counsel please introduce yourselves
8  and state whom you represent.
9          MS. COLLINS:  Heather Collins for the
10 plaintiff.
11         MS. DOHNER SMITH:  Mary Dohner -- oh,
12 sorry.  We've got co-counsel.
13         MS. HUNTER:  Anne Hunter for plaintiff.
14         MS. LYLE:  Paige Lyle for plaintiff.
15         MS. DOHNER SMITH:  Mary Dohner Smith on
16 behalf of the defendant.
17         MR. JOHNSTON:  Doug Johnston on behalf
18 of the witness.
19         VIDEOGRAPHER:  Would the court reporter
20 please swear in the witness.
21                    * * *
22         WILLIAM LEE "TOMMY" WHITED
23 was called as a witness, and after having been first
24 duly sworn, testified as follows:
25
```

Page 6

1  E X A M I N A T I O N
2  BY MS. COLLINS:
3  Q    Good morning.  Could you state your complete
4  name for the record, please?
5  A    William Lee Whited.
6  Q    And Mr. Whited --
7  A    I'm sorry.  They call me Tommy.
8  Q    Okay.  Mr. Whited, what is your address?
9  A    I live at 271 Greenfield Lane, in
10 Castalian Springs, Tennessee.
11 Q    What is that zip code?
12 A    37031.
13 Q    And what is your phone number?
14 A    My cell phone number is (615)948-1956, and I
15 do not have a landline at home.
16 Q    Okay.  What is your date of birth?
17 A    April 3rd, 1953.
18 Q    Are you currently employed?
19 A    I am not.
20 Q    Where was -- where were you last employed?
21 A    With WestRock.
22 Q    When did that employment end?
23 A    That was August 30th of 2016.
24 Q    Okay.  At the time that you were terminated,
25 what was your job title?

Page 7

1  A    I was the general manager for the Gallatin
2  plant operations.
3  Q    The Gallatin plant operations, that refers
4  to two facilities, the sheet plant and the
5  fulfillment center, correct?
6  A    That's correct.
7  Q    Okay.  How long were you in that position?
8  A    I took that position in, I believe it was
9  1986.
10 Q    Of those two facilities, where was your
11 office located?
12 A    Actually, my office was at the sheet plant.
13 Q    Okay.  How much time in the last two years
14 of your employment did you spend at the fulfillment
15 center?
16 A    The majority of my time in that -- in the
17 last year was probably at the fulfillment center.
18 Q    Why was that?
19 A    We had taken on some -- an account for GE,
20 General Electric, piece of business that
21 required the installation of a one of a kind piece
22 of equipment that -- and I was asked by my boss to
23 get it up and running and make the thing successful.
24 Q    Okay.  And so that was in 2016 that you
25 spent most of your time at the fulfillment center?

Page 8

1  A    Yes, that's correct.  Prior to that, it was
2  kind of split between the two.
3  Q    What was the percentage prior to that?
4  A    You know, it's really difficult to say.  I
5  was back and forth between the two.  I probably
6  spent 70 percent of my time at the sheet plant.
7  Q    When did y'all get that piece of equipment
8  so that you started spending more time at the
9  fulfillment center?
10 A    The piece of equipment was delivered during
11 the holidays, and we started installation on
12 January 4th of 2016.
13 Q    Who was your immediate supervisor?
14 A    Tom Pedine.
15 Q    In the hierarchy at WestRock, were you the
16 highest ranking management official at the Gallatin
17 facility?
18 A    On a daily basis, yes.
19 Q    How often was Tom Pedine at the Gallatin
20 plant in 2015/2016?
21 A    I'm going to have to guess.  I don't
22 remember exactly, but Tom probably visited the plant
23 three or four times.
24 Q    Who was the HR person assigned to the
25 Gallatin plants in 2015/2016?

Page 9

1  A    Helen Kendall was the HR representative for
2  the plant.
3  Q    What was Ms. Kendall responsible for as the
4  HR representative?
5  A    Helen actually was the -- my -- she doubled
6  as the office assistant, the administrative
7  assistant.  She was responsible for keeping the
8  payrolls, taking care of employee files, managing
9  inventory reporting to the home office, a number of
10 things along those lines.
11 Q    Could people also make complaints if they
12 were having problems with another employee to Helen?
13 A    They could go to Helen and she certainly had
14 the authority to report them to the business unit HR
15 rep and the area and regional reps.
16 Q    Who was the business unit HR rep?
17 A    Terri Henley is the business unit.  Or she
18 was.  I assume she still is.
19 Q    How often did Ms. Henley come out to the
20 Gallatin facilities in 2015?
21 A    I'm guessing again, but I remember a couple
22 of times that she visited the plant.
23 Q    When Ms. Henley would come out to the
24 Gallatin plants, what was typically the purpose of
25 her visit?

Page 10

1 A    Usually we'd talk about training or --
2 that's really all -- the only thing I remember her
3 coming for in 2015 was training.
4 Q    What kind of training?
5 A    We were changing some of our -- putting in
6 kiosks and those type things, and I think she was
7 there to work with Helen on some of that type of
8 stuff.
9 Q    Kiosks for what?
10 A    For employees to be able to do the employee
11 surveys and those type things.
12 Q    Were the employee surveys just done on an
13 annual basis?
14 A    Yes.
15 Q    Were they done at a specific time each year?
16 A    They were.  They came about during a certain
17 period, and I'm not sure exactly what that period
18 was.
19 Q    Okay.  What about 2016?  Was her presence at
20 the plant about the same?
21 A    No.  Actually, she -- it increased.  She --
22 she was there more often.
23 Q    Why was she there more often in 2016?
24 A    I -- I did ask that question, and she told
25 me she was just there to -- a couple of times she

Page 11

1 told me she was just there because she was going to
2 Murfreesboro and she wanted to stop by and visit and
3 she was just killing some time.
4 Q    Was that around the end of 2016, when she
5 was conducting an investigation, or was that in
6 general, she was just around then?
7 A    Probably started to see some of the -- her
8 coming by in midyear.
9 Q    Okay.  Who would she typically meet with
10 when she would come out?
11 A    She would -- she would see Helen, see
12 myself.  And I can't tell you who else she met with.
13 I just don't know.
14 Q    Okay.  When she would come out, would she go
15 to both facilities, to your knowledge?
16 A    I know she would sometimes.  I can't tell
17 you if she always did or not.  I wouldn't know the
18 answer to that.
19 Q    At the Gallatin plants -- and I'm
20 specifically sort of narrowing it down to the
21 2015/2016 time frame -- did y'all have any sort of
22 specific training for employees, non-management
23 employees, for sexual harassment?
24 A    I do not recall any.
25 Q    Did management have training for sexual

Page 12

1 harassment during that time frame?
2 A    I truly don't recall any.
3 Q    As a WestRock manager, did you have to do
4 any sort of online courses for -- that related to
5 your sexual harassment policies?
6 A    We did some online courses, and I do not
7 remember what all of the makeup of those things
8 were.  There were a number of them that we did.
9 Q    When you did those, did you have to sign off
10 saying that you did that?
11 A    I did.
12 Q    Okay.  Who maintained the employee files out
13 at the Gallatin facilities?
14 A    I'm sorry?
15 Q    Who maintained the employee files out at the
16 Gallatin --
17 A    That was Helen.  Helen Kendall.
18 Q    What about your file?  Was that also
19 maintained out at Gallatin or was that maintained at
20 a regional office, to your knowledge?
21 A    You know, to my knowledge, it was -- it was
22 maintained outside the plant.  Corporate, I think,
23 is where the -- our files were.  Now, that's to the
24 best of my knowledge.  I can't swear that that's
25 where they were.

Page 13

1 Q    And when you say corporate, where are you
2 referring to?
3 A    Our home office was in Norcross, Georgia.
4 Q    A moment ago you mentioned surveys.  When
5 the employees did these annual surveys, did you
6 receive a summary of the results of those surveys?
7 A    Yes.
8 Q    What sort of information did the summary
9 provide?
10 A    It was primarily a rating on a variety of
11 topics that told us how we were doing.
12 Q    Did you get any specific feedback other than
13 a rating?  Like examples of comments employees had
14 made without --
15 A    Yes.  There was a comment section in the --
16 at the -- I think it was at the end of the survey,
17 there were comments in there.
18 Q    Would it identify who had made the comment?
19 A    Would it -- as far as having their names?
20 Q    Yes.
21 A    No, no.
22 Q    As the -- as the general manager of the
23 Gallatin facilities, were you typically made aware
24 of complaints, of employee complaints?
25 A    I -- I can't tell you that I was aware of

1 all complaints, because I don't know what all of
2 them may have been. It was -- if there were
3 complaints, I was certainly made aware of some
4 complaints. Whether or not it was all of them, I
5 can't answer that for you.
6 Q    Who would make you aware if a complaint had
7 been made?
8 A    Generally, that would come from my plant
9 manager, and that was Larry Eden.
10 Q    What about global hotline complaints? Were
11 you made aware of those?
12 A    Not through Larry Eden, no. Any -- those
13 type things, if I heard anything about them, it
14 would be through Terri Henley, yes, Terri Henley,
15 the HR rep for the business unit.
16 Q    How would she notify you of a global hotline
17 complaint that pertained to the Gallatin plants?
18 A    Terri talked to me about one, and if I --
19 the best of my recollection was that it was on one
20 of her visits that we talked about it.
21 Q    Tell me about that.
22 A    The complaint was -- had to do with a
23 forklift driver that had a -- felt like he had been
24 not adhered to over some of his concerns about
25 loading a truck.

1 Q    Who was that?
2 A    The lift driver?
3 Q    Yes.
4 A    His name was Tommy Davis. But, now, he was
5 not the one who made the complaint.
6 Q    Who made the complaint?
7 A    I don't know who made the complaint. It was
8 an anonymous complaint. Well, I say it was
9 anonymous. As far as I know, it was anonymous. I
10 was never told who made the complaint.
