IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL KULAKOWSKI,           )
                              )
    Plaintiff,                 )
                              )
vs.                           ) CASE NO.
                              ) 3:16-CV-02510
                              )
WESTROCK SERVICES, INC.,      )
                              )
    Defendant.                 )

DEPOSITION OF

TERRY ANTHONY STAFFORD

Taken on Behalf of the Plaintiff

October 24, 2017

Commencing at 9:36 a.m.

Reported by: Jerri L. Porter, RPR, CRR
Tennessee LCR No. 335
Expires: 6/30/2018

Page 2

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3       HEATHER MOORE COLLINS
         Collins & Hunter
 4       7000 Executive Center Drive
         Building 2, Suite 320
 5       Brentwood, Tennessee  37027
         (615) 724-1996
 6       heather@collinshunter.com
 7
    For the Defendant:
 8
         MARY DOHNER SMITH
 9       Constancy, Brooks, Smith & Prophete
         1010 SunTrust Plaza
10       401 Commerce Street
         Nashville, Tennessee  37219
11       (615) 320-5200
         mdohner@constangy.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2          INDEX OF EXAMINATIONS
 3                    Page
 4  Examination By Ms. Collins ...................5
 5  Examination By Ms. Dohner-Smith ..............42
 6  Examination By Ms. Collins ...................48
 7
 8
 9          MARKED EXHIBITS
10
    Exhibit    Description          Page
11
    No. 1    RockTenn Employee Welcome Book ..........20
12       Bates WestRock 000048-0060
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         The deposition of TERRY ANTHONY
 2  STAFFORD was taken on behalf of the Plaintiff on
 3  October 24, 2017, in the offices of Constangy,
 4  Brooks, Smith & Prophete, 1010 SunTrust Plaza,
 5  401 Commerce Street, Nashville, Tennessee, for all
 6  purposes under the Federal Rules of Civil Procedure.
 7         The formalities as to notice, caption,
 8  certificate, et cetera, are waived.  All objections,
 9  except as to the form of the questions, are reserved
10  to the hearing.
11         It is agreed that Jerri L. Porter,
12  being a Notary Public and Court Reporter for the
13  State of Tennessee, may swear the witness, and that
14  the reading and signing of the completed deposition
15  by the witness are reserved.
16
17
18
19
20
21               * * *
22
23
24
25
```

Page 5

```
 1           TERRY ANTHONY STAFFORD
 2  was called as a witness, and after having been first
 3  duly sworn, testified as follows:
 4              E X A M I N A T I O N
 5  BY MS. COLLINS:
 6  Q    Would you state your complete name for the
 7  record, please.
 8  A    Terry Anthony Stafford.
 9  Q    Mr. Stafford, what is your address?
10  A    2150 Puryears Bend Road, Hartsville,
11  Tennessee.
12  Q    Was that parriers?
13  A    Yeah, P-u-r-y-e-a-r-s.
14  Q    Okay.  And what is the zip code?
15  A    37074.
16  Q    Okay.  And what is your phone number?
17  A    You want my work number?
18  Q    Your mobile number.
19  A    (615)681-2177.
20  Q    Okay.  Where are you currently employed?
21  A    WestRock.
22  Q    And how long have you been employed there?
23  A    Thirty-one years.
24  Q    Do you have any plans to retire in the near
25  future?
```

Page 6

1  A    No.
2  Q    What is your current job title?
3  A    Supervisor.
4  Q    Of what department?
5  A    The GE machine.
6  Q    And which WestRock facility do you work at?
7  A    Fulfillment.
8  Q    Fulfillment?
9  A    Uh-huh.
10 Q    Do you know that address?
11 A    Let me see.
12 Q    Or just the name of the road?
13 A    Hancock Street.
14 Q    Okay. How long have you been a supervisor
15 of the GE machine?
16 A    Six to eight months.
17 Q    Okay. What were you -- what was your job
18 before that?
19 A    Pretty much just seeing over that the
20 production of the GE machine was working.
21 Q    So before that, you worked on the GE
22 machine, you just weren't supervisor?
23 A    Right.
24 Q    Who preceded you as supervisor?
25 A    Al Hasbrouck.

Page 7

1  Q    Okay. Is he still with WestRock?
2  A    Yes, ma'am.
3  Q    What is his job now?
4  A    General manager.
5  Q    All right. When you were working on the GE
6 machine but not supervisor, who was your supervisor?
7  A    Michael White.
8  Q    Is Michael White still with WestRock?
9  A    Yes.
10 Q    What's his current job title?
11 A    Safety manager, production manager.
12 Q    Has he been in that role for a while?
13 A    The safety manager just took over just a few
14 weeks.
15 Q    Okay. Before that he had been production
16 manager for a while?
17 A    Yes.
18 Q    Okay. What is the highest position over at
19 the WestRock plant where you worked?
20 A    What's the highest position?
21 Q    Yes.
22 A    Plant manager.
23 Q    Who's the current plant manager?
24 A    Keith Hall.
25 Q    And who was the plant manager before Keith?

Page 8

1  A    Larry Eden.
2  Q    Does Larry still work there?
3  A    Yes.
4  Q    What's Larry's current job title?
5  A    Shipping manager.
6  Q    Was Larry just an interim plant manager or
7 was he demoted?
8  A    Demoted.
9  Q    Okay. Do you know why?
10 A    No.
11 Q    Have you heard anything?
12 A    No.
13 Q    Okay. How long has Keith Hall been the
14 plant manager?