11 Q    Would Ms. Henley or anyone else in HR ever
12 provide you with a copy of the global hotline
13 complaint --
14 A    No.
15 Q    -- as it came to them?
16 A    No.
17 Q    Was it typically just a verbal communication
18 that a complaint was made?
19 A    Yes.
20 Q    Did you discuss that with the employees,
21 that you got -- you were notified of complaints that
22 were made at the Gallatin plants?
23 A    I would look into the -- into the complaint,
24 yes.
25 Q    How many were made in the 2015/2016 time

1 frame?
2 A    The one that I just mentioned is really
3 the -- it's the only one I recall.
4 Q    When you said you would look into a
5 complaint, what do you mean by that? What would you
6 do?
7 A    As with that particular complaint, I really
8 didn't have to look into it, because I'd already
9 addressed the situation from it. If there was --
10 and that's really the only one that I had at that
11 time. I had already taken care of that.
12 Q    Okay. Did you communicate to the employees
13 at the Gallatin plants that if complaints were made,
14 you would know about them?
15 A    No, I did not tell them that.
16 Q    Did you at any point in the -- from 2014 to
17 2016, discourage employees from making complaints?
18 A    No.
19 Q    While working for WestRock or its
20 predecessor, RockTenn, were you disciplined for any
21 sort of policy infraction that involved harassment
22 or a violation of the code of conduct?
23 A    No. I've not been disciplined for any of
24 that, no.
25 Q    Have you been disciplined for anything in

1 the past ten years?
2 A    No.
3 Q    Were you made aware that in 2013 a complaint
4 of sexual harassment was made against you through
5 the global hotline?
6 A    No.
7 Q    Did anyone discuss that with you?
8 A    No.
9 Q    So no one asked you about any allegations of
10 sexual harassment in 2013?
11 A    No. Not that I remember, no.
12 Q    Well, you'd probably recall something like
13 that, wouldn't you?
14 A    I would certainly think so, but no.
15 Q    To your knowledge, had any employee or
16 subcontractor of WestRock made a complaint of sexual
17 harassment against you?
18 A    No.
19 Q    What was your understanding of the reasons
20 why you were terminated?
21 A    Well, I was never given any reasons.
22 Q    Tell me what you were told.
23 A    The day that -- the day that I was
24 terminated, I asked for a specific reason for the
25 termination, and I was told that there had been a

1 complaint, there had been an investigation, I was
2 asked some questions, and that there was no point
3 rehashing it.
4 Q        Who told you that?
5 A        That was Jeb Bell.
6 Q        Who else was there on the day you were
7 terminated?
8 A        Tom Pedine, Melinda McGraw, and Terri
9 Henley.
10 Q        Did they give you the opportunity to resign
11 in lieu of termination?
12 A        They did.
13 Q        And who said that you could resign instead
14 of being terminated?
15 A        Jeb Bell.
16 Q        What did you say to that?
17 A        My -- well, actually, I had a question
18 regarding that. And my question was simply, what
19 was going to be best for me from a financial
20 standpoint. And the -- there was a lot of confusion
21 about that.
22           Without going into, you know, a long drawn
23 out something for you, I really didn't get -- didn't
24 get a satisfactory answer about things such as the
25 bonus that I -- that would have come at the end of

1 September, these type things. So, as I asked -- and
2 I don't want to bore you with a lot of detail, but
3 it was evident that I couldn't get answers. So I
4 wasn't looking to resign. Told them they could
5 terminate me. Now, that took place with Melinda
6 McGraw a little bit later.
7 Q        Not during the meeting with --
8           (Overlapping speech.)
9 A        Not during that meeting, no.
10 Q        Okay. Was that a phone call with Melinda
11 McGraw?
12 A        No.
13 Q        Was it after others had left or how did that
14 play out?
15 A        It -- the way the thing happened was that we
16 were in the conference room at fulfillment. We had
17 that discussion. I asked about the financial impact
18 to me. And initially, Melinda was the one answering
19 the question. She thought that I would get a
20 prorated bonus and that kind of thing if I resigned.
21 And if I was terminated, I would get nothing. So
22 I'm like -- at that point, I felt it was probably in
23 my best interest if I was going to resign.
24           Cleaned out my office there. And my office
25 was simply a desk in the back. But when we went

1 from there to the sheet plant, Melinda had made a
2 call by the time we got to the sheet plant, and when
3 we got there, she told me that it didn't matter if I
4 resigned or was terminated, that I wasn't entitled
5 to anything. And at that point, I told Melinda,
6 then you just terminated me, then.
7 Q        Before y'all got to the sheet plant and you
8 cleaned out your desk and she had that phone
9 conversation, had you been given a separation
10 notice?
11 A        No.
12 Q        That day were you given a separation notice?
13 A        No.
14 Q        Have you ever been provided a separation
15 notice?
16 A        I have. It was the following day.
17 Q        Who did you receive that from?
18 A        Received that from Melinda McGraw.
19 Q        In person or by mail?
20 A        In person.
21 Q        Where did you receive -- where were y'all?
22 A        We were back at the conference room at
23 fulfillment.
24 Q        So, was this on August 31st?
25 A        Thirty-first.

1 Q        The day after you were -- they notified you
2 of your termination?
3 A        Yes.
4 Q        Did she ask you to come out there to meet
5 her to get the separation notice?
6 A        I believe that was -- I can't recall if she
7 asked me to come out for that or not, to be
8 perfectly honest with you.
9 Q        Why would you have been out there the day
10 after you were terminated?
11 A        There was some confusion regarding my cell
12 phone. The day -- on the 30th when I was
13 terminated, Melinda had taken my cell phone. She
14 had -- she deactivated the number and then erased
15 everything in the -- in the phone. She should not
16 have done that, as I found out from corporate,
17 because I was asking if I could keep my phone number
18 because it was mine very early on.
19           And actually, by the time we went through
20 the whole situation and I had conversations with
21 folks at our corporate office, the way it should
22 have been handled was that my phone should have only
23 had the password to the e-mail changed, because I
24 owned the phone. I had bought it myself.
25           So when I called Melinda to talk about that

Page 22

1  and to try to get my phone number reactivated, at
2  that point I went back to the -- or I told her I
3  wanted to get my phone back and I told her what
4  corporate had said. And when I told her that, she
5  asked Mr. Bell if I could -- well, I told her that
6  if she wanted to bring me the phone, you know, I'd
7  wait at the Verizon store for her to bring it.
8       Now, Mr. Bell was there. She asked Mr. Bell
9  if I could come back and get the phone, and he
10 approved it. Or she said that he did. I didn't
11 talk to him directly. So I went back to get the
12 phone, and when I went back and got my phone is when
13 I completed the separation slip.
14 Q      Okay. Who at corporate did you talk to?
15 A      I wish I could tell you her last name. Her
16 first name was Joann.
17 Q      And that was someone in Atlanta or --
18 A      Norcross.
19 Q      Norcross. Did you see or talk to Jeb Bell
20 the next day, on the 31st, when you --
21 A      No.
22 Q      Okay. So when you got your phone back, had
23 everything been wiped off of it?
24 A      Oh, yeah.
25 Q      Including text messages?

Page 23

1  A      Text messages, the pictures from my
2  granddaughter's graduations. It was clean. All
3  my -- all the contact information, everything was
4  gone from it.
5  Q      Did you use your cell phone to text with
6  employees of WestRock while you were there?
7  A      I was not big on texting, no.
8  Q      Prior to you being terminated, had you
9  engaged in any e-mail communication about the
10 investigation that led up to your termination or
11 your termination?
12 A      No, not that I remember.
13 Q      Did you e-mail much?
14 A      I used my phone for a lot of e-mails, yeah.
15 Q      And that was -- but those e-mails were
16 through a WestRock account, I assume?
17 A      Yes.
18 Q      Okay. I'm going to show you an exhibit real
19 quick. If you could turn to a document in there
20 that's been tabbed as Exhibit Number 24.
21           (Presented Exhibit No. 24.)
22           MS. COLLINS: I'm sorry, Doug, I didn't
23 bring extra copies.
24           THE WITNESS: Okay.
25

Page 24

1  BY MS. COLLINS:
2  Q      All right. Have you seen this document
3  before?
4  A      Excuse me. I have.
5  Q      Was this the separation notice that
6  Ms. McGraw gave you?
7  A      It is.
8  Q      And it looks like there's a mark-out
9  section, where it was marked out under the explain
10 the circumstances of this separation.
11 A      You're going to have to tell me where we
12 are.
13 Q      In that box. That box where there's also
14 handwriting.
15 A      Oh, here (indicating)?
16 Q      Yes.
17 A      Okay.
18 Q      Was this the -- that part that was marked
19 out, did it initially say resignation?
20 A      I don't know.
21 Q      Okay. Did she make any changes to this
22 document in front of you?
23 A      I didn't see her make changes to it, but
24 she -- we were positioned like here and there
25 (indicating). I don't know if she did or not. She

Page 25

1  did not that I saw.
2  Q      Okay. And up at the top, for the reason for
3  separation, it has the box for discharge and quit
4  marked, but then it has the box for discharged
5  circled. Do you know why that was? Or was it for
6  the reasons that you just explained?
7  A      I would have to tell you -- if I'm going to
8  make an assumption, I'm assuming it's because she
9  changed it after the reasons that I just talked
10 about.
11 Q      Okay. But to be clear, you did not receive
12 a copy of this document on the 30th?
13 A      No, I did not. Matter of -- I'm going to go
14 a step farther. It just made me think, because what
15 she had told me on the 31st was that she was going
16 to mail it to me, but that since I came back to get
17 the phone, she'd go ahead and give it to me while I
18 was there.
19 Q      And did you have any discussions with her
20 about the inconsistencies in having discharged
21 marked and quit marked?
22 A      No.
23 Q      After the 31st, have you been back out to
24 the plant?
25 A      I have not.

Page 26

1  Q    The Gallatin plants, they have both men and
2  women working out there, correct?