15 A    A year.
16 Q    About how many people work out there?
17 A    Sixty-five.
18 Q    And can you tell me generally what the
19 fulfillment center where you work at WestRock does?
20 A    Well, it makes GE boxes for General
21 Electric, and we do Lochinvar boxes, like the water
22 heaters, and T-folders for Amazon, Kimberly-Clark.
23 Q    So, basically, y'all make boxes?
24 A    Yeah.
25 Q    Is it a 24-hour operation?

Page 9

1  A    Yes.
2  Q    What shift do you work?
3  A    First.
4  Q    Do they have three shifts?
5  A    Yes.
6  Q    Have you always been on first shift?
7  A    Yes.
8  Q    Okay. So your current supervisor, is that
9 Mr. Hasbrouck?
10 A    Yes. It was Michael, and then Michael was
11 taken over, so...
12 Q    It was Michael White?
13 A    Uh-huh.
14 Q    And then he moved into that other --
15 A    That other safety -- safety spot, yes.
16 Q    Do you supervise anybody?
17 A    Yes.
18 Q    And have you just started supervising people
19 since you became a supervisor six to eight months
20 ago?
21 A    Yes.
22 Q    About how many people do you supervise?
23 A    On that machine, four.
24 Q    Are you considered management in your
25 current position?

Page 10

1 A    No.
2 Q    Are you still hourly?
3 A    Yes.
4 Q    Who is in the office or who is considered
5 management out there?
6 A    Michael White.
7 Q    And he's the safety manager, production
8 manager?
9 A    Yes.
10 Q    And he reports to the plant manager?
11 A    Yes.
12 Q    Now, you said Larry Eden is now the shipping
13 manager. But he was the plant manager before that?
14 A    Yes.
15 Q    How long was he plant manager?
16 A    Ten, fifteen years.
17 Q    And the plant manager reports to the general
18 manager?
19 A    General manager.
20 Q    Okay. And who is the general manager?
21 A    Al Hasbrouck.
22 Q    Who was the general manager before Al?
23 A    Tommy Whited, W-h-i-t-e-d.
24 Q    And do you recall when Tommy Whited left?
25 A    A year ago.

Page 11

1 Q    And is Al still there?
2 A    Yes.
3 Q    Sometimes I get all of these different names
4 confused. What is -- and he's there as the general
5 manager still?
6 A    Yes.
7 Q    All right. I'm going to go over this to
8 make sure I've got it right to refer back to these
9 different people.
10      Al is a general manager, Keith is the plant
11 manager.
12 A    Yes.
13 Q    And Mike White is the safety/production
14 manager.
15 A    Yes.
16 Q    And is that the -- sort of the hierarchy,
17 the general manager, then the plant manager, and
18 then the safety production manager?
19 A    Yes.
20 Q    All right. Are there office or
21 administrative people out there?
22 A    As far as?
23 Q    Well, a lot of times out at plants, there
24 are separate people in offices that do more
25 administrative functions, answer the phones,

Page 12

1 paperwork, that sort of thing.
2 A    Yes.
3 Q    Do y'all have anything like that?
4 A    Yes.
5 Q    Okay. Tell me about that. Who's in the
6 office?
7 A    Sara Scheffey (phonetic).
8 Q    Could you spell that?
9 A    No.
10 Q    No, you can't? Scheffey?
11 A    Uh-huh.
12 Q    Okay. Who else?
13 A    Scott Cothran (phonetic).
14 Q    Okay. Just those two?
15 A    (Witness moves head up and down.)
16 Q    What is Sara's job?
17 A    She like answers the front door when people
18 comes in, pages people, and she's also customer
19 service.
20 Q    Okay. And what about Scott?
21 A    Customer service.
22 Q    And how long have they been there in those
23 jobs?
24 A    Sara, probably five; Scott, one year.
25 Q    Who did Scott replace?

Page 13

1 A    Cindy Cardenas.
2 Q    Now, is the fulfillment center part of
3 another larger facility, or is it its own separate
4 functioning facility?
5 A    That one and the sheet plant is one plant.
6 Q    Okay. Is the sheet plant within close
7 proximity to the --
8 A    Six miles.
9 Q    Okay. Do the people at fulfillment where
10 you work report to anybody at the sheet plant?
11 A    Yes.
12 Q    Okay. Who do y'all report to out there?
13 A    The shipping department reports to Larry.
14 Q    And what's Larry's last name?
15 A    Eden.
16 Q    All right. And that was the Larry Eden that
17 used to be --
18 A    Yes.
19 Q    -- at the fulfillment center?
20 A    He never was at the fulfillment, but, I
21 mean, he was at both plants doing the plant manager
22 of both plants.
23 Q    Okay. And do they have an office staff at
24 the sheet plant?
25 A    Yes.

Page 14

1 Q  Okay. About how many people are in the
2 office staff there?
3 A  Ten to twelve.
4 Q  Okay. Do they come to the fulfillment
5 center to do certain functions?
6 A  I think maybe Georgie, she'll come over
7 because we keep our files in a box, and they may
8 have to come back over to the fulfillment where we
9 keep them stored and look for like an invoice or
10 something.
11 Q  Okay. Who handles like payroll and if
12 somebody is calling in sick and that sort of stuff?
13 A  You have a number that you have to call now.
14 Q  How long has that been in place?
15 A  Let's see. Three to four months.
16 Q  What did y'all do before that?
17 A  Just called the supervisor.
18 Q  You'd call the supervisor when you've got --
19 to report your hours or if you're going to be sick
20 or something like that?