3  A    Yes.
4  Q    Okay.  Are you familiar with Michael
5  Kulakowski?
6  A    I am.
7  Q    And you worked with him?
8  A    Yes.
9  Q    At any point in time when you worked with
10 him, did you backhand him in his groin area?
11 A    No.
12 Q    Did you hit him in his groin area in any
13 way?
14 A    You know, define groin area for me.  If
15 you're -- if you're asking me did I ever hit him in
16 his private parts, the answer is no.
17 Q    Well, if -- is there a different part of the
18 groin area where you did hit him?
19 A    No, I never hit him in the groin, no.
20 Q    Did you make any physical contact with
21 Michael Kulakowski anywhere in his groin area?
22 A    No.
23 Q    His mid section?
24 A    No.
25 Q    Did you ever knock -- slap his hat off his

Page 27

1  head?
2  A    No.
3  Q    Did you ever kick him in the workplace?
4  A    No.
5  Q    Did you ever hit him with a broom?
6  A    No.
7  Q    Did you do that to any other employees,
8  either -- did you ever hit any other employees in
9  the groin area?
10 A    No.  Well, what -- what we did -- and I'll
11 give you a bit of an explanation.  But if there
12 was -- we would make moves that solicited a response
13 that was similar to goosing somebody in the ribs
14 maybe.  But you never -- you never actually made
15 contact.
16 Q    What do you mean, that solicited -- you
17 would make a move that solicited a response?
18 A    Oh, my goodness.  You know, maybe you'd
19 (indicating), you'd do that (indicating), like
20 you're -- you know, like you're saying -- I don't
21 know how to explain that.
22 Q    So you would take your hand and act like you
23 were backhanding someone?
24 A    Yes.
25 Q    But you wouldn't actually make contact --

Page 28

1  A    Right.
2  Q    -- is what you're saying?
3  A    Exactly.
4  Q    And you're saying you didn't do that -- or
5  you didn't make contact with Mike White in his groin
6  area?
7  A    No.
8  Q    What about Terry Stafford?
9  A    No.
10 Q    What about Donnie Taylor?
11 A    No.
12 Q    What about Jerry Harville?
13 A    I did with Jerry Harville one time
14 accidentally.
15 Q    Tell me about that.
16 A    I was -- same type thing.  Jerry took a step
17 forward just as I was doing it, and I accidently did
18 hit Jerry and I apologized for it.  I told him I
19 didn't mean to -- you know, to hit him, and that it
20 happened just as he made a forward step.
21 Q    When was that?
22 A    Oh, gosh.  That's been a long time ago.
23 Q    What about Mike Hall?  Did you do that to
24 Mike Hall?
25 A    Who?

Page 29

1  Q    Mike Hall.  Is that name correct?  Keith
2  Hall.  Sorry.
3  A    No.
4  Q    What about Larry Eden?
5  A    No.  No.  I'm sorry.  I'm sorry, I have a
6  little hearing loss that's why I keep leaning over.
7  Q    No, you didn't do that to Larry Eden?
8  A    No.  As far as actually making contact, no.
9  And that's what I think you were asking.
10 Q    Do you recall an incident where you
11 backhanded Keith Hall in the groin and he got angry
12 and pushed you into a copier?
13 A    No, I don't.
14 Q    Do you recall him telling you to never do
15 that again?
16 A    No, I do not.
17 Q    Now, if other employees say that they saw
18 you hit employees out at the Gallatin plants in the
19 groin, do you have any basis to refute that?
20     MS. DOHNER SMITH:  Objection.
21     THE WITNESS:  I did not hit these folks
22 in the groin.
23 BY MS. COLLINS:
24 Q    You didn't backhand them or flick your hand
25 at them and hit them with your fingertips?

Page 30

1   A       At -- no.  At them, yes, like I described,
2   yes, we'd do that.  But no, I -- I did not hit them.
3   The incident that I told you about with Jerry
4   Harville was an accident that happened, as I said,
5   as he stepped forward.  I don't remember ever making
6   any contact with anybody else.
7   Q       Did you ever knock Michael Kulakowski's hat
8   off his head or slap his hat off his head?
9   A       Nope, not that I remember, no.
10  Q       Have you ever kneed Michael Kulakowski in
11  the groin?
12  A       I have gone through the motion, just as with
13  the backhand flick (indicating), gone through the
14  motions, but never hit him.
15  Q       You've gone through the motions of kneeing
16  him in the groin?
17  A       Yes.
18  Q       Why?
19  A       We were -- in the working environment that
20  we had, a lot of us had worked together for a number
21  of years, and we were friends.  And it was just a
22  matter of simple camaraderie that we cut up with --
23  you know, with each other within our group of
24  friends.  Michael Kulakowski was a part of that
25  group of friends.

Page 31

1   Q       Do you remember Michael Kulakowski telling
2   you to stop that?
3   A       No.
4   Q       Would you consider that horseplay in the
5   workplace?
6   A       No.
7   Q       What would you consider it?
8   A       My definition of horseplay is creating a
9   situation or actions that cause somebody to be hurt
10  or the potential for an unsafe condition.
11  Q       And you're saying you did not engage in that
12  in the workplace?
13  A       No, I did not.
14  Q       Did you do that with women that worked out
15  there, pretend like you were going to knee them or
16  slap them in the groin?
17  A       Oh, no.  No.
18  Q       Would you say there's a culture of horseplay
19  out at the Gallatin plants when you were general
20  manager?
21          MS. DOHNER SMITH:  Objection.
22          THE WITNESS:  No.
23  BY MS. COLLINS:
24  Q       Did you ever kick Mike Eden in the
25  workplace?

Page 32

1   A       No.
2   Q       What about do that backhand, where you --
3   A       Yes.
4   Q       You would do that with Mike Eden as well?
5   A       Would not hit him, no.
6   Q       You would not -- you maintain that you
7   didn't make contact when you did that?
8   A       I didn't -- I did not make contact, no.
9   Q       So that thing that you describe as a
10  backhanded motion where you did not make contact,
11  you did that to Mike Eden, right?
12  A       Yes.
13  Q       You did that to Michael Kulakowski?
14  A       Yes.
15  Q       You did that to Mike White?
16  A       I don't remember ever -- Michael White.  I
17  don't remember ever doing it with Michael, no.
18  Q       You did that to Jerry Harville?
19  A       Yes.
20  Q       Did you do that to Keith Hall?
21  A       No.
22  Q       What about Larry Eden?
23  A       Yes.
24  Q       What about Donnie Taylor?
25  A       No, I don't remember ever doing it with

Page 33

1   Donnie, no.
2   Q       What about Terry Stafford?
3   A       Yes.
4   Q       What about J.R. Sanders?
5   A       Yes.
6   Q       Did you ever hit Donnie Taylor in the arm or
7   leg?
8   A       Not that I recall.
9   Q       Do you recall Donnie Taylor hitting you back
10  when you hit him in the groin?
11  A       I never hit Donnie in the groin, and I don't
12  recall Donnie ever hitting me.
13  Q       Did you ever smack Michael Kulakowski in the
14  back of his head?
15  A       You'd have to define smack, I guess, for me.
16  Q       Well, did you --
17  A       To me -- I'm sorry.
18  Q       Did you come into physical contact with the
19  back of his head, either a smack, a hit, knocking
20  his hat off, anything like that?
21  A       Never knocked his hat off, never hit him,
22  what I call a hit.  Flick on the back of the cap,
23  yes.  And no, I don't recall ever knocking his cap
24  off.
25          Do you recall ever hitting Michael

Page 34

1 Kulakowski so hard that he fell to the ground and
2 couldn't breathe?
3 A    Oh, my goodness, no.
4 Q    And Michael Kulakowski did not hit you back,
5 right?
6 A    Yes, he did.  This was -- what I'm
7 describing is what we did with each other.
8 Q    Okay.  Did he hit you back physically, make
9 contact with you?  Michael Kulakowski, did he ever
10 hit you back, make physical contact with you?
11 A    Not in the groin area, if that's what you're
12 asking.
13 Q    Anywhere on your body?
14 A    Oh, slap me on the shoulder or, you know,
15 that type thing, yes.
16 Q    Did you write him up for that?
17 A    No.
18 Q    Did you document it in any way?
19 A    No.
20 Q    Did you ever cuss out Michael Kulakowski in
21 the workplace?
22 A    No.
23 Q    Did you ever call him a stupid Polak?
24 A    I don't remember ever calling him that, no.
25 I remember him calling himself that, but I don't

Page 35

1 remember ever calling him that.
2 Q    What about a stupid motherfucker?
3 A    Ooh.  I don't remember doing that, no.
4 Q    Is that a term that you use?
5 A    Very selectively, and in -- only with close
6 friends.
7 Q    Did you use it in the workplace?
8 A    No, no.
9 Q    Did you ever call Michael Kulakowski a
10 pussy?
11 A    I do not remember ever doing that, no.
12 Q    Did you ever tell Michael Kulakowski that he
13 could suck your dick?
14 A    Oh, Lord, no.
15 Q    Did you ever shake your groin area or your
16 zipper at him and tell him he could suck your dick
17 or anything like that?
18 A    No.
19 Q    Do you recall ever doing that physical
20 motion towards any employee at WestRock?
21 A    No.
22 Q    And you never -- did you ever kick Michael
23 Kulakowski in his nuts or his balls?
24 A    No.
25 Q    Did you ever threaten Michael Kulakowski's

Page 36

1 job, tell him you were going to fire him?
2 A    No.
3 Q    Who gave Michael Kulakowski job evaluations?
4 A    That -- Larry Eden gave him his -- yeah, it
5 was Larry's job to do the job reviews on an annual
6 basis for the hourly employees.
7 Q    Did you have to sign off on those?
8 A    I did.
9 Q    Did you see Michael Kulakowski's
10 evaluations?
11 A    I don't recall seeing it, but I'm pretty --
12 I would assume it was in there.
13 Q    Did you sign off on those in addition to
14 Mr. Eden?
15 A    I did Larry's reviews, yes.
16 Q    But did you sign off on the other employees'
17 evaluations?