21 A  If you call out, you just call the
22 supervisor.
23 Q  Who handled the payroll?
24 A  As far as?
25 Q  Well, yeah, that's a good question. Let's

Page 15

1 go back a little bit.
2     How is the -- how did you record your work
3 hours?
4 A  Time clock.
5 Q  Okay. Just punch in and punch out?
6 A  (Witness moves head up and down.)
7 Q  Is it still that way?
8 A  Yes.
9 Q  Did you get like a weekly summary what those
10 punch ins and punch outs were?
11 A  Like a readout?
12 Q  Yes.
13 A  No.
14 Q  So, was it just one of those little small
15 time clock sheets that you --
16 A  Just swipe.
17 Q  You swiped it?
18 A  (Witness moves head up and down.)
19 Q  So you didn't have an individual sheet every
20 week or every two weeks, right?
21 A  (Witness moves head up and down.) No.
22 Q  Sorry. I forgot to go over the rules. She
23 needs you to answer audibly because she can't record
24 a nod or a shake of the head.
25 A  Okay.

Page 16

1 Q  We're not trying to be rude. I forget we
2 tend to do that a lot.
3 A  Yeah, I do.
4 Q  So you just had a --
5 A  (Indicating.)
6 Q  All right. So it's a little bar code type,
7 looks like a credit card?
8 A  Yes.
9 Q  Okay. And y'all have had that for several
10 years?
11 A  Yes.
12 Q  Are there ever occasions where you come into
13 work to handle something and you don't swipe in your
14 card?
15 A  No. You have to clock in.
16 Q  Okay. Has any supervisor ever told you to
17 come in and do any work off the clock?
18 A  No.
19 Q  Who was the HR person for the fulfillment
20 center, the sheet plant?
21 A  Lana Potts.
22 Q  How long was she the HR person?
23 A  Oh, HR? I'm sorry, that was the safety. HR
24 was Helen Kendall.
25 Q  Kendall, K-e-n-d-a-l-l?

Page 17

1 A  I think so.
2 Q  Okay. Is she still there?
3 A  No.
4 Q  When did she leave?
5 A  She retired a year and a half to two years
6 ago.
7 Q  Who replaced her?
8 A  I hadn't heard.
9 Q  Where was her office?
10 A  At the sheet plant.
11 Q  Did she come to the fulfillment center on
12 occasion to --
13 A  Every now and then.
14 Q  Okay. What sort of things did Helen handle
15 as HR person that you knew about?
16 A  I know a code of conduct.
17 Q  Okay. So she was the one that handled the
18 code of conduct issues.
19 A  (Witness moves head up and down.)
20 Q  And the code of conduct you're referring to,
21 is that in the employee handbook?
22 A  Yes.
23 Q  Did you get a copy of the employee handbook?
24 A  Yes.
25 Q  And you know they update these employee

Page 18

1 handbooks every so often. Would you get updates
2 when that would happen?
3  A     Yes.
4  Q     And would you get a hard copy of the
5 employee handbook or how would that work?
6  A     I think it's a paper copy.
7  Q     Okay. So, you're not really sure who took
8 over Helen's HR duties after she retired?
9  A     No.
10 Q     Okay. Did Helen handle payroll?
11 A     I think she may have submitted it.
12 Q     Okay. Do you have -- in your job at
13 WestRock, do you receive any sort of annual
14 training?
15 A     As far as?
16 Q     That is a good question. Like
17 employee-related issues. Not training on your
18 machine or anything like that, but as far as
19 employment -- employee conduct or anything like
20 that.
21 A     Let me see. I know they was saying
22 something about them -- you know, when they put me
23 supervisor, that they were going to send me for
24 training here before long.
25 Q     Okay. Do you know what type of training?

Page 19

1  A     No.
2  Q     So, before that, have you received any kind
3 of training that was not related to your operation
4 of the GE machine?
5  A     Oh, yes.
6  Q     Okay. Just generally, what types of
7 training?
8  A     All kinds of safety training and -- let's
9 see what all. We have, you know, safety meetings
10 every week, all kinds of lockout/tagout stuff.
11 Q     So, is it mostly safety type training that
12 you receive on a yearly basis?
13 A     A lot of it is.
14 Q     Any other kinds that you can think of?
15 A     Not at the moment.
16 Q     Okay. If you went to a training course,
17 would you have to sign a sheet saying that you were
18 there?
19 A     Yes.
20 Q     Okay. Who typically conducted the
21 trainings?
22 A     We've had the safety people to do it, plant
23 manager, general managers.
24       MS. COLLINS: I'm going to mark this
25 first document as Exhibit Number 1.

Page 20

1       (Marked Exhibit No. 1.)
2       THE WITNESS: (Reviewing document.)
3 BY MS. COLLINS:
4  Q     The document that's been marked as Exhibit
5 Number 1, does this look familiar to you?
6  A     Yes.
7  Q     Okay. And do you recall when you would have
8 first received a copy of this document?
9  A     Four or five years ago.
10 Q     Okay. Now, at some point RockTenn -- well,
11 the company you currently work for, WestRock, it
12 used to be called RockTenn; is that right?
13 A     Yes.
14 Q     When did that changeover occur?
15 A     Year and a half, two years ago.
16 Q     Okay. Did you receive any other policies
17 like this or handbooks after that changeover
18 occurred?
19 A     Yes.
20 Q     Okay. Do you recall what you might have
21 received?
22 A     It would be one of these with WestRock's
23 name on it.
24 Q     Was that shortly after the changeover
25 occurred?