18 A    You're talking about the hourly employees?
19 Q    Yes.
20 A    Yes.
21 Q    And those evaluations, were they maintained
22 in their files?
23 A    Yes.
24 Q    Out at the --
25 A    They were -- should be at the sheet plant.

Page 37

1 Q    Did Helen maintain those?
2 A    She did.
3 Q    Did Mr. Pedine do your evaluations?
4 A    He did one.
5 Q    Who did your evaluation in 2015?
6 A    That would have been Pedine.
7 Q    Did you get one in 2016?
8 A    No.  I was -- I left before that.
9 Q    Did you get a good evaluation in 2015?
10 A    I did.
11 Q    Have you ever hired employees out there with
12 a criminal record?
13 A    Yes.
14 Q    When employees are hired out at WestRock,
15 would the company typically conduct background
16 checks on them?
17 A    Yes.
18 Q    Did you Michael -- know Michael Kulakowski
19 had a criminal record?
20 A    I did.
21 Q    And that wasn't a problem with his
22 employment, correct?
23 A    No.
24 Q    And he wasn't the only one that worked out
25 there that had a criminal record, correct?

Page 38

1  A      He's the only one that comes to mind. I
2  can't tell you for sure. I don't know.
3  Q      Okay. You don't have a criminal record, do
4  you?
5  A      No.
6  Q      Ever been arrested?
7  A      No.
8  Q      Do you find -- you worked with Keith Hall,
9  right?
10 A      Yes.
11 Q      Do you find him to be a credible person?
12 A      No.
13 Q      Why not?
14 A      Keith -- Keith has a habit of unfortunately
15 kind of putting himself first.
16 Q      So you think that makes him untruthful at
17 times?
18 A      Well, taking credit, yeah, for things that
19 he was not a part of, yeah.
20 Q      What about Larry Eden? Did you find him to
21 be a credible person?
22 A      I found Larry to be, yes.
23 Q      What about Tracy Duncan? Do you find her to
24 be a credible person?
25 A      I've never had a reason to think that she's

Page 39

1  not.
2  Q      What about Mike White, or Michael White?
3  Did you find him to be credible?
4  A      You know, I can't answer that about Michael.
5  I just -- I don't know that I've ever known him to
6  be in a situation to try to determine one way or the
7  other.
8  Q      Okay. But you haven't caught him telling
9  you an untruth that you -- or telling you something
10 that you later found out to be untrue, did you?
11 A      No. No, not in Michael's case, no.
12 Q      What about Jerry Harville? Do you find him
13 to be a credible person?
14 A      No.
15 Q      Why not?
16 A      Jerry is -- you know, even though I like
17 Jerry, he tends to not tell things truthfully. He's
18 inaccurate with -- knowingly inaccurate with some of
19 the things he's done and said.
20 Q      Did you ever write him up for anything like
21 that?
22 A      The -- I -- I talked with Larry Eden about
23 it. I didn't do a write-up on him myself, no.
24 Q      Specifically, what are you -- are you
25 referring to a specific situation?

Page 40

1  A      I am.
2  Q      What?
3  A      One example that comes to mind that I would
4  give you would be the -- we had a situation -- and I
5  think you -- we touched on it a little earlier with
6  Terri Henley, where there's some question about a
7  complaint.
8         Actually, where we got to with that was that
9  Jerry had -- the complaint was from a forklift
10 driver. The forklift driver was being told to do
11 something that was -- he was not supposed to do,
12 which was to load a damaged trailer, and the damage
13 was identified during the trailer inspection. He
14 brought it to Jerry's attention. Jerry had him go
15 ahead and load that trailer and told him to load
16 around the hole and ship it.
17        When they did that, the -- actually, the
18 forklift driver spoke with me about it. And when he
19 told me what had happened, the truck was already
20 gone. Went to the customer. It ended up being
21 returned and credits being issued.
22        And that was enough that I told Larry Eden,
23 who was Jerry's supervisor, that we couldn't have
24 that kind of thing going on out of Jerry, and that
25 we were going to have to pull Jerry out of his role

Page 41

1  as shipping manager for the sheet plant and find
2  something else to do with him, which we did. I
3  think I put him -- I think Larry put him back on
4  the die cutter, but you'd have to verify that with
5  Larry. But I think that's what he did with him.
6  Q      Who was the forklift driver again?
7  A      That was Tommy Davis.
8  Q      What about Donnie Taylor? Do you find him
9  to be credible?
10 A      I've never caught Donnie telling me a
11 falsehood that I know of. No, I can't think --
12 Donnie tends to -- Donnie finds a lot to talk about,
13 but I've never known him to just fib to me.
14 Q      What do you recall about the investigation
15 that led to your termination?
16 A      I'm not sure what you're asking me.
17 Q      Well, what do you know about anything that
18 led up to your termination?
19 A      The only thing that really I know about it
20 was just the questions that I was asked on the 20 --
21 I believe it was the 26th of August.
22 Q      And who asked you those questions?
23 A      This was in that -- with Melinda McGraw.
24 Melinda was the one that basically headed up the
25 question and answer session.

Page 42

1  Q    Was Terri Henley there?
2  A    She was.
3  Q    Was either -- were either of them taking
4  notes?
5  A    I know Melinda was.  I can't tell you about
6  Terri.
7  Q    Was Melinda typing notes or handwriting
8  notes?
9  A    I just don't -- I don't remember.
10  Q    Where was the interview?
11  A    It was at the fulfillment center conference
12  room.
13  Q    What about Tom Pedine?  Was --
14  A    Tom was there, yes.
15  Q    Anyone else besides Melinda, Terri, and Tom?
16  A    No.
17  Q    How long did the meeting last?
18  A    Hour and a half.  I really don't remember
19  just how long it was.  I wasn't paying -- I know
20  that we had a conference call that was with GE at
21  3:00, Tom and I did.  So it was over well before
22  that.  Probably in the 2:30 neighborhood it was
23  over, and they got there may be a little bit before
24  lunch.
25  Q    Did y'all --

Page 43

1  A    But I'm just going on memory.  Don't
2  document those times.
3  Q    Did the interview last through lunch or did
4  y'all start the interview after lunch?
5  A    You know, it seems to me that -- and here
6  I'm trying to rely on my memory, but it seems to me
7  that we sent out for sandwiches.  I think we started
8  right at lunchtime and sent for sandwiches, and we
9  got started.
10  Q    Did you take any notes during the meeting?
11  A    No.
12  Q    Did you fill out any documents?
13  A    No.
14  Q    Was the meeting recorded?
15  A    No.  Well, let me say, as far as I know it
16  wasn't recorded, unless somebody had a device on
17  that I wasn't aware of.
18  Q    Okay.  At the time that you met with Melinda
19  McGraw, Terri Henley, and Tom Pedine, did you know
20  that you were under investigation?
21  A    I did not know it when the meeting was
22  arranged.
23  Q    When was the meeting arranged?
24  A    I really don't remember when that was.  It
25  was within a couple of days, I think, that they

Page 44

1  notified me that they wanted to get together, but I
2  don't remember the exact time frame.
3  Q    How were you notified?
4  A    I think it may have been an e-mail from
5  Melinda.  And I hate to say I think, but that's kind
6  of -- that's what I remember.  That's the way -- and
7  it wasn't -- gosh, I just don't remember those
8  details.  I'm sorry.
9  Q    Okay.  Prior to receiving an e-mail from
10  Melinda, did you know that she and Terry had been
11  coming out and meeting with employees?
12  A    No.
13  Q    Do you recall having a phone conversation
14  with Keith Hall about the investigation?
15  A    No.
16  Q    Do you recall calling Keith Hall and telling
17  him that you had a list of who all had talked with
18  management or HR?
19  A    No.
20  Q    Do you recall calling Keith Hall and asking
21  him what was going on?
22  A    No.
23  Q    Or how long HR had been coming out to the
24  plant?
25  A    No.

Page 45

1  Q    Do you recall if you had ever told employees
2  that hotline complaints come to you?
3  A    No.
4  Q    Do you know who mailed the initial complaint
5  against you in August of 2016?
6  A    No.
7  Q    And you were never made aware of a complaint
8  against you in 2013?
9  A    No.
10  Q    And I understand you have a car lot, or
11  you're part owner in a car lot, or you were?
12  A    Used to have one, yeah.
13  Q    Okay.  When did you get rid of that?
14  A    My -- my partner and I separated -- it was
15  gone -- it's been over a year.  No, it's been
16  two years now, I guess.
17  Q    I understand you sold a car to Terry
18  Stafford.
19  A    I did.
20  Q    And he's still making payments on that?
21  A    He is.
22  Q    Had you sold any cars to any other WestRock
23  employees?
24  A    No.
25  Q    Have you seen Michael Kulakowski since your

Case 3:16-cv-02510   Document 33-7   Filed 02/26/18   Page 13 of 24 PageID #: 719

1 termination?

2 A       I did see him -- I was pulling into a gas

3 station, and I saw him there.

4 Q       Did you talk with him?

5 A       No.  It was across the parking lot.

6 Q       How big was the parking lot?

7 A       I think that -- I think there are about six

8 sets of gas pumps across the -- strung out across

9 the parking lot.  He was on the far side, and I

10 pulled in the lower side.  As far as I know, he

11 never even saw me.

12 Q       Do you carry a handgun?

13 A       I do not.

14 Q       What about a shotgun or a rifle?

15 A       I do not.

16 Q       Do you own any firearms, handgun, shotgun?

17 A       I own firearms, yes, but they're locked in a

18 cabinet at home.

19 Q       You don't keep them with you in the car?

20 A       No.

21 Q       Since your termination, have you talked with

22 any WestRock employees?