Page 21

1  A     Yes.
2  Q     Did you have to sign for that one, too?
3  A     Yes.
4  Q     All right. Do you know who your divisional
5 HR director is?
6  A     Terri Henley.
7  Q     How do you know that? How do you know that
8 that's the divisional HR director?
9  A     Because she's been at the plant.
10 Q     Why was she at the plant?
11 A     Questioning.
12 Q     What was she questioning?
13 A     Same thing we're going over today.
14 Q     Okay. When was that? Like last fall?
15 A     Yes.
16 Q     Okay. Was that before Tommy Whited left?
17 A     No.
18 Q     It was after Tommy --
19 A     Yes.
20 Q     -- Whited left?
21 A     Yes.
22 Q     Before Ms. Henley came out to ask questions,
23 was that the first time you had met her?
24 A     No.
25 Q     What occasion did you have to meet her prior

Page 22

1 to that?
2 A   I didn't actually talk to her. I just seen
3 her come in the plant.
4 Q   Okay. Was it around the same time?
5 A   Probably a few months before that.
6 Q   Did you hear anything about why she was
7 there?
8 A   Before?
9 Q   Yes, the few months before.
10 A   No.
11 Q   And before that, did you know who she was or
12 who the divisional HR director was?
13 A   No.
14 Q   To your knowledge, is that information
15 posted anywhere, who the divisional HR director is?
16 A   I, myself, has not seen it posted.
17 Q   Do you know what to do in the event that you
18 feel discriminated against or harassed at work?
19 A   You call the hotline.
20 Q   Okay. And when did you find out about that?
21 A   It's been posted for a long time.
22 Q   Have you ever had occasion to call the
23 hotline?
24 A   No.
25 Q   Do you know anyone who has?

Page 23

1 A   No.
2 Q   Has anyone reported harassment or
3 discrimination to you?
4 A   To me?
5 Q   Yes.
6 A   No.
7 Q   Have you witnessed harassment or
8 discrimination at the plant?
9 A   I don't really know how to answer that.
10 Q   What do you mean?
11 A   I have heard names called, but it was one of
12 the deals to where it was like a good friendship,
13 like kidding back and forth, like a buddy system.
14 Q   What do you mean?
15 A   Good friends.
16 Q   Who are you talking about?
17 A   Tommy and Kuli -- or Michael Kulakowski. I
18 call him Kuli.
19 Q   Okay. So, when you say you didn't know how
20 to answer if you witnessed harassment or
21 discrimination --
22 A   Well, I know it says you can't call anybody
23 names, but, you know, that part there, you know,
24 it's just -- you know, they would do it and then
25 laugh, you know, laugh at one another about it.

Page 24

1 Q   What names were called?
2 A   I hate to say this in front of y'all.
3 Q   I need you to say exactly what Mr. Whited
4 said.
5        MS. DOHNER-SMITH: Objection.
6 BY MS. COLLINS:
7 Q   You can say it.
8 A   Pussy, Polak.
9 Q   What else?
10 A   That's it.
11 Q   And those were names that Mr. Whited called
12 Mr. Kulakowski?
13 A   (Witness moves head up and down.)
14 Q   Did you ever see Mr. Whited kick or hit
15 Mr. Kulakowski?
16 A   No.
17 Q   Did you witness Mr. Kulakowski telling
18 Mr. Whited to stop calling him names or to stop
19 kicking him or hitting him?
20 A   No.
21 Q   Did you hear about any instances like that?
22 A   I heard it.
23 Q   What did you hear?
24 A   That he done it. Like I say, I never seen
25 it.

Page 25

1 Q   That who did what?
2 A   That Tommy kicked Kuli.
3 Q   Did Mr. Kulakowski tell you about it?
4 A   Uh-huh.
5 Q   When did he tell you about it?
6 A   Couple of days after it happened.
7 Q   Do you recall about when that was?
8 A   No.
9 Q   Was it in the past year?
10 A   Yes.
11 Q   What do you recall Mr. Kulakowski saying?
12 A   Just that he smacked him in the groin.
13 Q   Did he say it hurt?
14 A   Uh-huh.
15 Q   That's a yes?
16 A   Yes.
17 Q   Did he say if anybody else was present?
18 A   No.
19 Q   Was -- do you consider Mr. Kulakowski a
20 friend of yours?
21 A   Yes.
22 Q   Did he express to you at any point in time
23 that he was scared of or fearful of Mr. Whited?
24 A   No.
25 Q   Now, there at the fabrication plant where

Page 26

1 you work, there's both men and women that work
2 there, right?
3 A   Yes.
4 Q   Are there women on the floor?
5 A   Yes.
6 Q   Okay. About how many would you say work on
7 the floor?
8 A   About 65.
9 Q   Women?
10 A   That was the total.
11 Q   Okay.
12 A   Let's see. Ten.
13 Q   And did Mr. Kulakowski work first shift with
14 you?
15 A   Yes.
16 Q   Okay. And there are women that also work
17 first shift?
18 A   First?
19 Q   Yes.
20 A   Yes.
21 Q   And what are the hours of first shift?
22 A   7:00 to 3:30.
23 Q   Is that typically when management is there,
24 as far as the plant manager and the general manager
25 and all that?

Page 27

1 A   Yes.
2 Q   During the daytime?
3 A   Yes.
4 Q   To your knowledge, who has the ability to
5 hire and fire employees out there?
6 A   Keith Hall and Al Hasbrouck.
7 Q   Okay. So, the general manager and the plant
8 manager?