23 A       Oh, yes.

24 Q       Who?

25 A       Ooh, that's going to be a string of folks.

1 I've had folks call me from other plants.  Let's

2 see.  Jim Hull, Deanie Brantley.  I talked with

3 Roger Smith, Ed Ammaday.  I'll forget some before

4 I'm done with this.  Terry Stafford, Jason Brazzell,

5 Austin Matthews, Susan Hart, Georgie Anthony.

6 That's nowhere near everybody.  Eric Sullivan, Terry

7 Taylor, Jeff Scruggs.  And I know that's not

8 everybody, but that's a sampling.

9 Q       Which of those people besides Terry Stafford

10 were at the Gallatin facility?

11 A       Let's see.  Jim Hull was not.  I think the

12 first three that I gave you, Jim, Deanie, and Roger

13 Smith are not.

14 Q       Okay.  What about Ed?

15 A       Ed works out of the Gallatin facility.

16 Q       What's his job?

17 A       Ed is -- I'm not sure what he is now.  He

18 was the business unit GM.  He was based in

19 Murfreesboro.  They moved him to Gallatin.  Tom did,

20 Pedine.

21 Q       What did you talk with Ed about?

22 A       Nothing in particular, just, you know, kids,

23 how you doing, how you getting along, those types

24 things.

25 Q       What about Terry Stafford?  What did you

1 talk with him about?

2 A       Pretty much same type stuff.  You know,

3 these folks -- I had an open door policy when I was

4 at the plant.  These folks come talk to me about

5 personal issues, about work issues.  You know, it's

6 just not -- nothing out of the ordinary.

7 Q       Susan Hart, what did you talk with her

8 about?

9 A       Same type stuff.

10 Q       How many times have you talked with her

11 since you left?

12 A       Oh, I've talked to Susan a number of times.

13 Q       What about Terry?  A number of --

14       (Overlapping speech.)

15 A       A number of times.

16 Q       Would you say it's on a regular basis?

17 A       It's sporadic.  I might talk to him two or

18 three times in one week, may not talk to him again

19 for two or three weeks.

20 Q       Did he tell you he was being deposed in this

21 case?

22 A       I knew that he was being deposed.  I don't

23 know that he was the one that told me.

24 Q       Did y'all talk about his deposition?

25 A       No.

1 Q       Have you talked about his deposition at any

2 point in time?

3 A       About con -- no.  I haven't talked to

4 anybody about the contents of their depositions.

5 Q       What about Jason?  Is he -- was he at the

6 Gallatin plant?

7 A       Yes.

8 Q       What was his job?

9 A       Jason worked on a machine in the plant.

10 Q       How many times have you talked with Jason?

11 A       Not many.  Two or three times.

12 Q       What about Austin?

13 A       Austin actually married my granddaughter a

14 few weeks ago.

15 Q       Is he at the Gallatin plant?

16 A       He is.

17 Q       What about Georgie?

18 A       She's at the Gallatin plant.  I talked to

19 Georgie only a couple of times.

20 Q       What did y'all talk about?

21 A       Kids, you know, her youngest one deer

22 hunting.  Just personal friendship type stuff.

23 Q       Were most of these conversations on the

24 phone or were they in person?

25 A       Been some of both.  Some of these folks come

Page 50

1  to my house to visit and we talk in person,
2  sometimes they call.
3  Q        What about Eric?  Is he from the Gallatin
4  plant?
5  A        He is.
6  Q        How many times have you talked with him
7  since you left?
8  A        Several.
9  Q        Same sort of stuff, just personal?
10  A        Yeah.
11  Q        What about Terry Taylor?
12  A        I talked to a couple of times.
13  Q        Is he at the Gallatin plant?
14  A        He is.
15  Q        What about Jeff?
16  A        Jeff Scruggs?
17  Q        Uh-huh.
18  A        Only talked to Jeff a couple of times.
19  Q        And he was at the Gallatin plant?
20  A        Yes.
21  Q        Same sort of stuff, just personal?
22  A        Jeff had actually had a car wreck.
23  Q        Okay.
24  A        And yeah, I went to see how he was.
25  Q        All right.  Anyone else you can think of?

Page 51

1  A        Not that -- not off the top of my head, no.
2  But I would tell you that I would not say that
3  that's everybody.
4  Q        Okay.  Did you have any relatives that
5  worked out at the plant other than your -- I guess
6  your granddaughter's fiancé?
7  A        Well, he wasn't a relative when he started.
8  Q        Okay.
9  A        My -- I had a nephew years ago.  When my son
10  was in high school, he worked one summer when he was
11  out of school.  That's really all I remember.
12  Q        Did you have a personal relationship with
13  Susan Hart when you were general manager at
14  WestRock?
15  A        What do you mean?
16  Q        An intimate relationship.
17  A        No.
18  Q        Did you ever kiss her out at the plant?
19  A        No.
20  Q        Did you ever hire workers from your son's
21  construction company to perform work out at the
22  plant?
23  A        I hired some guys that worked for my son,
24  yes.
25  Q        Did they go through the temp agency --

Page 52

1  A        They did.
2  Q        -- to work out there?
3  A        They did.
4  Q        Which temp agency?
5  A        White Staffing.
6  Q        Did you have a -- out at the Gallatin
7  plants, was there a White Staffing person that
8  worked there on a regular basis?
9  A        On-site supervisor, yes.
10  Q        Who was that?
11  A        Heather -- I'm sorry.  I don't recall
12  Heather's last name off the top of my head.
13  Q        Was she still there when you --
14  A        When I left, yes.  I know they changed that
15  person a couple of times, but as far as I know
16  Heather -- well, Heather was still there when I
17  left, yes.
18  Q        Were you aware of employees working off the
19  clock?
20  A        I'm sorry?  Say it again.
21  Q        Were you aware of employees working off the
22  clock?
23  A        At the plant?
24  Q        Yes.
25  A        No.

Page 53

1  Q        Did you ever ask employees to come in and
2  get some work done off the clock?
3  A        Did I ask them what?
4  Q        Ask them to come in and get work done off
5  the clock?
6  A        No.
7  Q        Did you discourage employees from taking
8  vacation days?
9  A        I'm sorry.  I'm --
10  Q        Yeah.  Did you discourage employees from
11  taking vacation days?
12  A        No.  Absolutely not.
13  Q        Do you recall telling any employee out there
14  that you could leave now if you don't like how I run
15  things, you have to do things my way?
16  A        No, I've never told anybody that.
17  Q        Did you ever call Michael Kulakowski a
18  stupid son of a bitch?
19  A        No.
20  Q        If multiple employees stated that you
21  physically slapped them in the groin area, do you
22  have a basis to dispute that?
23          MS. DOHNER SMITH:  Objection.
24          THE WITNESS:  Yeah.  It's like I said
25  earlier, there were a group of us who had worked

Page 54

1  together for years, and we were -- we were all
2  friends.  We had -- in the course of our working
3  relationship, we made gestures toward each other
4  like we were going to hit each other.
5          It was -- this was just our -- I don't
6  know what you call it.  It was just our camaraderie.
7  There was -- I don't know what to tell you other
8  than there was -- if anybody hit anybody, it would
9  have been totally by accident, because I don't
10 believe there was any intentional harm meant toward
11 anybody.
12 BY MS. COLLINS:
13 Q      Do you think that behavior was in
14 conformance with WestRock's policies?
15 A      I think it was.
16 Q      Do you recall ever telling an employee that
17 the horseplay stops now because another employee was
18 terminated for horseplay at another plant?
19 A      I do, uh-huh.
20 Q      Tell me about that.
21 A      I know there was a -- I read about a
22 situation with our Murfreesboro facility where an
23 employee was terminated after -- well, I shouldn't
24 say after.  But he was terminated, and I think there
25 was a law -- well, I know there was a lawsuit that

Page 55

1  was connected to it in some way.  And it had to do
2  with some kind of physical harassment of some --
3  some sort.
4          And the -- in telling the folks at the
5  plant -- both plants, actually, that we had to stop
6  our -- the things that we've been talking about
7  here, because somebody that didn't know our group
8  might misinterpret what was going on, and that we
9  didn't want anybody to think there was anything that
10 was improper going on.
11 Q      When was that?
12 A      Gosh, that was sometime before the
13 termination.
14 Q      Was it --
15 A      And when I say sometime, I mean, months
16 before.  I don't know how many months, but it wasn't
17 like, you know, the week before or anything like
18 that.
19 Q      Okay.  Who were you talking to about that?
20 A      I talked to pretty much all of my managers,
21 and all the folks that were in our group that I was
22 talking about, like Jerry Harville, Kulakowski,
23 Larry Eden, Terry Stafford, J.R., Michael White.
24 Q      Anyone else?
25 A      I can't tell you if there was anybody else

Page 56

1  or not.  Those are the ones that I remember.
2  Q      What about Donnie Taylor?  Was he in your
3  group?
4  A      I don't remember talking to -- directly to
5  Donnie about it.
6  Q      Was there anyone else in your group other
7  than those people that you just named?
8  A      I don't think so.
9  Q      When you talk about --
10 A      Well, I say I don't think so.  Let me --
11 there were -- you know, I'd have to sit here and
12 research this thing.  Mikey Eden was -- you know,
13 Mikey wasn't adverse to coming up and slapping me on
14 the shoulder, you know.  J.H. Herndon, and I didn't
15 think about Jay, because Jay had retired.  I'm sure
16 there are others.
17 Q      Okay.  And when you talk about folks in your
18 group, those are people that y'all would engage in
19 that sort of --
20 A      Camaraderie, yes.
21 Q      Well, what you called camaraderie was --
22 where you talked had about earlier, where you said
23 that you pretended to slap someone in their groin.
24 A      Uh-huh.
25 Q      But you could only remember actually making

Page 57

1  physical contact with one person on one occasion; is
2  that correct?