9 A   Yes.
10 Q   Okay. Did you ever hear about or witness
11 Mr. Whited kicking women in the groin?
12 A   No.
13      MS. DOHNER-SMITH: Objection.
14 BY MS. COLLINS:
15 Q   Did you ever witness or hear about
16 Mr. Whited slapping or hitting women that worked out
17 there?
18 A   Tapped them on the shoulder.
19 Q   But not anything --
20 A   No.
21 Q   -- that you would view as out of line?
22 A   No.
23 Q   Now, the incident you heard about with
24 Mr. Kulakowski being hit in the groin, would you
25 consider that to be out of line --

Page 28

1      MS. DOHNER-SMITH: Objection.
2 BY MS. COLLINS:
3 Q   -- in the workplace?
4     You can answer.
5 A   I'm going to say this, if it actually
6 happened.
7 Q   If it actually happened what?
8 A   If he actually really hit him or just acted
9 like he hit him.
10 Q   You would consider that to be out of line?
11      MS. DOHNER-SMITH: Objection.
12      THE WITNESS: Not if he just acted like
13 it, no.
14 BY MS. COLLINS:
15 Q   But if you were hit in the groin in the
16 workplace, would you consider that to be out-of-line
17 behavior?
18 A   If he got hit, yes.
19 Q   Okay. How long did you work with Michael --
20 or have you worked with Michael Kulakowski?
21 A   Twelve years, fourteen years.
22 Q   How long had you worked with Mr. Whited?
23 A   Thirty-one.
24 Q   The whole time?
25 A   Uh-huh.

Page 29

1 Q   Did he hire you?
2 A   John Farley hired me.
3 Q   Okay. Did you ever witness or hear about
4 Mr. Whited grabbing employees in their private parts
5 other than Mr. Kulakowski?
6 A   Repeat that again.
7      MS. COLLINS: Can you repeat it?
8      (The requested question was read back
9 by the court reporter as follows:
10      "Question: Did you ever witness or
11 hear about Mr. Whited grabbing employees in their
12 private parts other than Mr. Kulakowski?")
13      THE WITNESS: I didn't say he grabbed
14 Mr. Kulakowski.
15 BY MS. COLLINS:
16 Q   Did you hear about it?
17 A   Not about him grabbing him.
18 Q   Okay. Or hitting employees in their private
19 parts besides Mr. Kulakowski?
20 A   If he actually done it, yes.
21 Q   Okay. Who else did you hear about?
22 A   Just Kuli. No.
23 Q   Just Kulakowski?
24 A   Yes.
25 Q   Okay. Now, do you recall an incident in the

Page 30

1 shipping office where Tommy Whited came in and
2 reached his hands between Mr. Kulakowski's legs and
3 grabbed his testicles and squeezed them?
4 A   No.
5 Q   Okay. No, you don't recall it?
6 A   No.
7 Q   Do you recall an incident outside the
8 shipping office at a picnic table where Tommy Whited
9 came up to Mr. Kulakowski and hit him in his
10 testicles?
11 A   No.
12 Q   Okay. No, you don't recall that?
13 A   No.
14 Q   Do you recall an incident in the shipping
15 office where Mr. Whited came in the office and
16 grabbed Mr. Kulakowski and threw him across the
17 office onto the desk?
18 A   No.
19 Q   Do you recall an incident in Susan Hart's
20 office where Mr. Whited hit Mr. Kulakowski in the
21 head, knocked his hat off, and kicked him in his
22 testicles?
23 A   No.
24 Q   No, you don't recall it?
25 A   No.

Page 31

1 Q   Do you recall an employee named Susan Hart?
2 A   Yes.
3 Q   Is she still out there?
4 A   Yes.
5 Q   What's her job?
6 A   Maintenance -- she helps in the maintenance
7 department, ordering parts.
8 Q   Do you know an employee named Jerry
9 Harville?
10 A   Yes.
11 Q   What job does he have out there?
12 A   Shipping.
13 Q   Shipping. Does he also work first shift?
14 A   Yes.
15 Q   Have you witnessed Mr. Whited abuse or kick
16 him in the groin?
17 A   No.
18 Q   Have you heard about any instances like
19 that?
20 A   Not with him.
21 Q   Do you find Mr. Harville to be a credible or
22 honest person?
23 A   Yes.
24 Q   What about Mr. Kulakowski?
25 A   No.

Page 32

1 Q   Why do you say that?
2 A   I've caught him in lies before.
3 Q   Like what?
4 A   Let's see. Me and him was fishing partners,
5 and he had told Michael White that I did not want to
6 fish with him anymore. I never said anything to
7 that, because me and him used to be really close.
8 Q   All right. So that was not work-related?
9 A   Not work-related, no.
10 Q   Okay. Why are you no longer close, you and
11 Mr. Kulakowski?
12 A   He don't even talk to me anymore.
13 Q   As far as you know, it was mostly about that
14 fishing?
15 A   I don't know if it's about that or what it
16 is, because he used to come to the house, stay all
17 night, we'd go fishing, call me. Don't do none of
18 that anymore.
19 Q   Okay. When did that happen where he kind of
20 just...
21 A   I guess probably about the time all of this
22 started.
23 Q   Okay. About the time all of this started,
24 did you notice a change in his behavior?
25 A   Uh-huh.

Page 33

1 Q   Did he seem more standoffish?
2 A   Yes.
3 Q   More paranoid?
4 A   Yes.
5 Q   Did it seem like he cut off communication
6 with other people?