3  A      That's the only one I remember.
4  Q      And you don't recall any employee ever
5  telling you to stop doing that?
6  A      No, no.
7  Q      Do you think allowing horseplay like that in
8  the work environment is consistent with WestRock's
9  policies?
10 A      I still don't consider what we were doing to
11 be horseplay, as I understand horseplay.
12 Q      Were you aware that WestRock had a policy
13 prohibiting assault in the workplace?
14 A      Yes.
15 Q      And you didn't consider that behavior
16 assault?
17 A      No.
18 Q      Do you recall an incident in the shipping
19 office where Michael Kulakowski was bent over
20 looking at the computer and you came in and reached
21 your hand between his legs and grabbed his balls?
22 A      I do not, no.
23 Q      Is it that you just don't remember it or it
24 did not happen?
25 A      It didn't happen.

Page 58

1  Q       Did you ever act like you were going to run
2  down Michael Kulakowski in your truck or hit him in
3  your truck?
4  A       No.
5  Q       Do you recall an incident outside of the
6  shipping office at the picnic table where you came
7  up and hit Michael Kulakowski in his groin area?
8  A       I don't, no.
9  Q       You don't recall it or it did not happen?
10 A       It did not happen.
11 Q       Do you recall an incident in the shipping
12 office where you grabbed Michael Kulakowski and
13 threw him across the office desk?
14 A       No.
15 Q       Did you ever show your genitals or your
16 penis to any employees at WestRock?
17 A       No.
18             MS. COLLINS:  Okay.  If I could just
19 have a break to review my notes.
20             MR. JOHNSTON:  Sure.
21             VIDEOGRAPHER:  We are going off the
22 record.  The time on the monitor is 10:36 a.m.
23             (Recess observed.)
24             VIDEOGRAPHER:  We are back on the
25 record.  The time on the monitor is 10:44 a.m.

Page 59

1  BY MS. COLLINS:
2  Q       Mr. Whited, earlier you described what you
3  called camaraderie between you and several other
4  male employees.  How often would y'all engage in
5  that sort of behavior, where you pretended to hit
6  someone in the groin area, or what you said --
7  characterized as pretending to hit someone, how
8  often would y'all do that?  Was that a regular --
9  A       That was regular, yeah.
10 Q       And that was a regular sort of thing up
11 until your termination?
12 A       Up until we had the discussions that I've --
13 I mentioned earlier that -- for fear that somebody
14 might misinterpret because of that incident out of
15 Murfreesboro.
16 Q       And you don't remember when that discussion
17 was?
18 A       I'm sorry, I don't.
19 Q       Okay.  Was it in 2016?
20 A       Yes.
21 Q       Sometime?
22 A       It was, it was.
23 Q       You don't remember what time of year in
24 2016?
25 A       No, I'm sorry, I don't.

Page 60

1  Q       And you didn't document anywhere that you
2  had that discussion?
3  A       No.
4  Q       And by regular -- you said that was a
5  regular sort of thing.  Would that be like weekly or
6  daily?
7  A       That's really hard for me to say.  It was
8  just not uncommon.  And folks just didn't think a
9  whole lot about it.
10             MS. COLLINS:  Okay.  That's all I have.
11          E X A M I N A T I O N
12 BY MS. DOHNER SMITH:
13 Q       Mr. Whited, Helen Kendall's actual job title
14 was administrative assistant, correct?
15 A       Correct.
16 Q       And she didn't have any reporting structure
17 up through the HR group, she only reported to
18 management at the Gallatin facility, correct?
19             MS. COLLINS:  Objection to form.
20             THE WITNESS:  No.
21 BY MS. DOHNER SMITH:
22 Q       She didn't have any reporting structure with
23 respect to Joy Jones, did she?
24 A       Not directly to Joy, no.
25 Q       Well, Terri Henley wasn't in any way her

Page 61

1  boss, correct?
2             MS. COLLINS:  Objection to form.
3             THE WITNESS:  Really didn't have her as
4  a boss, I don't think.  She worked directly with
5  Terri.
6  BY MS. DOHNER SMITH:
7  Q       She would pass information on to Terri?
8  A       Okay.
9  Q       Correct?
10 A       Yes, that's true.
11 Q       Okay.  There wasn't actually a local HR
12 representative, and so Helen was the one who would
13 pass questions on, pass information on, get forms
14 from HR to give to employees, correct?
15 A       Right.
16             MS. COLLINS:  Objection to form.
17 BY MS. DOHNER SMITH:
18 Q       So she wasn't really technically an HR
19 person, she was the person there kind of being the
20 go-between, between the plant and HR?
21 A       Yes.  Helen had a number of
22 responsibilities.  That was -- that communication
23 piece was part of it.
24 Q       Okay.  Now, the surveys that took place at
25 the Gallatin facility, those were actually biannual,

1  correct?  They weren't every year?
2  A      Employee surveys?
3  Q      Uh-huh.
4  A      I think they missed the prior year.  I
5  really can't recall.
6  Q      Okay.  So if other people in the corporate
7  structure testified that they're done biannually,
8  you would have no reason to --
9              (Overlapping speech.)
10  A      I have no reason to say that's wrong.
11          MS. COLLINS:  Objection to form.
12  BY MS. DOHNER SMITH:
13  Q      In 2015, the company changed from RockTenn
14  to WestRock, correct?
15  A      True.
16  Q      And when that took place, corporate sent out
17  HR to do code of conduct training at the facility,
18  correct?
19  A      For --
20  Q      For employees.
21  A      You know, I don't remember that.
22  Q      Okay.  Could have happened, you just don't
23  remember it?
24  A      Could be, could be.
25  Q      All right.  Earlier you were talking about

1  this group, I think you called it, a group of
2  friends.
3  A      Uh-huh.
4  Q      Was Mr. Kulakowski your friend?
5  A      Oh, yes.
6  Q      Okay.  And you talked about the conduct you
7  said was camaraderie, where you would pretend or
8  make a movement like you were going to hit somebody
9  but not actually make contact?
10  A      Right.
11  Q      Would Mr. Kulakowski engage in that as well?
12  A      Yes.
13  Q      Would he -- who would he engage in that type
14  of behavior with?
15  A      Oh, shucks.  Pretty much anybody in the
16  group.  Terry Stafford, J.R., myself, Donnie Taylor.
17  And I'm sorry, I just can't remember all of them off
18  the top of my head, but it was -- it was a number of
19  folks, yeah.
20  Q      And was that something that was contained
21  just within your group of friends?
22  A      It was -- we didn't -- you didn't do that
23  kind of thing with a newcomer.  You know, that --
24  that could -- maybe they would not understand what
25  was going on.  But there were some of us who had

1  worked together for a number of years, and that's --
2  it was -- well, that's all it was, camaraderie in a
3  group of friends.
4  Q      So you didn't mean it to be harmful in any
5  way?
6  A      Oh, absolutely not.
7  Q      And you didn't mean to hurt anybody
8  physically --
9  A      No.
10  Q      -- in any way?
11          MS. COLLINS:  Objection to form.
12  BY MS. DOHNER SMITH:
13  Q      Was that meant to be sexual in nature at
14  all?
15  A      No.
16          MS. COLLINS:  Objection to form.
17  BY MS. DOHNER SMITH:
18  Q      As of August 30th, 2016, you didn't have
19  any intent to resign at that time, did you, as of --
20  A      No.
21  Q      -- August 30th?
22          The only reason you would have considered a
23  voluntary resignation is because you were told you
24  were being terminated?
25  A      Yes.

1  Q      Are you at all related to Helen Kendall in
2  any way?
3  A      I'm sorry?
4  Q      I'm sorry.  Are you at all related to Helen
5  Kendall in any way?
6  A      No.
7  Q      By marriage or anything like that?
8  A      My first wife's sister was married to
9  Helen's brother.
10  Q      Okay.  But you're not related in any --
11  A      No.
12  Q      -- way?
13  A      No.
14  Q      Okay.
15  A      That was the closest I got to a
16  relationship.
17  Q      I think earlier you were asked if you recall
18  calling Mr. Kulakowski a stupid son of a bitch, and
19  you said no.  Do you just not recall that or did
20  that not happen?
21  A      That didn't happen.
22  Q      Did Mr. Kulakowski use curse words in the
23  workforce?
24  A      Oh, yeah.  Yes.
25  Q      What type of curse words would he use in the

Page 66

1  workforce?
2  A      You know, he would -- Mr. Kulakowski would
3  use -- you know, he'd drop the F word, you know.  I
4  really can't pin them down.  I just -- the same type
5  of thing a bunch of redneck guys do.
6  Q      Okay.  You were asked some questions about
7  whether you would pretend like you were going to hit
8  Mr. Kulakowski with your truck or if you actually
9  hit him.  I think that was a do you recall question.
10         Did you ever act like you were going to hit
11 him with your truck or hit him with your truck?
12 A      No, I've never hit him with the truck, I'm
13 sure.  And no, I never -- I never made any attempt
14 to run over Mr. Kulakowski, no.  I think that's what
15 you asked.
16 Q      Yes.  You were asked about an incident in
17 the shipping office and whether you recalled
18 throwing Mr. Kulakowski across a desk.  Is that
19 something you just don't recall or that didn't
20 happen?
21 A      No, I didn't -- I didn't do that.
22 Q      Okay.  Part of your job responsibilities as
23 the general manager would be to ensure that
24 WestRock's policies were complied with, correct?
25 A      Right.

Page 67

1  Q      That includes the code of conduct?
2  A      Yes.
3  Q      That includes the anti-violence policy?
4  A      Yes.
5  Q      And that would include the anti-harassment
6  policy?
7  A      Yes.
8  Q      Hitting Mr. Kulakowski in his groin would
9  not be part of your job duties, would it?
10 A      No.
11 Q      That's not something you were employed by
12 the company to do, correct?
13 A      Correct.
14 Q      And I'm not saying you did it, but that
15 would not be anything that was serving to WestRock
16 in any way, correct?