7 A   Yes.
8 Q   What would you do if you were kicked in the
9 groin in the workplace, if that happened to you?
10 A   If it happened to me, I'd call the hotline.
11 Q   Okay. I think you said you have not had
12 occasion to call the hotline, right?
13 A   Correct.
14 Q   Or you've not used that.
15 A   I haven't had occasion to do that.
16 Q   Do you know anything about why Tommy Whited
17 was terminated?
18 A   No.
19 Q   Have you heard anything?
20 A   No.
21 Q   After he was terminated, did y'all have
22 security out at the plant for a couple of weeks?
23 A   Yes.
24 Q   Do you know or were you told why y'all had
25 security out there for a few weeks?

Page 34

1 A No. Not exactly, no.
2 Q Did you hear anything?
3 A Said just so that way he don't come back on
4 the premises, pretty much.
5 Q Was there concern about employee safety and
6 something Mr. Whited might do?
7 A Yes.
8     MS. DOHNER-SMITH: Objection.
9 BY MS. COLLINS:
10 Q Do you know an employee whose last name is
11 Buckmaster?
12 A Buckmaster?
13 Q Yes.
14 A Yes.
15 Q Is that his full name or is that his last
16 name?
17 A That's his last name.
18 Q What's his full name?
19 A Ken, Kenneth Buckmaster.
20 Q What was Kenneth's job?
21 A He was maintenance.
22 Q How long had he been out there?
23 A Twenty-plus.
24 Q And he quit, right?
25 A Yes.

Page 35

1 Q Do you know why he quit?
2 A Said he wanted to move closer to home.
3 Q Have you talked with him since he quit?
4 A Yeah.
5 Q Okay. Do you know if he made any complaints
6 about Mr. Whited?
7 A No.
8 Q Had you ever heard Tommy Whited say anything
9 like the hotline complaints come to him?
10 A No.
11 Q Do you know if they do, if they would go to
12 the plant manager or the general manager?
13 A I think it's all confidential, it can't go
14 anywhere.
15 Q Have you ever heard Tommy Whited make any
16 statements that the supervisors report to him or
17 threaten other employees with that?
18 A No.
19 Q Do you know if other employees were afraid
20 to report behavior of Tommy Whited's?
21     MS. DOHNER-SMITH: Objection.
22     THE WITNESS: No.
23 BY MS. COLLINS:
24 Q Have you talked with anyone from the EEOC?
25 A What is that?

Page 36

1 Q I guess you haven't talked to them, then.
2 The Equal Employment Opportunity Commission.
3 A I don't know what that is.
4 Q You've just talked to Terri Henley about
5 this whole incident?
6 A Yeah, and her (indicating).
7 Q WestRock's attorney?
8 A Yeah. That's it.
9 Q Now, when Ms. Henley came to talk to you,
10 did she talk to you just that one time?
11 A I can't remember.
12 Q Okay. Do you recall where that meeting took
13 place?
14 A At fulfillment.
15 Q At the fulfillment office?
16 A Yes.
17 Q Okay. Was the meeting recorded, to your
18 knowledge?
19 A Not that I know of.
20 Q Did Ms. Henley take notes?
21 A Yes.
22 Q Did she take handwritten notes --
23 A Yes.
24 Q -- or type on a computer?
25 A Handwritten.

Page 37

1 Q Handwritten? Was anyone else there?
2 A No.
3 Q Did you know what the meeting was about when
4 you were called in?
5 A No.
6 Q Did you have to sign any documents at that
7 time?
8 A No.
9 Q Did you have to sign any following that
10 meeting with Ms. Henley?
11 A Not as I know of.
12 Q Are you worried about your job security
13 because you're testifying here today?
14     MS. DOHNER-SMITH: Objection.
15     THE WITNESS: No.
16 BY MS. COLLINS:
17 Q Are you still in touch with Tommy Whited?
18 A Yes. I owe him money.
19 Q You what now?
20 A I owe him money.
21 Q Oh, okay. What do you owe him money for?
22 A I bought a car from him.
23 Q When did you buy a car from him?
24 A Two years ago.
25 Q How much do you owe him?

Page 38

1  A    Probably four or five thousand dollars.
2  Q    What kind of car was it?
3  A    A Lexus.
4  Q    Okay. What kind of Lexus?
5  A    RX300.
6  Q    Is that those little small SUVs?
7  A    Yeah.
8  Q    Okay. So you bought that car from
9  Mr. Whited, and you've just been --
10 A    Yes.
11 Q    -- making monthly payments directly to him?
12 A    Yes.
13 Q    Okay. How much do you pay him a month?
14 A    Two twenty-five.
15 Q    Have you heard of horseplay in the workplace
16 at RockTenn when Mr. Whited was the manager?
17       MS. DOHNER-SMITH: Objection.
18       THE WITNESS: As far as?
19 BY MS. COLLINS:
20 Q    Just that term, horseplay.
21 A    Yes.
22 Q    That horseplay went on. Yes?
23 A    Yes.
24 Q    Tell me about that.
25 A    It's not -- in other words, you can't do it.

Page 39

1  Q    But did you hear that it went on?
2  A    I guess the horseplay is -- I guess I look
3  at it different than everybody else does. What they
4  consider as horseplay, I guess, you know, I don't.
5  Q    Tell me what you mean by that.
6  A    Well, you'd have -- well, he don't work
7  there anymore. J.R. Sanders, when he come in, he'd
8  grab my beard, just like a handshake.
9  Q    Okay. So you don't consider that horseplay,
10 right?