17 A      Correct.
18 Q      And that's not something that WestRock would
19 expect from you as a general manager, correct?
20        MS. COLLINS:  Objection to form.
21        THE WITNESS:  As far as hitting.
22 BY MS. DOHNER SMITH:
23 Q      Actually hitting him in the groin.
24 A      Right.
25 Q      Okay.  And you were never authorized by

Page 68

1  anybody to slap Mr. Kulakowski in the groin,
2  correct?
3  A      Correct.
4  Q      Got to run through these with each of these.
5  I'm sorry; just bear with me.
6         Same thing with kicking Mr. Kulakowski in
7  the groin.  That's not something that was part of
8  your job duties, correct?
9  A      Correct.
10 Q      It wasn't something you were employed to do,
11 correct?
12 A      Correct.
13 Q      That's not something that, if it happened,
14 was serving in any positive way to WestRock,
15 correct?
16        MS. COLLINS:  Objection to form.
17 BY MS. DOHNER SMITH:
18 Q      It wasn't in service?
19 A      Right.
20 Q      That's not something that WestRock would
21 expect a general manager to do?
22        MS. COLLINS:  Objection to form.
23        THE WITNESS:  To?
24 BY MS. DOHNER SMITH:
25 Q      To kick Mr. Kulakowski in the groin?

Page 69

1  A      To actually hit?
2  Q      To kick him in the groin, to make contact
3  and kick him in the groin?
4  A      Right.
5  Q      And that's not something that WestRock
6  authorized you to do, kick him in the groin?
7  A      Right.
8  Q      We're going to run through the same thing
9  with grabbing of the groin.  That's not something
10 that's part of your job duties, correct?
11 A      Right.
12 Q      It's not something you were employed to do?
13 A      Correct.
14 Q      Doing that would not be in service to
15 WestRock in any way?
16        MS. COLLINS:  Objection to form.
17        THE WITNESS:  Correct.
18 BY MS. DOHNER SMITH:
19 Q      It's not something that WestRock would have
20 expected you to do?
21        MS. COLLINS:  Objection to form.
22        THE WITNESS:  Correct.
23 BY MS. DOHNER SMITH:
24 Q      And that's not something that WestRock would
25 have authorized you to do?

Page 70

```
1   A       Correct.
2               MS. COLLINS:  Objection to form.
3   BY MS. DOHNER SMITH:
4   Q       Let's run through the same thing with
5   hitting Mr. Kulakowski with a broom.  That's not
6   something that would be part of your job duties?
7   A       Correct.
8   Q       Not something you were employed to do?
9   A       Correct.
10  Q       Not something that would be in service of
11  WestRock?
12              MS. COLLINS:  Objection to form.
13              THE WITNESS:  Correct.
14  BY MS. DOHNER SMITH:
15  Q       Not something WestRock would have expected
16  you to do?
17              MS. COLLINS:  Objection to form.
18              THE WITNESS:  I'm sorry.  I'm losing
19  you now.
20  BY MS. DOHNER SMITH:
21  Q       Sorry.  I think I'm getting a little softer.
22  Sorry about that.
23          Hitting Mr. Kulakowski with a broom, that's
24  not something WestRock would have expected you to
25  do?
```

Page 71

```
1               MS. COLLINS:  Objection to form.
2               THE WITNESS:  No.
3   BY MS. DOHNER SMITH:
4   Q       And that's not something WestRock authorized
5   you to do?
6   A       No.
7   Q       Same thing with -- there's been an
8   allegation that you unzipped your pants, exposed
9   your penis and told Mr. Kulakowski to suck your
10  dick.
11          That's not something that would be part of
12  your job duties, correct?
13  A       No.
14  Q       That's not something you were employed to
15  do?
16  A       No.
17  Q       That's not something that would be in
18  service to WestRock in any way?
19              MS. COLLINS:  Objection to form.
20              THE WITNESS:  No.
21  BY MS. DOHNER SMITH:
22  Q       That is not something that WestRock
23  expected?
24              MS. COLLINS:  Objection to form.
25              THE WITNESS:  No.
```

Page 72

```
1   BY MS. DOHNER SMITH:
2   Q       And that is not something that authorized --
3   or WestRock would have authorized you to do?
4   A       No.
5   Q       And by no with those, you mean correct, that
6   was a correct statement?
7   A       Correct.  I'm sorry.
8   Q       All right.  Let's talk about the allegation
9   that you hit him with your truck or pretended to hit
10  him with your truck.  That's not something that
11  would be part of your job duties?
12  A       No.
13  Q       And that is not something you were employed
14  to do?
15  A       Correct.
16  Q       Your earlier no, that means correct?
17  A       Right.
18  Q       Thank you.  That wouldn't be serving
19  WestRock in any way, correct?
20  A       Correct.
21              MS. COLLINS:  Objection to form.
22  BY MS. DOHNER SMITH:
23  Q       And that was not something WestRock would
24  expect you to do, correct?
25  A       Correct.
```

Page 73

```
1               MS. COLLINS:  Objection to form.
2   BY MS. DOHNER SMITH:
3   Q       And that's not something that you were
4   authorized by WestRock to do, correct?
5   A       Correct.
6   Q       What about calling an employee a pussy, is
7   that something that would be part of your job
8   duties?
9   A       No.
10  Q       You weren't employed to call people that
11  term, were you?
12  A       No.
13  Q       And if you had called somebody a pussy, that
14  wouldn't be serving WestRock in any way, correct?
15  A       No.
16              MS. COLLINS:  Objection to form.
17  BY MS. DOHNER SMITH:
18  Q       WestRock wouldn't expect you as a general
19  manager to be calling employees pussies, correct?
20  A       No.
21              MS. COLLINS:  Objection to form.
22              THE WITNESS:  Correct.
23  BY MS. DOHNER SMITH:
24  Q       And that's not something that WestRock would
25  authorize and say, hey, call --
```

1        MS. COLLINS: Objection to the form.
2  BY MS. DOHNER SMITH:
3  Q      -- your employees pussies, correct?
4  A      Correct.
5  Q      Same thing with calling Mr. Kulakowski a
6  quote/unquote fucking Polak. That wouldn't be part
7  of your job duties, correct?
8  A      Correct.
9  Q      You weren't employed to do that, correct?
10 A      Correct.
11 Q      And that wouldn't be serving WestRock in any
12 way, correct?
13        MS. COLLINS: Objection to the form.
14        THE WITNESS: Correct.
15 BY MS. DOHNER SMITH:
16 Q      And that is not something WestRock would
17 have expected you to do, correct?
18        MS. COLLINS: Objection.
19        THE WITNESS: Correct.
20 BY MS. DOHNER SMITH:
21 Q      And that's not something that you were
22 authorized to do, correct?
23 A      Correct.
24 Q      There's also been an allegation by
25 Mr. Kulakowski that you made a comment to him that

1  he needed to stay late so you could go home and fuck
2  his wife. Is that anything that you ever said to
3  him?
4  A      No.
5  Q      Would that be part of your job duties?
6  A      No.
7  Q      Would that be something you were employed to
8  do?
9  A      No.
10 Q      Would that be something that was serving
11 WestRock in any way?
12 A      No.
13 Q      Is that something WestRock would have
14 expected you to say to an employee?
15 A      No.
16        MS. COLLINS: Objection to form.
17 BY MS. DOHNER SMITH:
18 Q      Is that something that WestRock authorized
19 you to say to an employee?
20 A      No.
21 Q      Now, actually, making contact, hitting,
22 kicking, grabbing Mr. Kulakowski in the groin, that
23 would be a violation of WestRock's policies,
24 correct?
25 A      Correct.

1  Q      Hitting Mr. Kulakowski with a broom would be
2  a violation of company policy, correct?
3  A      Correct.
4  Q      Hitting him with your car would be -- or
5  your truck --
6  A      Correct.
7  Q      My husband doesn't want his truck called a
8  car, so...
9  A      Right.
10 Q      So hitting him with your truck would not
11 be -- or would be a violation of company policy?
12 A      Correct.
13 Q      Calling Mr. Kulakowski a pussy, a stupid
14 fucking Polak, or saying I'm going to fuck your
15 wife, those would be a violation of company policy,
16 correct?
17 A      Yeah. And if I'm squirming, it's because
18 I'm just not used to hearing this language in mixed
19 company.
20 Q      I'm sorry. I grew up with four brothers, so
21 I've heard it all by now.
22 A      Okay. Well, yeah. No, they don't expect me
23 to do that.
24 Q      And those would all be a violation of
25 company policy?

1  A      Yes.
2  Q      Okay. Employees receive a copy of the -- of
3  the employee handbook, correct?
4  A      Yes.
5  Q      And that has a copy of the compliance
6  hotline in it; is that correct?
7  A      Yes.
8  Q      Now, the compliance hotline, that's also
9  posted at the --
10 A      Yes.
11 Q      -- facility, correct?
12 A      It is.
13 Q      And that's been posted for years, correct?
14 A      Yes.
15 Q      That's not something that just went up in
16 2016.
17 A      No.
18 Q      That's been there for a long time?
19 A      Yes.
20 Q      How far back can you recall the compliance
21 hotline being posted?
22 A      Ever since we had one.
23 Q      Do you know when that was?
24 A      I do -- it's been a long, long time.
25 Q      Okay.

Page 78

1  A       Years and years.
2  Q       And that's posted on the employee bulletin
3  board in the breakroom?
4          MS. COLLINS:  Objection to form.
5          THE WITNESS:  Well, the bulletin boards
6  are not in the breakroom.
7  BY MS. DOHNER SMITH:
8  Q       Oh, okay.  Where are they?
9  A       They're in the walkway --
10 Q       Okay.
11 A       -- to the breakroom.
12 Q       Okay.  And that's where that's posted?
13 A       Yes.
14 Q       All right.
15 A       Or that's where they were.  I don't know if
16 they've been moved or not.
17 Q       Okay.
18 A       When I was there, they were in the -- they
19 were in the -- posted in the walkway.