11 A    No, ma'am.
12 Q    What else were you told was horseplay that
13 you didn't consider horseplay?
14 A    Just like that right there.
15 Q    Okay. Did you see any of the -- did you
16 ever see Mr. Whited like hitting or punching other
17 male employees on the shoulder or back?
18 A    No.
19 Q    Do you know a contract employee named -- or
20 employee of a vendor that would come around named
21 Heather?
22 A    Heather? She's like -- the Heather that I
23 know is an onsite for the temporary service.
24 Q    Okay. Do you know her last name?
25 A    I do not.

Page 40

1  Q    What department was she in?
2  A    What do you mean?
3  Q    Is she in -- she's at the fulfillment
4  center, right?
5  A    Yes.
6  Q    What specific department is she in?
7  A    She's actually got an office right there
8  behind in our -- around where the shipping office,
9  and she's like for Elwood Staffing company.
10 Q    Okay. How long has she been there?
11 A    Year and a half, two years.
12 Q    So she was there when Mr. Whited was working
13 out there?
14 A    Yes.
15 Q    Okay. Do you know an employee named Donnie?
16 A    Donnie? Last name? Taylor?
17 Q    Yeah.
18 A    Okay. Yes.
19 Q    Okay. Is he still out there?
20 A    Yes.
21 Q    Do you find him to be credible?
22 A    Yes.
23 Q    Okay. Have you heard of Tommy Whited having
24 an affair with any female employees out there?
25 A    No.

Page 41

1  Q    Would you say that Mike White is close
2  friends or tight with Tommy Whited?
3  A    No.
4  Q    Why do you say that?
5  A    Because they didn't always agree on
6  everything.
7  Q    Mike White is still out there, right?
8  A    Yes.
9  Q    Do you know if Helen still lives in the
10 area, Helen Kendall?
11 A    Westmoreland.
12 Q    Okay. Are you in touch with her --
13 A    No.
14 Q    -- or still in touch with her?
15 A    (Witness moves head side to side.)
16 Q    No?
17 A    No.
18 Q    Do you find her to be credible?
19 A    No.
20 Q    Why do you say that?
21 A    Let's see. How can I put it? It's just
22 I've heard her say -- I can't remember exactly what
23 it is, tell one person one thing and another person
24 something different on the same occasion.
25 Q    Okay. Anything else?

Page 42

1 A   No.
2       MS. COLLINS: Okay. If I could have
3 just a minute to review my notes.
4       MS. DOHNER-SMITH: Absolutely.
5       (Recess observed.)
6       MS. COLLINS: I'm done.
7       MS. DOHNER-SMITH: I've just got a
8 couple.
9           E X A M I N A T I O N
10 BY MS. DOHNER-SMITH:
11 Q   Mr. Stafford, you were asked some questions
12 about Helen -- is it McKendall or Kendall?
13 A   Kendall.
14 Q   Kendall, okay. Do you know what her actual
15 position or title was?
16 A   Yeah. Human resource.
17 Q   If her title was actually administrative
18 assistant, would you have any reason to dispute
19 that?
20       MS. COLLINS: Objection to form.
21       THE WITNESS: No.
22 BY MS. DOHNER-SMITH:
23 Q   And when you said that Helen handled the
24 code of conduct issues, what do you mean by that?
25 A   She just went over the code of conducts with

Page 43

1 us.
2 Q   Okay. So she came out, provided a copy of
3 the code of conduct --
4 A   Yes.
5 Q   -- and reviewed it with you?
6 A   Yes.
7       MS. COLLINS: Objection to form.
8 BY MS. DOHNER-SMITH:
9 Q   So she didn't come out and write people up
10 for code of conduct violations and that sort of
11 thing?
12 A   No.
13 Q   She was just the messenger?
14 A   Uh-huh.
15       MS. COLLINS: Objection to form.
16 BY MS. DOHNER-SMITH:
17 Q   And do you have any personal knowledge what
18 Helen's actual duties were?
19 A   Just HR is all I know.
20 Q   And were there any other HR functions other
21 than her coming out and handing out the code of
22 conduct policy?
23 A   Not as I know of.
24 Q   Okay. So, other than her handing out the
25 code of conduct, you don't have any personal

Page 44

1 knowledge regarding her duties?
2 A   No.
3       MS. COLLINS: Objection to form.
4 BY MS. DOHNER-SMITH:
5 Q   And throughout your course of employment,
6 you did receive a copy of the code of conduct and it
7 was reviewed with you, correct?
8 A   Yes.
9 Q   Is that correct also with respect to the
10 harassment policy?
11 A   Yes.
12 Q   Is that also true with respect to the ethics
13 and corporate hotline?
14 A   Yes.
15 Q   Okay. I think earlier you had talked about
16 meeting Terri Henley at the plant and being
17 questioned by her. Could that have been before
18 Tommy Whited left the company?
19       MS. COLLINS: Objection. Asked and
20 answered.
21       THE WITNESS: Not for sure.
22 BY MS. DOHNER-SMITH:
23 Q   Okay. So, sitting here today, you just
24 don't recall what the specific date was?
25 A   Yes, ma'am. Exactly.

Page 45

1 Q   Okay. So, for example, if Ms. Henley had
2 some notes from a discussion that indicated she'd
3 talked with you before Mr. Whited left the company,
4 you would have no reason to dispute that that --
5 A   No.
6       MS. COLLINS: Objection to form.
7 BY MS. DOHNER-SMITH:
8 Q   I think you testified you didn't have any
9 reason to talk with Terri Henley before you met with
10 her and were questioned by her, but do you have any
11 reason to dispute that she was actually at the
12 facility prior to that time you spoke with her?