20 Q       Okay.  Thank you.
21         Throwing somebody across a desk, that's not
22 something that would be part of your job duties,
23 correct?
24 A       Correct.
25 Q       And that's not something you were employed

Page 79

1  to do?
2  A       Correct.
3  Q       And that's not something that would be
4  serving to WestRock in any way?
5  A       Correct.
6          MS. COLLINS:  Objection to form.
7  BY MS. DOHNER SMITH:
8  Q       That's not something WestRock expected you
9  to do?
10         MS. COLLINS:  Objection to form.
11         THE WITNESS:  Correct.
12 BY MS. DOHNER SMITH:
13 Q       And that's not something WestRock authorized
14 you to do?
15 A       Correct.
16 Q       I think you testified that this group of
17 friends that would pretend to hit each other, it
18 wasn't expected that anybody was actually going to
19 hit each other, was it?
20         MS. COLLINS:  Objection to form.
21         THE WITNESS:  No, no.
22 BY MS. DOHNER SMITH:
23 Q       And if they were actually hitting each other
24 in the groin, that would not be appropriate
25 workplace behavior?

Page 80

1  A       No, it would not.
2  Q       And that would be a violation of policy?
3  A       Yes, it would.
4  Q       So you draw a distinction between the kind
5  of act of pretending you're going to hit somebody
6  and then actually hitting somebody?
7  A       Yes.
8  Q       Okay.  Earlier you asked if you recalled
9  whether you told employees that hotline complaints
10 came to you.  Is that something you just don't
11 recall telling them or is that something you didn't
12 tell them?
13 A       I'm sorry.  Say that -- I'm not sure I
14 understood what you just asked me.
15 Q       Sorry.  And I talk fast.  I'm from the
16 north.
17 A       No, that's okay.  I'm just not sure I
18 understood what you said.
19 Q       Earlier you were asked a question about
20 whether you recall if you told employees that
21 hotline complaints came to you.
22 A       Okay.
23 Q       And you said no.  So do you just not recall
24 that or is that something you didn't tell employees?
25 A       I -- I did not tell employees that hotline

Page 81

1  complaints came to me.
2  Q       Okay.  Because they don't come to you,
3  right?
4  A       They don't -- no, I don't get them.  Now, as
5  I did say earlier, I may be asked about them by
6  somebody like Terri Henley.
7  Q       I think earlier you testified that with your
8  group of friends you would pretend, you know, to hit
9  them, but you wouldn't do that with female
10 employees?
11 A       Right.
12 Q       Why wouldn't you do that with female
13 employees?
14 A       I'm not sure that -- they're just not that
15 close a friendly relationship with female employees
16 to do that.
17 Q       Okay.  And you didn't engage in that type of
18 conduct, pretending to hit people, males that
19 weren't your friends?  That's a horrible question.
20 A       No, we didn't.
21 Q       Did you understand what I asked?  For
22 example, men that weren't your friends, you didn't
23 pretend to slap them in the groin either?
24 A       The men that you didn't know, yeah,
25 newcomers, those, no, didn't.

Case 3:16-cv-02510   Document 39-7   Filed 02/26/18   Page 22 of 24 PageID #: 728

Page 82

1 Q So it was just your male friends?
2 A Yeah. It was the -- yeah, the group of
3 guys. And that's what it amounted to, just a group
4 of guys that worked together, and they were very
5 comfortable working with each other.
6 Q You've never threatened to terminate an
7 employee if they reported you to the compliance
8 hotline?
9 A No.
10 Q Did you ever tell Mr. Kulakowski to work off
11 the clock?
12 A No.
13 Q Did you ever tell him that he couldn't punch
14 in if he came back to work after he left during his
15 normal shift?
16 A If he was called back? No.
17 Q You expected he would punch in if he was
18 called back to work?
19 A Yes.
20 MS. DOHNER SMITH: That's it.
21 MS. COLLINS: I have a couple of
22 follow-up.
23 E X A M I N A T I O N
24 BY MS. COLLINS:
25 Q You were asked on cross-examination about

Page 83

1 cursing in the workplace. Was that -- and you
2 specifically said a bunch of redneck guys, something
3 a bunch of redneck guys do --
4 A Okay.
5 Q -- right?
6 Was cursing in the workplace something that
7 happened on a regular basis?
8 A Cursing happened, yes. Yes.
9 Q You didn't write any employees up for
10 cursing in the workplace, did you?
11 A No.
12 Q You didn't have Mike Eden write -- or Larry
13 Eden write up employees for cursing in the
14 workplace, did you?
15 A No. Now, that's not to say that we didn't
16 coach or counsel people.
17 Q Would that have been documented?
18 A No.
19 Q Okay. Do you recall calling Keith Hall and
20 telling him that you were going to resign at the
21 beginning of 2017?
22 A No.
23 Q Do you dispute that you told him something
24 like that?
25 A That I was going to resign?

Page 84

1 Q Yes.
2 A I don't remember ever telling Keith that I
3 was going to resign, no. Now, I will say that I was
4 63 years old. My intention would have been to
5 retire after 65. And we were having discussions
6 about my retirement, but we had no discussion
7 about -- but I don't know about how much discussion
8 I had with Keith about that. But no, I didn't have
9 any discussion about resigning.
10 Q A moment ago you said that you were
11 uncomfortable with some of the language that was
12 used in mixed company, right?
13 A Here, yes.
14 Q Would you also be uncomfortable with curse
15 words or the type of language that was used in mixed
16 company in the workplace?
17 A Yes.
18 Q So using that sort of language in the
19 workplace was primarily around men or guys?
20 MS. DOHNER SMITH: Objection.
21 THE WITNESS: Yes.
22 MS. COLLINS: That's all I have.
23 MR. JOHNSTON: Mr. Whited --
24 MS. DOHNER SMITH: I'm sorry.
25 MR. JOHNSTON: Go ahead.

Page 85

1 E X A M I N A T I O N
2 BY MS. DOHNER SMITH:
3 Q Did women at the -- working out on the floor
4 tend to cuss as well or use cuss words?
5 A Not in front of -- not in front of me. I
6 would hear occasionally somebody would.
7 Q Okay. All right. So it's not that cussing
8 didn't go on in front of women; you just weren't
9 there to hear it?
10 A Right.
11 Q Okay.
12 A And if it was -- I will go on to say, if it
13 was -- if this was loud, if this was broadcasted --
14 you know, when I mentioned counseling folks about
15 some of this, yeah, we -- we didn't want it -- if
16 the two of you were sitting there having a
17 conversation and you wanted to keep it between the
18 two of you, I don't care what kind of language you
19 used. You know, that would be between the two
20 friends. But that young lady down there didn't need
21 to hear that.
22 Q Okay.
23 A I hope that answered the question.
24 MS. DOHNER SMITH: It does. That's it.
25 MS. COLLINS: Your turn, if you have

Page 86

1  anything.
2          MR. JOHNSTON:  Just quickly.
3              E X A M I N A T I O N
4  BY MR. JOHNSTON:
5  Q      Mr. Whited, how long have you known
6  Mr. Kulakowski?
7  A      Actually, I think he worked for the plant
8  ten, eleven years.
9  Q      Okay.  And that -- and your knowledge of
10 Mr. Kulakowski is through his employment at the
11 plant, correct?
12 A      I met him just shortly before I hired him.
13 And then in way of explanation, he was working at
14 the facility that we leased, and I hired him from
15 that because of his forklift experience.
16 Q      All right.  And over the course of that ten
17 or eleven years, did you work with him more or less
18 on a regular basis?
19 A      Yes.
20 Q      Interact with him frequently, two, three,
21 four times a week?
22 A      Oh, absolutely, yes.
23 Q      Over that period of time, did you develop an
24 opinion as to Mr. Kulakowski's truthfulness?
25 A      Yes.

Page 87

1  Q      And what's that opinion?
2          MS. COLLINS:  Objection to form.
3          THE WITNESS:  Not truthful.
4          MR. JOHNSTON:  Thank you.  That's all I
5  have.
6          MS. COLLINS:  That's all I have.
7          MS. DOHNER SMITH:  That's it.
8          VIDEOGRAPHER:  This marks the end of
9  Disk 1 and it concludes the video deposition of
10 William Tommy Whited.  We are off the record.  The
11 time on the monitor is 11:15 a.m.
12          FURTHER DEPONENT SAITH NOT.
13          (Proceedings concluded at 11:15 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 88

1              REPORTER'S CERTIFICATE
2
3          I, Jerri L. Porter, RPR, CRR, Notary
4  Public and Court Reporter, do hereby certify that I
5  recorded to the best of my skill and ability by
6  machine shorthand all the proceedings in the
7  foregoing transcript, and that said transcript is a
8  true, accurate, and complete transcript to the best
9  of my ability.
10          I further certify that I am not an
11 attorney or counsel of any of the parties, nor a
12 relative or employee of any attorney or counsel
13 connected with the action, nor financially
14 interested in the action.
15          SIGNED this 2nd day of January, 2018.
16
17
18
19
20
21          Jerri L. Porter, RPR, CRR
22 My Notary commission expires:  2/19/2018
23 Tennessee LCR No. 335
24 Expires:  6/30/2018
25

Page 89

1              E R R A T A
2
3      I, WILLIAM TOMMY WHITED, having read the
   foregoing deposition, Pages 1 through 87, taken
4  December 21, 2017, do hereby certify said
   testimony is a true and accurate transcript,
5  with the following changes, if any:
6  PAGE   LINE      SHOULD HAVE BEEN
7  _____  _____   _____
8  _____  _____   _____
9  _____  _____   _____
10 _____  _____   _____
11 _____  _____   _____
12 _____  _____   _____
13 _____  _____   _____
14 _____  _____   _____
15 _____  _____   _____
16 _____  _____   _____
17
18         _____
19          WILLIAM TOMMY WHITED
20
21
22 _____
      Notary Public
23 My commission expires:  _____
24
25