13       MS. COLLINS: Objection to form.
14       THE WITNESS: No.
15 BY MS. DOHNER-SMITH:
16 Q   Earlier, I think you provided some testimony
17 regarding Mr. Whited and Mr. Kulakowski calling
18 names, but indicated they were good friends.
19 A   Yes.
20 Q   And that that bantering was something that
21 went back and forth between them?
22 A   Yes.
23       MS. COLLINS: Objection to form.
24 BY MS. DOHNER-SMITH:
25 Q   Would Mr. Kulakowski laugh when --

Page 46

1  A    Yes.
2  Q    -- Tommy was doing this?
3       Did it ever seem like Mr. Kulakowski was
4  upset by Mr. Whited joking around with him in this
5  manner?
6  A    No.
7       MS. COLLINS: Objection to form.
8  BY MS. DOHNER-SMITH:
9  Q    In fact, you saw him actually laughing?
10 A    Yes.
11 Q    Earlier you were asked if you recall an
12 incident where Tommy Whited kicked Mr. Kulakowski in
13 the groin.
14      You never witnessed him --
15 A    No.
16 Q    -- Tommy Whited kick Mr. Kulakowski?
17 A    No.
18 Q    Earlier you were asked about an incident in
19 the shipping department where Tommy Whited grabbed
20 Mr. Kulakowski between the legs and squeezed his
21 groin.
22      Did you ever witness any incident --
23 A    No.
24 Q    -- like that?
25      Earlier you were asked about whether or not

Page 47

1  you recalled an incident at the picnic table where
2  Mr. Whited hit Mr. Kulakowski in the groin.
3       Did you ever witness anything like that?
4  A    No.
5  Q    Earlier you were asked about an incident in
6  the shipping office and whether you recalled that
7  incident, where Mr. Whited allegedly threw
8  Mr. Kulakowski across a desk.
9       Did you ever witness an incident like that?
10 A    No.
11 Q    Earlier you were asked about an incident --
12 whether you remembered an incident in Susan Hart's
13 office where Mr. Whited kicked Mr. Kulakowski in the
14 testicles.
15      Did you ever witness any incident like that?
16 A    No.
17 Q    Earlier you had indicated that it seemed
18 like there had been a change in Mr. Kulakowski's
19 behavior, and you said after all this started. Was
20 that after Mr. Whited's termination?
21 A    Yes.
22 Q    Do you know when Mr. Kulakowski first
23 started making claims of sexual harassment?
24 A    I do not.
25 Q    Earlier you testified that you owe

Page 48

1  Mr. Whited approximately $45,000.
2  A    No, no, no. 4,500.
3  Q    Oh, $4,500. Sorry. My notes are -- I can
4  barely read them.
5       Would your owing Mr. Whited money impact
6  your truthfulness in any way today?
7  A    No.
8  Q    Earlier you had indicated that J.R. Sanders
9  would come up and shake your beard, kind of like he
10 was shaking somebody's hand.
11 A    Yes.
12 Q    Would you consider that sexual harassment?
13 A    No.
14      MS. DOHNER-SMITH: I think that's all.
15      MS. COLLINS: I do have a follow-up
16 question.
17         E X A M I N A T I O N
18 BY MS. COLLINS:
19 Q    Did you talk with Tommy Whited before your
20 deposition today?
21 A    No.
22 Q    Did you text message with him?
23 A    No.
24 Q    Do you text message? Are you a text
25 messager?

Page 49

1  A    No.
2  Q    Okay. All right. Did you have any
3  discussions with Mr. Whited that you were being
4  deposed today?
5  A    No.
6       MS. COLLINS: Okay. That's all I have.
7       FURTHER DEPONENT SAITH NOT.
8       (Proceedings concluded at 10:50 a.m.)

Page 50

```
 1            REPORTER'S CERTIFICATE
 2
 3        I, Jerri L. Porter, RPR, CRR, Notary
 4  Public and Court Reporter, do hereby certify that I
 5  recorded to the best of my skill and ability by
 6  machine shorthand all the proceedings in the
 7  foregoing transcript, and that said transcript is a
 8  true, accurate, and complete transcript to the best
 9  of my ability.
10        I further certify that I am not an
11  attorney or counsel of any of the parties, nor a
12  relative or employee of any attorney or counsel
13  connected with the action, nor financially
14  interested in the action.
15        SIGNED this 3rd day of November, 2017.
16
17
18
19
20        _____
21           Jerri L. Porter, RPR, CRR
22  My Notary commission expires:  2/19/2018
23  Tennessee LCR No. 335
24  Expires:  6/30/2018
25
```

Page 51

```
 1              E R R A T A
 2
 3     I, TERRY ANTHONY STAFFORD, having read the
    foregoing deposition, Pages 1 through 49, taken
 4  October 24, 2017, do hereby certify said
    testimony is a true and accurate transcript,
 5  with the following changes, if any:
 6  PAGE    LINE      SHOULD HAVE BEEN
 7  _____  _____   _____
 8  _____  _____   _____
 9  _____  _____   _____
10  _____  _____   _____
11  _____  _____   _____
12  _____  _____   _____
13  _____  _____   _____
14  _____  _____   _____
15  _____  _____   _____
16  _____  _____   _____
17
18        _____
19             TERRY ANTHONY STAFFORD
20
21
22  _____
       Notary Public
23  My commission expires: _____
24
25
```